UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| DR. DANIEL HALLER and LONG ISLAND SURGICAL PLLC,<br><br>        Plaintiff,<br><br>  – against –<br><br>U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, 200 Independence Avenue SW, Washington, DC 20201, et al.,<br><br>        Defendants. | Case No. 21-cv-7208-AMD-AYS<br><br>**DECLARATION OF**<br>**DR. DANIEL HALLER**<br>**IN SUPPORT OF PLAINTIFFS'**<br>**MOTION FOR A TEMPORARY**<br>**RESTRAINING ORDER AND**<br>**<u>PRELIMINARY INJUNCTION</u>** |

Dr. Daniel Haller, hereby declares pursuant to 28 U.S.C. § 1746:

1. I am a Plaintiff in this action, and I am the President and 100% owner of Plaintiff Long Island Surgical PLLC ("Long Island Surgical"). I respectfully submit this Declaration in support of Plaintiffs' motion for a preliminary injunction prohibiting enforcement of the federal No Surprises Act, Pub. L. 116-260 (the "Act") and the regulations implementing the Act, and for a temporary restraining order prohibiting their enforcement while the motion is being heard and determined.

2. This declaration is made upon my personal knowledge of the facts and circumstances set forth herein.

3. I earned my medical degree in 2006 from the Technion – Israel Institute of Technology, Faculty of Medicine. I completed my residency in general surgery at Maimonides Medical Center, and my fellowship in surgical critical care at North Shore-Long Island Jewish Health System. I am board-certified in both general surgery and surgical critical care by the

American Board of Surgery. I am a fellow of the American College of Surgeons and an Adjunct Clinical Associate Professor of Surgery, teaching both students and residents.

4. I specialize in general surgery and acute care surgery, which includes general surgery, trauma and critical care surgery. Among other things, as an acute care surgeon I perform a wide range of services and procedures for urgent medical conditions when patients require either short or long-term treatment for a severe illness or injury in addition to services provided during their recovery period. . Critical care deals with the sickest patients in the hospital and requires 24 hour a day attention to meet their medical needs. During the first wave of COVID-19 in March of 2020 we managed two intensive care units in two different hospitals, taking care of over 40 patients a day, while risking our lives during a time of extreme uncertainty on how to safely care for our patients, ourselves and our families.

5. Long Island Surgical is a general and acute care surgical private practice in Rockville Centre, New York. We provide individualized and high-quality services to each patient, whether a consult, surgery, and/or follow up. Patients receive their provider's cell phone number with 24 hour, seven-days-a-week access to discuss their clinical needs. Long Island Surgical employs six physicians who have over forty combined years of clinical experience. The practice offers traditional, laparoscopic, and robotic services to best meet the needs of each patient. Additionally, our surgeons offer their time and effort to ensure the best possible patient outcomes. Our surgeons engage in high quality peer review and performance improvements meetings to ensure high quality patient care. Our surgeons are affiliated with hospitals in Long Island, including Mercy Hospital, Mount Sinai South Nassau, and St. Joseph Hospital, and cooperate with many other doctors and specialists.

6. I and the other surgeons at Long Island Surgical perform approximately 2,700 emergency consultations and surgical procedures each year for patients admitted to hospitals through their emergency departments.

7. Around 78% of the patients that I and Long Island Surgical treat each year are covered by health insurance plans with whom we have no contractual relationship. We are therefore "out-of-network" providers with respect to these insurers.

**Effects of The Federal No Surprises Act**

8. A large majority of the out-of-network services I and my colleagues at Long Island Surgical provide are subject to the balance billing prohibition for patients with health insurance covered by the Act. The Act applies to most emergency services, including those provided in hospital emergency rooms, inpatient settings and urgent care centers that are licensed to provide emergency care. Other out-of-network services that I and Long Island Surgical provide are non-emergency medical services in which I or one of my colleagues is out-of-network, but the facility in which we are providing services is in-network for our patient. The Act also broadly defines covered non-emergency services to include treatment, equipment and devices, and preoperative and postoperative services, all services that I and Long Island Surgical often render. Under the Act, patients cannot consent to being balanced billed for either emergency services or many other services I and my Long Island Surgical colleagues provide, despite the fact that, because of our reputation, patients often seek us out for their emergency care.

9. Since January 1, 2022, when the Act went into effect, I and the other providers at Long Island Surgical have provided out-of-network services subject to reimbursement through the

Act's independent dispute resolution ("IDR") process, and we will continue to provide out-of-network services that are subject to reimbursement through that process.

10. I expect that the rates I and my Long Island Surgical colleagues submit to out-of-network health plans will generally not be the amount closest to the qualifying payment amount ("QP A") under the Act. I therefore do not expect that the issue of a reasonable reimbursement rate for out-of-network services provided by me and the other Long Island Surgical providers can in most cases be resolved solely by reference to the QPA. My level of training, and the level of training of my colleagues, all of whom are fellowship-trained, is well above-average, and the surgical services we provide are often highly complex due to the acuity of the patients. Therefore, the QP A will often be well below the true median contracted rate as paid in the marketplace because the QPA fails to account for the severity of the patient's condition(s) or the difficulty of the treatment(s). We at Long Island Surgical often operate on the most acute and sickest patients at the hospitals where we practice, and during all hours of the day, including nights, weekends, and holidays.

11. Upon information and belief, now that the Act is in effect, providers will need to first find out the patient's insurance status and then submit the out-of-network bill directly to the health plan. Health plans must respond within 30 days, advising the provider of the applicable in-network amount for that claim, generally based on the median in-network rate the plan pays for the service. The health plan will send an initial payment or notice of denial to the provider and send the consumer a notice that it has processed the claim. Either side has 30 days to initiate a 30-day "open negotiation" period. If the parties cannot agree by the last day of the open negotiation period, either party may initiate the IDR process within four business days after the close of the open negotiation period. The parties may jointly select an IDR arbitration service provider or a

service provider will be selected for them, within 6 business days following the notice of IDR initiation. In IDR arbitration, each party must submit their best and final offer, and the independent arbitrator must select one of the offers, a so-called "baseball-style" process in which the IDR entity can only pick from one of two competing offers without modification. While the time deadlines in the act might seem like a good idea, they are unrealistic and will be difficult to keep track of and adhere to, especially since in our experience, the insurance companies do not have dedicated personnel to negotiate claims or even answer questions that providers may have in a timely fashion.

12. As required by the Act, I and my colleagues at Long Island Surgical would engage in open negotiation with out-of-network insurers for a reasonable out-of-network reimbursement rate. However, as discussed above, because the rules implementing the Act default to the QPA, the bargaining power of the health plans has dramatically increased. Therefore, as a result of the Act, negotiation alone is less likely to resolve rate disputes. If negotiation does not succeed, I and my colleagues will work with Long Island Surgical administrative staff to submit claims under the Act's IDR process. An IDR arbitrator will then determine the reimbursement rate that Long Island Surgical receives, defaulting to the QPA.

13. Based on my experience with the New York State Emergency Medical Services and Surprise Bill Act (the "New York Act"), I expect that Long Island Surgical will have to participate in tens of thousands, of IDRs under the Act in the coming years.

14. In that regard, Long Island Surgical must navigate the new IDR program and the administrative burdens and costs associated with the program. We have started the process of hiring additional administrative staff to deal with the impending IDR arbitrations should the Act continue to go into effect without the Court's intervention. This problem is acute because, as discussed above, the deadlines provided for under the Act are strict.

15. We must compete with other independent practices to hire individuals who are proficient with the new regulations and procedures of the Act, and who are in short supply, thereby making staffing difficult and expensive. Our current administrative staff numbers nine, and we anticipate needing to hire at least six to ten more professionals. It will therefore take up an enormous amount of my and Long Island Surgical staff's time and effort to properly prepare to meet the Act's requirements, and more importantly, to receive fair compensation for services provided. As one example of severe underpayment, Long Island Surgical received $238 for a hernia repair surgery, which thus far has taken up two years of challenges and appeals.

16. Another aspect of the Act's effects on our practice is that physicians are now required to make available to each patient who is enrolled in a health plan a disclosure regarding the Act's protections against balance billing. Typically, when dealing with an out-of-network patient, the patient completes an assignment of benefits form ("AOB") requiring his or her health insurance provider to pay the provider directly. In our experience, even with a signed AOB from the patient, the insurer still chooses to send payment checks to the patient as reimbursement instead of directly to the provider, causing additional burden on the practice and staff to obtain any payment at all for those services. In addition, the AOB should allow the provider, such as my colleagues and me, with the opportunity to negotiate directly with the out-of-network insurer in a more efficient manner and increases the bargaining position of the provider with respect to the insurer. I estimate that as many as 99% of Long Island Surgical's out-of-network patients provide AOBs when requested. However, patients are becoming increasingly reluctant to sign an AOB with Long Island Surgical because they know that, under the Act, they cannot in any case be billed for any outstanding balance. Should this trend continue and grow, the lack of AOBs will severely

limit our ability to negotiate directly with out-of-network insurers, further eroding our bargaining position.

17. Similarly, the Act also requires disclosure to certain patients seeking non-emergency surgery as to how much in theory they would be billed for the procedure if their out-of-network provider does not pay the unnegotiated bill in full. This disclosure is required notwithstanding that (a) the out-of-network non-emergency patient will in most cases have out-of-network benefits, (b) we are likely negotiating with the out-of-network insurer to obtain coverage for the procedure at an agreed upon rate, and (c) the patient will likely end up paying little if anything additional out-of-pocket. It has been our experience recently that this mandated disclosure is scaring off out-of-network, non-emergency surgical patients and causing them to seek in-network providers, who may be less qualified or have worse clinical outcomes, but who do not have to make a similar disclosure, when the disclosure in any event does not reflect the reality of what that patient will in fact pay for our services. Patients therefore elect and pay for increased coverage that allows them to utilize the services of out-of-network providers, but are now being unnecessarily dissuaded from exercising their contracted rights. This will cause me and my colleagues to lose out-of-network, non-emergency surgical patients at a rate that will be difficult to calculate.

18. I declare under penalty of perjury that the foregoing is, to my knowledge and understanding, true and correct.

_____
Dr. Daniel Haller

Sworn to before me on this

24th day of March, 2022

_____
Notary Public

DAVID REICH
Notary Public, State of New York
Registration No. 02RE4989171
Qualified in Queens County
Commission Expires February 15, 2026

8