IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

_____

DR. DANIEL HALLER and LONG
ISLAND SURGICAL PLLC,

          Plaintiffs,

          v.

U.S. DEPARTMENT OF HEALTH AND
HUMAN SERVICES, *et al.*,

          Defendants.

_____

)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 2:21-cv-07208-AMD

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION AND IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................... 1

BACKGROUND .................................................................................................................... 4

I.     Providers' surprise billing practices have imposed devastating financial consequences on patients and have driven up the cost of health care. ......................................................4

II.    New York enacted the New York State Emergency Medical Services and Surprise Bill Law in 2014. ...................................................................................................................7

III.   Congress enacted the No Surprises Act to protect patients from predatory billing practices and to control health care costs. ..............................................................................8

IV.   The Departments issued rules to implement the Act's framework to protect patients and to control health care costs. .........................................................................................13

V.    This litigation is brought. .......................................................................................16

LEGAL STANDARDS ........................................................................................................ 16

ARGUMENT ....................................................................................................................... 18

I.     Plaintiffs fail to demonstrate a likelihood of success on the merits and fail to state a claim. ....................................................................................................................................18

     A.    The No Surprises Act does not offend Article III. ................................................ 18

          i.     Overview of the "public rights" doctrine .................................................. 18

          ii.    Congress permissibly created an arbitration process in § 300gg-111(c) to adjudicate a newly-created right for out-of-network providers to recover directly from health plans and insurers.................... 21

          iii.   The right of out-of-network health care providers to recover from health plans and insurers flows from the federal statutory scheme and is integral to the purposes of the No Surprises Act to rein in health care costs. ................................................................................... 23

          iv.   The arbitration process decides streamlined and specialized questions of fact that are suitable for resolution outside of Article III procedures. ......................................................................................... 25

     B.    The No Surprises Act does not offend the Seventh Amendment. ........................ 26

     C.    The No Surprises Act preempts state common law claims for surprise bills.......................................................................................................................... 28

i

D. The No Surprises Act does not offend due process or effect an unconstitutional taking. ........................................................................... 29

i. Plaintiffs' due process claim rests on a misunderstanding of the No Surprises Act's text and structure. ............................................. 29

ii. Plaintiffs lack a legally cognizable property interest in future claims, causes of action, or future business expectations. ....................... 31

iii. At any rate, Plaintiffs' takings claim is not ripe. ..................................... 33

E. There is no live dispute concerning the regulation. .............................................. 34

II. Plaintiffs have not shown any risk of irreparable harm that would be remedied by the injunctive relief they seek. ......................................................................................... 37

III. The equities and the public interest disfavor injunctive relief. ..........................................39

CONCLUSION ....................................................................................................................... 40

## TABLE OF AUTHORITIES

**Cases**

*Able v. United States,*
   44 F.3d 128 (2d Cir.1995) ................................................................................. 17

*American Corn Growers Association v. EPA,*
   291 F.3d 1 (D.C. Cir. 2002) ............................................................................... 36

*Animal Welfare Inst. v. Romero,*
   No. 17-CV-6952, 2019 WL 959675 (E.D.N.Y. Feb. 26, 2019) ............................. 17

*Arizona v. United States,*
   567 U.S. 387 (2012) .......................................................................................... 28

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) .......................................................................................... 17

*Atlas Roofing Co. Inc., v. OSHA,*
   430 U.S. 442 (1977) ............................................................................... 19, 21, 27

*Barr v. Am. Ass'n of Pol. Consultants, Inc.,*
   140 S. Ct. 2335 (2020) ...................................................................................... 29

*Broecker v. N. Y. City Dep't of Educ.,*
   No. 21-cv-6387 (KAM)(RLM), 2021 WL 5514656 (E.D.N.Y. Nov. 24, 2021) ..................... 39

*Buffalo Emergency Assocs., LLP v. Aetna Health, Inc.,*
   145 N.Y.S.3d 446 (N.Y. App. Div),
   *leave to appeal denied,* 37 N.Y.3d 916 (2021) ................................................ 8, 23

*Chrebet v. Cnty. of Nassau,*
   24 F. Supp. 3d 236 (E.D.N.Y. 2014),
   *aff'd sub nom. Chrebet v. Nassau Cnty.,* 606 F. App'x 15 (2d Cir. 2015) ............................. 32

*Cienega Gardens v. United States,*
   331 F.3d 1319 (Fed. Cir. 2003) ......................................................................... 33

*Citibank, N.A. v. Citytrust,*
   756 F.2d 273 (2d Cir. 1985) .......................................................................... 38, 39

*College Savings Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.,*
   527 U.S 666 (1999) ........................................................................................... 32

*Commodity Futures Trading Comm'n v. Schor,*
   478 U.S. 833 (1986) .................................................................................. *passim*

*Costello v. McEnery*,
    767 F. Supp. 72 (S.D.N.Y. 1991)................................................................ 38

*Costello v. Town of Fairfield*,
    811 F.2d 782 (2d Cir. 1987).................................................................... 33

*Crowell v. Benson*,
    285 U.S. 22 (1932)................................................................... 19, 21, 26

*DeFabio v. E. Hampton Union Free Sch. Dist.*,
    658 F. Supp. 2d 461 (E.D.N.Y. 2009) ........................................................ 31

*Doe v. U. S. Merch. Marine Acad.*,
    307 F. Supp. 3d 121 (E.D.N.Y. 2018) ....................................................... 16

*Duke Power Co. v. Carolina Envtl. Study Grp., Inc.*,
    438 U.S. 59 (1978)............................................................................ 33

*Freedom Holdings, Inc. v. Spitzer*,
    408 F.3d 112 (2d Cir. 2005).................................................................. 37

*Germain v. Conn. Nat. Bank*,
    988 F.2d 1323 (2d Cir. 1993)................................................................ 28

*Gill v. Whitford*,
    138 S. Ct. 1916, 1934 (2018)............................................................... 40

*Granfinanciera v. Nordberg*,
    492 U.S. 33 (1989)................................................................... 19, 27, 28

*GSGSB, Inc. v. New York Yankees*,
    No. 91-cv-1803-SWK, 1995 WL 507246 (S.D.N.Y. Aug. 28, 1995) ..................... 27

*In re Border Infrastructure Envtl. Litig.*,
    915 F.3d 1213 (9th Cir. 2019) .............................................................. 36

*In re Series 7 Broker Qualification Exam Scoring Litig.*,
    548 F.3d 110 (D.C. Cir. 2008)........................................................... 28, 29

*Kaye v. Whalen*,
    405 N.Y.S.2d 682 (1978)..................................................................... 32

*Knick v. Twp. of Scott*,
    139 S. Ct. 2162 (2019)....................................................................... 33

*Lanier v. BATS Exch., Inc.*,
    105 F. Supp. 3d 353 (S.D.N.Y. 2015),
    *aff'd on other grounds*, 838 F.3d 139 (2d Cir. 2016)................................... 29

*Livery Round Table, Inc. v. New York City FHV & Limousine Comm'n*,
  No. 18-cv-2349 (JGK), 2018 WL 1890520 (S.D.N.Y. Apr. 18, 2018) ................................... 39

*Local 342, Long Island Pub. Serv. Emps. v. Town Bd. of Huntington*,
  31 F.3d 1191 (2d Cir. 1994) ................................................................................................ 32

*Majorica, S.A. v. R.H. Macy & Co.*,
  762 F.2d 7 (2d Cir.1985) ...................................................................................................... 38

*Martz v. Inc. Village of Valley Stream*,
  22 F.3d 26 (2d Cir. 1994) .................................................................................................... 33

*Mazurek v. Armstrong*,
  520 U.S. 968 (1997) ............................................................................................................ 17

*Mondou v. N.Y., New Haven, & Hartford R.R. Co.*,
  223 U.S. 1 (1912) ................................................................................................................ 33

*Murray's Lessee v. Hoboken Land & Improvement Co.*,
  59 U.S. 272 (1855) ........................................................................................................ 18, 21

*N. Am. Soccer League, LLC v. U. S. Soccer Fed'n*,
  883 F.3d 32 (2d Cir. 2018) ................................................................................................. 17

*N. Pipeline Const. Co. v. Marathon Pipe Line Co.*,
  458 U.S. 50 (1982) .............................................................................................................. 18

*N.Y. Progress & Prot. PAC v. Walsh*,
  733 F.3d 483 (2d Cir. 2013) .......................................................................................... 17, 39

*N.Y. SMSA Ltd. P'ship v. Town of Clarkstown*,
  612 F.3d 97 (2d Cir. 2010) ................................................................................................. 28

*N. Y. Bay Cap., LLC v. Cobalt Holdings, Inc.*,
  456 F. Supp. 3d 564 (S.D.N.Y. 2020) ................................................................................. 37

*Nken v. Holder*,
  556 U.S. 418 (2009) ............................................................................................................ 39

*Ohr Somayach/Joseph Tanenbaum Educ. Ctr. v. Farleigh Int'l Ltd.*,
  483 F. Supp. 3d 195 (S.D.N.Y. 2020) ................................................................................. 39

*Oil States Energy Servs. LLC v. Greene's Energy Grp. LLC*,
  138 S. Ct. 1365 (2018) ........................................................................................................ 27

*Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*,
  769 F.3d 105 (2d Cir. 2014) ............................................................................................... 17

*R.B. Ventures, Ltd. v. Shane*,
    112 F.3d 54 (2d Cir. 1997)..................................................................................... 27

*Rodriguez v. DeBuono*,
    175 F.3d 227 (2d Cir. 1999)................................................................................... 37

*Ruckelshaus v. Monsanto Co.*,
    467 U.S. 986 (1984)............................................................................................... 34

*Rye Psych. Hosp. Ctr., Inc. v. New York*,
    576 N.Y.S.2d 449 (3d Dep't 1991)........................................................................ 32

*Senape v. Constantino*,
    936 F.2d 687 (2d Cir.1991).................................................................................... 32

*Speedfit LLC v. Woodway USA, Inc.*,
    No. 13-cv-1276-KAM-AKT, 2020 WL 3051511 (E.D.N.Y. June 8, 2020)............ 27

*Stern v. Marshall*,
    564 U.S. 462 (2011) ............................................................................. 18, 19, 21, 25

*Sussman v. Crawford*,
    488 F.3d 136 (2d Cir. 2007)................................................................................... 17

*Tex. Med. Ass'n v. U.S. Dep't of Health & Hum. Servs.*,
    No. 6:21-cv-425-JDK, 2022 WL 542879 (E.D. Tex. Feb. 23, 2022).................... 15, 34, 35, 36

*Thomas v. Union Carbide*,
    473 U.S. 568 (1985).......................................................................................*passim*

*Tough Traveler, Ltd. v. Outbound Prod.*,
    60 F.3d 964 (2d Cir. 1995)............................................................................... 38, 39

*UBS Securities, LLC v. Voegeli*,
    405 F. App'x 550 (2d Cir. 2011) ........................................................................... 37

*UnitedHealthcare Servs., Inc. v. Asprinio*,
    16 N.Y.S.3d 139 (N.Y. Sup. Ct. 2015) .................................................................. 23

*Va. Soc'y for Human Life, Inc. v. FEC*,
    263 F.3d 379 (4th Cir. 2001) ................................................................................. 40

*Walentas v. Lipper*,
    862 F.2d 414 (2d Cir.1988).................................................................................... 33

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008).............................................................................................. 16, 17

**Statutes**

5 U.S.C. § 8902 ................................................................................................ 9

29 U.S.C. § 1144 .............................................................................................. 8

42 U.S.C. § 300gg-111 .............................................................................. *passim*

42 U.S.C. § 7491 ............................................................................................ 37

42 U.S.C. § 300gg-131 ........................................................................ 9, 28, 29

42 U.S.C. § 300gg-132 ........................................................................ 9, 28, 29

Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, 134 Stat. 1182 (2020)............ 9, 13

Cal. Health & Safety Code § 1371.9 ............................................................... 8

N.Y. Fin. Serv. Law § 601 .............................................................................. 1

N.Y. Fin. Serv. Law § 602 .............................................................................. 8

N.Y. Fin. Serv. Law § 604 .............................................................................. 7

N.Y. Fin. Serv. Law § 605 .............................................................................. 8

N.Y. Fin. Serv. Law § 606 .............................................................................. 8

Tex. Ins. Code Ann § 751.001 ....................................................................... 8

**The Constitution**

U.S. Const. amend. VII .................................................................................. 26

**Legislative Materials**

*Examining Surprise Billing: Protecting Patients from Financial Pain: Hearing Before the H. Comm. on Educ. and Labor, Subcomm. on Health, Employment, Labor and Pensions*, 116th Cong. 8 (2019) ........................................................................... 5, 7

H.R. REP. No. 116-615, pt. I, at 53 (Dec. 2, 2020) ............................... 7, 12, 24

**Regulations**

45 C.F.R. § 149.510 ................................................................................. *passim*

86 Fed. Reg. 36,872 (July 13, 2021).......................................................... 4, 5, 13

86 Fed. Reg. 55,980 (Oct. 7, 2021).......................................................... 13, 14, 24

**Other Authorities**

Eric C. Sun et al., *Assessment of Out-of-Network Billing for Privately Insured Patient s Receiving Care in In-Network Hospitals*, 179 JAMA INTERN. MED. 1543 (2019) ................... 6

Erin L. Duffy et al., *Policies to Address Surprise Billing Can Affect Health Insurance Premiums*, 26 AM. J. MANAGED CARE 401 (2020) ................................................................. 5, 7

Erin L. Duffy et al., *Prevalence and Characteristics of Surprise Out-Of-Network Bills From Professionals in Ambulatory Surgery Centers*, 39 HEALTH AFFAIRS 783, 785(2020).......... 6

Federal Independent Dispute Resolution (IDR) Process Guidance for Certified IDR Entities, (Apr. 12, 2022), https://www.cms.gov/sites/default/files/2022-04/Revised-IDR-Process-Guidance-Certified-IDREs.pdf ............................................................................................... 15

Sarah Kliff, *Surprise Medical Bills, the High Cost of Emergency Department Care, and the Effects on Patients*, 2019 JAMA INTERN. MED. 1457 (2019)...................................... 6

Zack Cooper et al., *Out-of-Network Billing and Negotiated Payments for Hospital-Based Physicians*, 39 HEALTH AFFAIRS 24 (Jan. 2020)............................................................ 5, 6, 7

Zack Cooper et al., *Surprise! Out-Of-Network Billing for Emergency Care in the United States*, 128 J. POL. ECON. 3626 (2020) ............................................................................. 6, 7

For the reasons stated below, the Defendants respectfully request that the Court deny Plaintiffs' Motion for a Preliminary Injunction and dismiss this case for failure to state a claim.

## INTRODUCTION

Millions of Americans, at one time or another, may face a critical decision whether to seek health care services "in network" or "out of network," that is, from a provider that is under contract with the patient's health plan or insurer, or from a provider that is not. As anyone familiar with group health plans and health insurance can attest, the cost difference between receiving care from an in-network versus an out-of-network provider can be substantial. And, in many cases, a patient might not be able to avoid these costs by choosing an in-network provider.

For example, in an emergency, the patient might be given medical care by a provider that turns out not to be in-network. Or the patient might carefully schedule a procedure at an in-network facility but, unbeknownst to him or her, a portion of the service could be performed by an out-of-network provider. Cases like these have often led to staggering, and sometimes ruinous, medical bills. What is more, this phenomenon of surprise billing has also inflated the cost of in-network care, because many providers have simply refused to negotiate for fair payment rates in advance, with the awareness that they could fall back on the option of demanding exorbitant out-of-network payments.

Over the years, many states have attempted to control the spiraling cost of these surprise medical bills. In 2014, New York passed the Emergency Medical Services and Surprise Bill Law. N.Y. Fin. Serv. Law § 601 *et seq*. The law protects patients with state-regulated health insurance plans from surprise medical bills by requiring that patients pay only the cost-sharing amounts that they would have been charged had they seen an in-network provider instead of an out-of-network provider, and by requiring out-of-network providers to negotiate and recover their fees directly from health plans. If negotiations between providers and health plans fail to yield an agreement on payment, the New York law creates an independent dispute resolution ("IDR") process where providers and health plans can arbitrate to reach a final payment amount. But the New York law

does not extend to cover self-funded health plans regulated under the Employee Retirement Income Security Act ("ERISA"), leaving New Yorkers covered by those plans vulnerable to surprise medical bills.

In late December 2020, Congress enacted the No Surprises Act ("NSA," or the Act). The principal aim of the NSA is to address this "surprise billing" problem at a nationwide level. The NSA, like the New York law, limits a patient's share of the cost of emergency services delivered by out-of-network providers, or of the cost of non-emergency services provided by out-of-network providers in in-network facilities and for which patients do not consent. The Act also addresses how a payment dispute between an out-of-network provider and a health plan or insurer will be resolved. The Act creates an arbitration mechanism whereby each party submits its proposed payment amount and an independent, private arbitrator, known as a "certified IDR entity," will select between the two. Congress also directed the Departments that are the Defendants in this suit to create rules to establish this arbitration process.

The principal provisions of the Act went into effect on January 1 of this year, and the arbitration of payment disputes began in April. But providers, as well as insurers and group health plans, needed to plan in advance for their new obligations and responsibilities under the Act. To accommodate this need, the Defendants—the Department of Health and Human Services ("HHS"), the Department of Labor, and the Department of the Treasury ("the Departments"), along with the Office of Personnel Management ("OPM")—published two interim final rules, one in July 2021, and a second one in September 2021.

Plaintiffs here challenge the constitutionality of the Act's prohibition against surprise billing and the Act's IDR process for resolving payment disputes between providers and payors. Specifically, they object to the Act's use of a non-Article III court to arbitrate payment disputes as between providers and health plans or insurers. They contend that this process deprives them of their Seventh Amendment right to a jury trial, violates their procedural due process rights under the Fifth Amendment, and results in an unconstitutional taking of property.

They also take issue with the rules implementing the Act, to the extent that the rules instruct

the arbitrator, when choosing between the competing amounts proposed by the plan or insurer and the provider, to look first to a figure known in the Act as the "qualifying payment amount," or QPA. This amount is generally based on the calculation of the median in-network price for a given medical service—that is, what a health plan or insurer would have paid for the service, on average, if it had been performed by an in-network provider. Plaintiffs contend that the Defendants, in issuing these instructions, unlawfully departed from the text of the Act. They now seek a preliminary injunction invalidating the Act and the rules implementing it on a massive scale, upending the health care and health insurance industry in one fell swoop.

Plaintiffs have not carried their burden on the preliminary injunction factors. Their memorandum does not even address two of the four preliminary injunction factors: the balance of the equities or whether an injunction is in the public interest. That alone should doom their motion. But they also fail to show that they are likely to succeed on the merits or that they will suffer any irreparable harm if the Act continues to govern payment disputes between out-of-network health care providers and health plans or insurers.

Plaintiffs' challenge fails on the merits, for multiple reasons. First, the Act is entirely consistent with the Constitution. In the Act, Congress created for the first time a right of providers to obtain compensation directly from health plans or insurers with which those providers have no contractual relationship. And where Congress creates new rights, especially rights integral to a complex and highly specialized statutory and regulatory framework, it may decide whether those rights are adjudicated in Article III courts or administrative tribunals that do not use juries. The Act also does not deprive Plaintiffs of their due process rights, or constitute an uncompensated taking, because Plaintiffs do not have a property right in any prospective future claims, causes of action, or business transactions. Such claims are premature, at any rate, because Plaintiffs do not allege that they have engaged in the IDR process, or that an arbitrator has awarded them anything less than fair compensation for their services.

Finally, there is no live dispute as to the portions of the interim final rule that Plaintiffs challenge here, as those provisions have been vacated by another court. If this Court addresses the

3

merits of the rule, it should reject Plaintiffs' challenge. The rule comports with the statutory text; both the rule and the statute set forth a series of factors for the arbitrator to consider, beginning with the qualifying payment amount, and then proceeding to what the statute describes as "additional" circumstances. The rule leaves ample room for the arbitrator to incorporate these additional circumstances into his or her decision, in accordance with the statute. And *Chevron* deference is owed to the rule, which was promulgated in response to a Congressional assignment of authority to the Defendants to establish the Act's arbitration process.

For all of these reasons, the Court should deny Plaintiffs' Motion for a Preliminary Injunction and dismiss this case for failure to state a claim.

## BACKGROUND

I.      **Providers' surprise billing practices have imposed devastating financial consequences on patients and have driven up the cost of health care.**

Congress enacted the No Surprises Act to address a "market failure" that has left certain health care providers with little incentive to negotiate fair prices in advance for their services, resulting in exorbitant bills to patients and "highly inflated payment rates" for those services. H.R. REP. NO. 116-615, pt. I, at 53 (Dec. 2, 2020).

Most group health plans and health insurance issuers "have a network of providers and health care facilities (participating providers or preferred providers) who agree by contract to accept a specific amount for their services." *Requirements Related to Surprise Billing: Part I*, 86 Fed. Reg. 36,872, 36,874 (July 13, 2021). "By contrast, providers and facilities that are not part of a plan or issuer's network (nonparticipating providers) usually charge higher amounts" than the in-network rates negotiated between plans or insurers and providers. *Id.* When an individual receives care out of network, the plan or insurer could decline to pay for the services, or could pay an amount lower than the provider's billed charges, leaving the patient responsible for the balance of the bill, a practice known as "balance billing." *Id.*

"A balance bill may come as a surprise for the individual." *Id.* Surprise billing occurs, for example, when a patient receives care from a provider whom the patient could not have chosen in

advance, or whom the patient did not have reason to believe would be outside the network of the patient's insurance plan. *Id.* These bills have arisen most frequently in two circumstances. First, in emergency situations, a patient may be unable to choose which emergency department he or she goes to (or is taken to); even if the patient goes to an emergency department that is in-network, he or she may still receive care from out-of-network providers working at that facility. *Id.* Second, a patient may schedule a medical procedure in advance at an in-network hospital or facility, but may not be aware that providers of ancillary services, such as radiologists, anesthesiologists, or pathologists, are out-of-network. *Id.* "Unlike most medical services, for which patients have an opportunity to seek in-network providers, patients generally are not able to choose these emergency and ancillary providers." Erin L. Duffy et al., *Policies to Address Surprise Billing Can Affect Health Insurance Premiums*, 26 AM. J. MANAGED CARE 401, 401 (2020).

In either of these circumstances, the patient's inability to select in-network providers has created a distortion in the market wherein these providers have little incentive to negotiate fair prices in advance for their services, or to moderate their charges for out-of-network care. "Emergency physicians and anesthesiologists receive a flow of patients based on individuals electing care at the hospital in which they practice. And that volume will be the same regardless of whether the physician is in- or out-of-network. Because volume does not depend on prices set by providers in these no choice specialties, going out-of-network frees them to bill patients at essentially any rate they choose. And, as would be expected, we see that physician specialties that are able to bill out-of-network have extraordinarily high charges compared to other doctors." *Examining Surprise Billing: Protecting Patients from Financial Pain: Hearing Before the H. Comm. on Educ. and Labor, Subcomm. on Health, Employment, Labor and Pensions*, 116th Cong. 8 (2019) (statement of Christen Linke Young, Brookings Inst.).

This market distortion has led to a widespread phenomenon of surprise billing. More than 20 percent of in-network emergency department visits involve care from an out-of-network physician. *See* Zack Cooper et al., *Out-of-Network Billing and Negotiated Payments for Hospital-Based Physicians*, 39 HEALTH AFFAIRS 24, 24 (Jan. 2020). Before the enactment of the No

Surprises Act, this phenomenon of out-of-network billing had been rapidly growing, "becoming more common and potentially more costly in both the emergency department and inpatient settings." Eric C. Sun et al., *Assessment of Out-of-Network Billing for Privately Insured Patients Receiving Care in In-Network Hospitals*, 179 JAMA INTERN. MED. 1543, 1544 (2019). From 2010 to 2016, "the incidence of out-of-network billing increased from 32.3% to 42.8% of emergency department visits, and the mean potential liability to patients increased from $220 to $628. For inpatient admissions, the incidence of out-of-network billing increased from 26.3% to 42.0%, and the mean potential liability to patients increased from $804 to $2040." *Id.*

This has led to unexpected, and devastating, medical bills for patients. "[B]alance bills can be substantial. . . . [T]he mean potential balance bills for anesthesiologists, pathologists, radiologists, and assistant surgeons were $1,171, $177, $115, and $7,420, respectively." Cooper et al., *Out-of-Network Billing and Negotiated Payments for Hospital-Based Physicians*, 39 HEALTH AFFAIRS at 27; *see also* Erin L. Duffy et al., *Prevalence and Characteristics of Surprise Out-Of-Network Bills From Professionals in Ambulatory Surgery Centers*, 39 HEALTH AFFAIRS 783, 785 (2020) (finding 81 percent increase in average amounts of surprise bills at ambulatory surgical centers from 2014 to 2017, from $819 in 2014 to $1,483 in 2017). "Given that nearly half of individuals in the US do not have the liquidity to pay an unexpected $400 expense without taking on debt, these out-of-network bills can be financially devastating to a large share of the population and should be a major policy concern." Zack Cooper et al., *Surprise! Out-Of-Network Billing for Emergency Care in the United States*, 128 J. POL. ECON. 3626, 3627 (2020).

Even these average figures understate the devastating effect that surprise bills have had on some patients. In some cases, patients have faced a $7,924 surprise bill after emergency jaw surgery; a $20,243 surprise bill for emergency care for a bike crash; and a $27,660 bill after being hit by a public bus. Sarah Kliff, *Surprise Medical Bills, the High Cost of Emergency Department Care, and the Effects on Patients*, 2019 JAMA INTERN. MED. 1457, 1457 (2019). "[A]mong the most shocking [examples of balance billing abuses] was a spinal surgery patient who received a bill of $101,000 despite having confirmed that her surgeon was in-network." H.R. REP. NO. 116-

615, pt. I, at 52.

Beyond these financial consequences in individual cases, the market distortion created by surprise billing has had the broader effect of driving up health care costs for all parties. This is because "the ability to bill out of network allows [emergency department] physicians to be paid in-network rates that are significantly higher than those paid to other specialists who cannot readily bill out of network.  These higher payments get passed along to all consumers (including those who do not even access care) in the form of higher insurance premiums." Cooper et al., *Out-of-Network Billing and Negotiated Payments for Hospital-Based Physicians*, 39 HEALTH AFFAIRS at 24. For example, emergency room physicians have been able to command higher in-network payment rates, a phenomenon "caused not by supply or demand, but rather by the ability to 'ambush' the patient." Cooper et al., *Surprise! Out-Of-Network Billing for Emergency Care in the United States*, 128 J. POL. ECON. at 3628. Because emergency department care is so common, this practice "raise[s] overall health spending." *Id.* This has resulted in "commercial health insurance premiums as much as 5% higher than they otherwise would be in the absence of this market failure," Duffy et al., *Policies to Address Surprise Billing Can Affect Health Insurance Premiums*, 26 AM. J. MANAGED CARE at 403, placing a financial burden "on employer plan sponsors as well as individuals." *Examining Surprise Billing: Protecting Patients from Financial Pain: Hearing Before the H. Comm. on Educ. and Labor, Subcomm. on Health, Employment, Labor and Pensions*, 116th Cong. 39 (2019) (statement of Ilyse Schuman, Vice-President, American Benefits Council).

## II.     New York enacted the New York State Emergency Medical Services and Surprise Bill Law in 2014.

Many states have enacted legislation aimed to curb the growing trend of surprise medical bills and rising health care costs. For example, New York, California, and Texas have prohibited balance billing of patients and created independent dispute resolution procedures for providers and health plans to negotiate payments directly without burdening patients.  *See* N.Y. Fin. Serv. Law §§ 604, 605; Cal. Health & Safety Code §§ 1371.9; 1371.30; Tex. Ins. Code Ann § 751.001 *et seq*.

The New York State Emergency Medical Services and Surprise Bill Law was enacted in 2014 and went into effect on March 31, 2015.[1] The New York law protects consumers from surprise bills when treated by an out-of-network provider at a participating hospital or ambulatory surgical center in their health plan's network or when they receive emergency services in hospitals, including inpatient care following emergency room treatment. N.Y. Fin. Serv. Law §§ 602, 603. Under the New York law, patients have to pay only the in-network cost sharing amount (copayment, coinsurance, or deductible) that they would have owed had they been treated by an in-network provider. *Id*. §§ 602(b)(2), 605(a). Providers are not permitted to engage in the practice of "balance billing"—meaning they are not permitted to bill patients for any amount over the patient's in-network cost-sharing amount. *Id*. § 606. Instead, health plans must pay out-of-network providers directly. *Id*. § 605(a)(1).

If the health plan and the provider cannot agree on an amount of payment, the New York law creates an IDR process overseen by a state-approved IDR entity. *Id*. §§ 601; 605(a)(2). The IDR process uses "baseball-style" arbitration, in which both the provider and the health plan submit a proposed payment amount and the IDR entity determines which represents the appropriate payment amount. *Id*. §§ 604; 606. The IDR award is legally binding on the health plan and the provider, and is admissible in any court of law. *Id*. § 606(c). If dissatisfied with the award, the provider is nonetheless prohibited from attempting to recover any amount in excess of the award from the patient directly or from the health plan through a private cause of action. *Id*. § 606; *Buffalo Emergency Assocs., LLP v. Aetna Health, Inc.*, 145 N.Y.S.3d 446, 447 (N.Y. App. Div), *leave to appeal denied*, 37 N.Y.3d 916 (2021).

State surprise billing laws, like New York's, do not apply to self-funded plans due to ERISA preemption. *See* 29 U.S.C. § 1144; N.Y. Fin. Serv. Law § 602(a).

## III.   Congress enacted the No Surprises Act to protect patients from predatory billing practices and to control health care costs.

---

[1] The New York law was recently amended to better align with the federal No Surprises Act. *See* NY LEGIS 57 (2022), 2022 Sess. Law News of N.Y. Ch. 57 (A. 9007-C).

To address abusive surprise billing practices not covered by state laws, and to rein in the cost of health care, Congress enacted the No Surprises Act in December 2020. Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, div. BB, tit. I, 134 Stat. 1182, 2758-2890 (2020).[2] As of its effective date on January 1, 2022, the Act protects patients with private health insurance coverage from unexpected liabilities arising from the most common forms of balance billing. If an insured patient receives emergency care, or if he or she receives care that is scheduled at an in-network facility, health care providers are generally prohibited (absent, in certain circumstances, the patient's consent) from balance billing the patient or holding them liable for medical bills, even if part of his or her care is furnished by an out-of-network practitioner. *See* 42 U.S.C. §§ 300gg-131, 300gg-132.[3] Likewise, health plans may not impose out-of-network cost-sharing responsibilities for any out-of-network services performed in these cases. For example, if the patient's health plan would require a coinsurance of 20% of the cost of an in-network service, the patient's responsibility for any out-of-network service would be limited to the same 20% coinsurance. *See* 42 U.S.C. § 300gg-111(a)(1)(C)(ii), (iii); (b)(1)(A), (B).

Specifically, the patient's coinsurance, co-payments, or other cost-sharing responsibilities for out-of-network services may not exceed his or her financial responsibilities "that would apply if such services were provided by a participating provider or a participating emergency facility." *Id*. § 300gg-111(a)(1)(C)(i), (b)(1)(A). Additionally, these responsibilities are calculated "as if the total amount that would have been charged for such services by such participating provider or participating emergency facility were equal to the recognized amount[.]" *Id.* § 300gg-

---

[2] The Act makes parallel amendments to the Public Health Service Act ("PHSA") (administered by HHS), the Employee Retirement Income Security Act (administered by the Department of Labor), and the Internal Revenue Code (administered by the Internal Revenue Service within the Department of the Treasury). In addition, the Act requires OPM to ensure that its contracts with carriers for federal employee health benefits conform to the same terms as those applicable to other insurers. 5 U.S.C. § 8902(p). For ease of reference, except where otherwise noted, this brief cites only to the Act's amendments to the PHSA.

[3] The No Surprises Act also prohibits out-of-network cost sharing, balance billing, and provides for an arbitration process with respect to services provided by out-of-network providers of air ambulance services.

111(a)(1)(C)(ii), (b)(1)(B). The "recognized amount" is a term of art under the statute. If an All-Payer Model Agreement is in place in a given state, or a specified state law applies with respect to a particular medical service, then the Agreement or the state law will determine the recognized amount. Otherwise, the "recognized amount" is the "qualifying payment amount . . . for such year and determined in accordance with rulemaking . . . for such item or service." *Id.* § 300gg-111(a)(3)(H)(ii); *see also id.* § 300gg-111(a)(2)(B) (directing the Departments to issue rules by July 1, 2021 that set the methodology for determining the qualifying payment amount).

The "qualifying payment amount," in turn, is also a statutory term of art. It is generally defined, for a given item or service and for a given plan or insurer, as "the median of the contracted rates recognized" by the plan or insurer, measured with respect to the payment rates for "the same or a similar item or service that is provided by a provider in the same or similar specialty and provided in the geographic region in which the item or service is furnished," under all of the plans offered by that plan or insurer in a given market. *Id.* § 300gg-111(a)(3)(E)(i)(I). The qualifying payment amount is based on the plan's or insurer's calculation of the median payment rate for its plans as of January 31, 2019, adjusted for inflation. *Id.* The statute thus textually treats the "qualifying payment amount," calculated in this manner, as a reasonable proxy for what the in-network payment rate would have been for a given out-of-network service, for the purposes of calculating an insured patient's cost-sharing responsibilities.

In addition to setting the rules for determining a patient's payment obligations for a particular out-of-network medical service, the Act also establishes a procedure for resolving disputes between health care providers and plans or insurers over the amount of payment for such a service, in which the "qualifying payment amount" again plays a central role. If a state law sets the amount of payment for a nonparticipating provider, the Act specifies that the plan or insurer will make payment in accordance with the state law. *Id.* § 300gg-111(a)(3)(K). Otherwise, the Act specifies that a plan or insurer will issue an initial payment, or a denial of payment, to a provider within 30 calendar days after the provider submits a bill to it for an out-of-network service. *Id.* § 300gg-111(a)(1)(C)(iv), (b)(1)(C). If the provider is not satisfied with this amount, it may initiate

a 30-day period of open negotiation with the insurer over the claim. *Id.* § 300gg-111(c)(1)(A). If those negotiations do not resolve the dispute, the parties may then proceed to an IDR process. *Id.* § 300gg-111(c)(1)(B).

The Act specifies that the Departments "shall establish by regulation," no later than December 27, 2021, "one independent dispute resolution process . . . under which . . . a certified IDR entity . . . determines, . . . in accordance with the succeeding provisions of this subsection, the amount of payment under the plan or coverage for such item or service furnished by such provider or facility." *Id.* § 300gg-111(c)(2)(A). The Act further instructs the Departments to "establish a process" to certify independent dispute resolution entities, *id.* § 300gg-111(c)(4)(A), under which such an entity "meets such other requirements as determined appropriate by the Secretary," *id.* § 300gg-111(c)(4)(A)(vii). The Departments are also instructed to "provide for a method" under which the parties to a dispute either jointly select an IDR entity or defer to the Departments' selection of an entity to hear their dispute, *id.* § 300gg-111(c)(4)(F).

The Act establishes a system of "baseball" arbitration under which both the provider and the plan or insurer will submit a proposed payment amount, with an explanation, and the IDR entity will select one or the other offer as the amount of payment for the item or service that is in dispute, "taking into account the considerations specified in subparagraph (C)." *Id.* § 300gg-111(c)(5)(A). Subparagraph (C) begins by instructing the IDR entity to consider "the qualifying payment amounts (as defined in subsection (a)(3)(E)) for the applicable year for items or services that are comparable to the qualified IDR item or service and that are furnished in the same geographic region (as defined by the Secretary for purposes of such subsection) as such qualified IDR item or service." *Id.* § 300gg-111(c)(5)(C)(i)(I).

Subparagraph (C) then goes on to set forth several examples of "additional information" and "additional circumstances" for the IDR entity to consider. *Id.* § 300gg-111(c)(5)(C)(i)(II), (C)(ii). The "additional circumstances" include: the provider's level of training, experience, and quality and outcomes measurements; the market share of the provider or of the plan or insurer; the acuity of the individual receiving the medical service, or the complexity of that service; the

provider's teaching status, case mix, and scope of services; and a demonstration of the provider's or the plan's or insurer's good faith efforts to enter into network agreements for the service, or the lack of such efforts. *Id.* The "additional information" for the IDR entity to consider includes any "information as requested by the IDR entity relating to such offer," and "any information relating to such offer submitted by either party." *Id.* § 300gg-111(c)(5)(B), (C)(i)(II). The IDR entity may not consider the provider's usual and customary charges for an item or service, the amount the provider would have billed in the absence of the Act, or the reimbursement rates for the item or service under public programs like Medicare or Medicaid. *Id.* § 300gg-111(c)(5)(D). The decision of the IDR entity is binding on the parties, and is subject to judicial review under the circumstances described in the Federal Arbitration Act. *Id.* § 300gg-111(c)(5)(E).

The Act requires the Departments to publish a report for each calendar quarter that states, among other things, "the number of times the payment amount determined (or agreed to) under this subsection exceeds the qualifying payment amount, specified by items and services," and for each dispute decided by an IDR entity, "the amount of such offer so selected expressed as a percentage of the qualifying payment amount. *Id.* § 300gg-111(c)(7)(A)(v), (B)(iv). Certified IDR entities shall submit such information to the Departments as they determine necessary to enable them to carry out these publication requirements. *Id.* § 300gg-111(c)(7)(C).

Congress thus chose an approach to the resolution of provider-payor payment disputes that was "designed to reduce premiums and the deficit." H.R. REP. NO. 116-615, at 58 (Dec. 2, 2020); *see also id.* at 48 (process is structured "to reduce costs for patients and prevent inflationary effects on health care costs"). The Act would not succeed in this goal, however, if arbitrations were to result routinely in payments greater than median in-network payment amounts; such a process would *increase* both federal deficits and health insurance premiums. *See id.* at 57. The Congressional Budget Office ("CBO") scored the Act on the understanding that Congress had avoided this pitfall, predicting that the Act's arbitration procedures will result in "smaller payments to some providers [that] would reduce premiums by between 0.5 percent and 1 percent. Lower costs for health insurance would reduce federal deficits because the federal government subsidizes

most private insurance through tax preferences for employment-based coverage and through the health insurance marketplaces established under the Affordable Care Act." CBO, *Estimate for Divisions O Through FF H.R. 133, Consolidated Appropriations Act 2021, Public Law 116-260 Enacted on December 27, 2020* at 3 (Jan. 14, 2021). In total, the No Surprises Act is expected to achieve $16.8 billion in budget savings, over ten years. *Id*. at 7.

## IV. The Departments issued rules to implement the Act's framework to protect patients and to control health care costs.

Congress instructed the Departments to issue one set of rules no later than July 1, 2021, addressing the No Surprises Act's patient protections, and to issue a second set of rules no later than December 27, 2021, addressing the procedures for resolving payment disputes. 42 U.S.C. §§ 300gg-111(a)(2)(B), (c)(2)(A).

The Departments released their first set of interim final rules on July 1, 2021. *Requirements Related to Surprise Billing: Part I*, 86 Fed. Reg. 36,872 (July 13, 2021). These rules implemented the provisions of the Act that prohibit providers from balance billing their patients for out-of-network medical services in certain situations; limit patients' cost-sharing responsibilities for these services; require providers to make disclosures to patients of federal and state protections against balance billing; codify certain additional patient protections; set forth complaint processes with respect to violations of the Act's balance billing and out-of-network cost sharing protections; and set the methodology for determining the qualifying payment amount. *See id.* at 36,876.

The Departments released a second set of interim final rules on September 30, 2021. *Requirements Related to Surprise Billing: Part II*, 86 Fed. Reg. 55,980 (Oct. 7, 2021). These rules implemented the Act's provisions requiring health care providers to furnish good-faith estimates of the cost of medical services to uninsured individuals; establishing a procedure for these individuals to dispute bills that exceed these good-faith estimates; establishing an external review procedure for insurers' adverse benefit determinations; and clarifying that carriers under the Federal Employees Health Benefits Program generally are subject to the Act's terms. *See id.* at 55,984-87.

These rules also exercise Congress's delegation of authority to the Departments to "establish by regulation one independent dispute resolution process," 42 U.S.C. § 300gg-111(c)(2)(A), for the resolution of disputes between providers, group health plans, and insurers over the amount of payment for out-of-network services. In particular, the rules set forth procedures for IDR entities to be certified, and for providers, group health plans, and insurers to invoke the Act's IDR system. *See* 86 Fed. Reg. at 55,985. The interim final rules also address the factors that the IDR entity should consider in deciding between the competing offers to be submitted by providers and plans or insurers and setting the out-of-network payment amount for a given medical service.

The IDR entity is instructed to "[s]elect as the out-of-network rate . . . one of the offers submitted [by the provider and the plans or insurers], taking into account the considerations specified in paragraph (c)(4)(iii) of this section (as applied to the information provided by the parties pursuant to paragraph (c)(4)(i) of this section)." 45 C.F.R. § 149.510(c)(4)(ii)(A).[4] After taking these considerations into account, the IDR entity "must select the offer closest to the qualifying payment amount unless [it] determines that credible information submitted by either party under paragraph (c)(4)(i) clearly demonstrates that the qualifying payment amount is materially different from the appropriate out-of-network rate, or if the offers are equally distant from the qualifying payment amount but in opposing directions." *Id.*

The considerations that the rule instructs the IDR entity to take into account are: the qualifying payment amount; any information that the IDR entity requests the parties to submit, so long as that information is credible; and any additional information submitted by a party, provided that information is credible, relates to certain specified circumstances as described in the regulation, and "clearly demonstrate[s] that the qualifying payment amount is materially different from the appropriate out-of-network rate." *Id.* § 149.510(c)(4)(iii). Mirroring the statute, the rule

---

[4] The interim final rules set forth parallel regulations implemented by HHS, the Department of Labor, and the Department of the Treasury. For ease of reference, except where otherwise noted, this brief cites only to the HHS regulations.

describes these specified circumstances as (1) the provider's level of training, experience, and quality and outcomes measurements; (2) the provider's and the plan's or insurer's relative market shares in the geographic region where the service was performed; (3) the acuity of the patient, or the complexity of the service; (4) the provider's teaching status, case mix, and scope of services; and (5) the good faith efforts, or the lack thereof, by the provider or by the plan or insurer to enter into in-network agreements for the service, and contracted rates, if any, for the service. *Id.* § 149.510(c)(4)(iii)(C). The IDR entity must also consider any "[a]dditional information submitted by a party," so long as the information is credible, relates to either party's offer, and does not include information on the factors that the IDR entity is prohibited from considering under the statute. *Id.* § 149.510(c)(4)(iii)(D).

For these purposes, the rule defines "credible information" as "information that upon critical analysis is worthy of belief and is trustworthy," *id.* § 149.510(a)(2)(v), and "material difference" as "a substantial likelihood that a reasonable person with the training and qualifications of a certified IDR entity making a payment determination would consider the submitted information significant in determining the out-of-network rate and would view the information as showing that the qualifying payment amount is not the appropriate out-of-network rate," *id.* § 149.510(a)(2)(viii).

Several provisions of the interim final rule were vacated by the Eastern District of Texas on February 23, 2022. *See Tex. Med. Ass'n v. U.S. Dep't of Health & Hum. Servs.*, No. 6:21-cv-425-JDK, 2022 WL 542879 (E.D. Tex. Feb. 23, 2022), *appeal filed* No. 22-40264 (5th Cir. 2022). The agencies are in the process of drafting a final rule providing clarifications to the IDR process and anticipate that they will complete that process early this summer. Meanwhile, arbitrations are commencing, and the agencies have informed IDR entities that they should not apply the vacated portions of the rule. *See* Federal Independent Dispute Resolution (IDR) Process Guidance for Certified IDR Entities, (Apr. 12, 2022), https://www.cms.gov/sites/default/files/2022-04/Revised-IDR-Process-Guidance-Certified-IDREs.pdf.

## V.    This litigation is brought.

Plaintiff Dr. Daniel Haller is an acute care surgeon who practices in Rockville Center, New York. Compl. ¶ 9, ECF No. 1. Plaintiff Long Island Surgical PLLC is a New York professional limited liability company also based in Rockville Center. *Id*. ¶ 10. Plaintiffs perform emergency consultations and surgical procedures on patients admitted to hospitals through emergency departments. *Id*. ¶ 11. Approximately 78% of the patients that they treat each year are covered by health plans with which they have no contractual relationship—in other words, they are "out-of-network." *Id*. ¶ 12. Plaintiffs ask this court for a declaration that three provisions of the No Surprises Act are unconstitutional, and for an injunction prohibiting enforcement of the Act. *Id*. ¶ 1. Plaintiffs contend that the No Surprises Act impermissibly delegates the authority to determine the physician's claims for reimbursement to an administrative tribunal and deprives them of the Seventh Amendment right to a jury trial. *Id*. ¶ 3. They also claim that the Act violates the Due Process Clause of the Fifth Amendment on the theory that the IDR process is unduly influenced by health plans and that the Act effects an unconstitutional taking because it prevents physicians from recovering the balance of the fair value of their services directly from their patients. *Id*. ¶ 3. Plaintiffs also contend that portions of the second interim final rule are contrary to the Act insofar as they create a presumption in favor of the "qualifying payment amount" as the reasonable amount of payment for an out-of-network service. Id. ¶¶ 4-5.

On April 4, 2022—more than fifteen months after the No Surprises Act was signed into law, six months after the interim final rules were promulgated, three months after filing their Complaint, and well after the prohibition on balance billing went into effect—Plaintiffs filed their Motion for a Preliminary Injunction. ECF No. 25.

## LEGAL STANDARDS

"The preliminary injunction 'is one of the most drastic tools in the arsenal of judicial remedies.'" *Doe v. U. S. Merch. Marine Acad.*, 307 F. Supp. 3d 121, 142 (E.D.N.Y. 2018) (citations omitted). It is "is an extraordinary remedy never awarded as of right," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008), "one that should not be granted unless the movant,

*by a clear showing*, carries the burden of persuasion," *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (citation omitted). A plaintiff must establish that four factors have been met: "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2013) (quoting *Winter*, 555 U.S. at 20).

A plaintiff that seeks a mandatory injunction—that is, an injunction that disrupts the status quo—must "meet a heightened legal standard by showing a clear or substantial likelihood of success on the merits." *N. Am. Soccer League, LLC v. U. S. Soccer Fed'n*, 883 F.3d 32, 37 (2d Cir. 2018). Additionally, where a party seeks injunctive relief that "will affect governmental action taken in the public interest pursuant to a statutory or regulatory scheme, the injunction should be granted only if the moving party meets the more rigorous likelihood-of-success standard." *Sussman v. Crawford*, 488 F.3d 136, 140 (2d Cir. 2007) (citations omitted); *see also Animal Welfare Inst. v. Romero*, No. 17-cv-6952, 2019 WL 959675, at *4 (E.D.N.Y. Feb. 26, 2019). This heightened requirement "reflects the idea that governmental policies implemented through legislation or regulations developed through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly." *Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*, 769 F.3d 105, 110 (2d Cir. 2014) (quoting *Able v. United States*, 44 F.3d 128, 131 (2d Cir.1995)).

Dismissal under Rule 12(b)(6) for failure to state a claim is proper when the complaint does not "contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*.

17

**ARGUMENT**

I.   **Plaintiffs fail to demonstrate a likelihood of success on the merits and fail to state a claim.**

    **A.  The No Surprises Act does not offend Article III.**

Plaintiffs' argument as to Count I rests on an inaccurate portrayal of the IDR process and the claims an arbitrator is empowered to hear. Rather than requiring the adjudication of state common law claims before an administrative tribunal, as Plaintiffs claim, the Act instead creates a mechanism to resolve disputes over rights newly-created by Congress—precisely the type of administrative adjudication that courts have blessed for much of the past century. The Act poses no Article III concerns.

**i.   Overview of the "public rights" doctrine**

Article III generally prevents Congress from "withdraw[ing] from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty." *Stern v. Marshall*, 564 U.S. 462, 484 (2011) (quoting *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. 272, 284 (1855)). In other words, non-judicial fora may not be assigned adjudication of "the stuff of the traditional actions at common law tried by the courts at Westminster in 1789." *N. Pipeline Const. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 90 (1982) (Rehnquist, J., concurring). But when Congress creates a new right by statute—i.e., a "public right[]"— "it depends upon the will of [C]ongress whether a remedy in the courts shall be allowed at all," so "Congress may set the terms of adjudicating" that right. *Stern*, 564 U.S. at 489 (citation omitted). The separation of powers is not offended by adjudication of public rights outside the judiciary because, when Congress creates new rights (such as through a novel, comprehensive statutory scheme), it has broad latitude to grant jurisdiction to federal courts or assign adjudication in another forum. *Id.*

The Supreme Court first recognized the category of public rights in *Murray's Lessee*, 59 U.S. 272, in which it held that "Congress may set the terms of adjudicating a suit when the suit could not otherwise have proceeded at all." *Stern*, 564 U.S. at 489. Since the 1850s, the Supreme

18

Court has expanded and elaborated on the reach of the public rights exception. *See Crowell v. Benson*, 285 U.S. 22 (1932) (holding that the adjudication of congressionally created public rights may be assigned to administrative agencies). For example, the Supreme Court long ago "rejected the limitation of the public rights exception to actions involving the Government as a party," instead explaining that it encompasses "cases in which the claim at issue derives from a federal regulatory scheme, or in which resolution of the claim by an expert Government agency is deemed essential to a limited regulatory objective within the agency's authority." *Stern*, 564 U.S. at 490-91; *see also id.* ("[W]hat makes a right 'public' rather than private is that the right is integrally related to particular Federal Government action.").

It does not matter that the dispute may arise between private parties; it is the character of the *right* at issue that renders it amenable to non-judicial resolution. It is now well-established that "when Congress creates new statutory 'public rights,' it may assign their adjudication to an administrative agency." *Atlas Roofing Co. Inc., v. OSHA*, 430 U.S. 442, 455 (1977); *see also Granfinanciera v. Nordberg*, 492 U.S. 33, 54 (1989) (holding that seemingly private rights may actually be public rights permissibly adjudicated by non-Article III tribunals where the right is closely integrated with a public regulatory scheme).

The Supreme Court has previously approved of a statutory scheme requiring that disputes between private parties be decided by arbitration. In *Thomas v. Union Carbide*, pesticide manufacturers challenged a provision in the Federal Insecticide Fungicide and Rodenticide Act ("FIFRA") that required disputes about compensation under a data-sharing arrangement to be decided by binding arbitration. 473 U.S. 568, 585 (1985). The arbitrator's decision was subject to judicial review only for "fraud, misrepresentation, or other misconduct." *Id*. at 573-74. The pesticide manufacturers argued that because FIFRA conferred a "private right" to seek compensation from a private company, it required "either Article III adjudication or review by an Article III court sufficient to 'retain the essential attributes of the judicial power.'" *Id*. at 585. The Court disagreed. It concluded that because the use of the data served a public purpose as an integral part of a program safeguarding the public health, Congress had the power, under Article I, to

authorize an agency to assign costs without providing an Article III adjudication. *Id*. at 571-75. The fact that the dispute centered between two private parties did not remove it from the framework of public rights, which Congress could properly assign to mandatory arbitration for adjudication. *Id*.

The Supreme Court thus held that the scheme did not violate Article III, explaining that "Congress, acting for a valid legislative purpose pursuant to its constitutional powers under Article I, may create a seemingly 'private' right that is so closely integrated into a public regulatory scheme as to be a matter appropriate for agency resolution with limited involvement by the Article III judiciary. To hold otherwise would be to erect a rigid and formalistic restraint on the ability of Congress to adopt innovative measures such as negotiation and arbitration with respect to rights created by a regulatory scheme." *Id*. at 593-94.

The year after *Thomas*, the Supreme Court held that even traditional common law claims may be appropriately adjudicated in non-Article III tribunals when the congressional scheme does not "impermissibly intrude on the province of the judiciary." *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 851-52 (1986). In *Schor*, the Supreme Court considered a statutory scheme that created a procedure for customers injured by a broker's violation of the federal commodities law to seek reparations from the broker before the Commodity Futures Trading Commission ("CFTC"). A disgruntled customer filed a claim with the CFTC to recover a debit from his account, while the broker filed a common law counterclaim to recover the same amount as lawfully due from the customer. *Id*. at 837-38. Rather than adopt a formalist approach requiring all common law claims to be adjudicated in Article III tribunals, the Court weighed a number of factors, "with an eye to the practical effect that the congressional action will have on the constitutionally assigned role of the federal judiciary." *Id*. at 851. The Court held that the adjudication of common law counterclaims in the CFTC did not violate Article III because the CFTC's authority involved only a "narrow class of common law claims" in a "particularized area of law" and the area of law in question was governed by "a specific and limited federal regulatory scheme" as to which the agency had "obvious expertise." *Id*. at 855-56.

Today, "public rights" fall into several, often overlapping, categories. First, public rights include those causes of action that "can be pursued only by the grace of the other branches" or that "historically could have been determined exclusively by" those branches, such as rights created by Congress that did not exist at common law. *Stern*, 564 U.S. at 493 (citing *Murrays's Lessee*, 59 U.S. at 284). Second, public rights may "flow from a federal statutory scheme," such as when the right at issue is dependent upon adjudication of a claim created by federal law. *Id.* (citing *Thomas*, 473 U.S. at 584-85, *Atlas Roofing*, 430 U.S. at 458, and *Schor*, 478 U.S. at 856). Finally, a right may be a "public right" if the claim is limited to a "particularized area of law" and "Congress devised an 'expert and inexpensive method for dealing with a class of questions of fact which are particularly suited to examination and determination by an administrative agency specially assigned to that task.'" *Id.* (citing *Crowell*, 285 U.S. at 46, *Thomas*, 473 U.S. at 584, and *Schor*, 478 U.S. at 855-856); *see also Schor*, 478 U.S. at 852-53 (holding that among the factors that the Supreme Court considers when determining if a public right is appropriately divested of Article III courts are "the extent to which the non-Article III forum exercises the range of jurisdiction and powers normally vested only in Article III courts, the origins and importance of the right to be adjudicated, and the concerns that drove Congress to depart from the requirements of Article III").

Whether the congressionally created right of providers to recover payments from health plans under the No Surprises Act is properly one delegated to an administrative, rather than Article III tribunal, is easily answered by the Supreme Court's precedents. Under this test, Congress was well within its rights to delegate its newly-created right to an administrative tribunal.

> ii. **Congress permissibly created an arbitration process in § 300gg-111(c) to adjudicate a newly-created right for out-of-network providers to recover directly from health plans and insurers.**

Plaintiffs contend that Congress "has no authority to require that the plaintiffs' claims for the reasonable value of the services they have provided to patients be determined by the 'independent dispute resolution process' established by the Act." Compl. ¶ 55. Plaintiffs acknowledge, as they must, that "Congress can require that a right it has created be adjudicated by

an administrative tribunal it creates." *Id*. ¶ 52. Yet they mistakenly assert that the right of an out-of-network provider to payment from a plan or insurer falls outside this category, claiming instead that it is a "right created by the common law of the State of New York" that cannot be decided outside of an Article III court. *Id*. ¶ 53. Not so. The congressionally created right to be adjudicated in the IDR process falls squarely within the category of "public rights" that Congress may assign to an administrative tribunal for adjudication.

Plaintiffs' claim rests on a misunderstanding of the nature of the disputes presented to the IDR entity. The No Surprises Act created new rights, and Congress assigned adjudication of those newly-created rights to the IDR entity. The arbitrator does not decide providers' common law claims of *quantum meruit* that they could have previously brought against their patients. The IDR process instead determines the value of out-of-network providers' newly-created right to payment from health plans and insurers. The right was created by Congress as part of a highly technical statutory scheme to regulate the nationwide health care industry. The rights of both providers and health plans and insurers under this scheme are quintessential public rights, created by a comprehensive and well-established statutory and regulatory system, and of precisely the same character as the administrative proceedings cited approvingly in *Thomas*. See 473 U.S. at 587-89.

The No Surprises Act permits health care providers to recover payments directly from health plans and insurers with which they have no pre-existing contractual agreement. 42 U.S.C. §§ 300gg-111(a)(1)(C)(iv), (b)(1)(C), (c)(1)(A). It therefore creates a new right—the right of out-of-network health care providers to seek payment directly from health plans and insurers—that did not previously exist in the common law. Prior to the No Surprises Act and the similar New York state law, out-of-network providers could not have sued health plans or insurers in state or federal court because they had not rendered any services to the health plan or insurer itself (making unavailable the claim of *quantum meruit*) nor did they have a contract with the health plan or insurer that they could sue on (hence why the provider was out-of-network). In cases where the federal law applies, it is the No Surprises Act itself that creates a health care provider's right to recover payments directly from a health plan or insurer (and the corresponding legal obligation of

the health plan or insurer to pay a provider with whom that plan had no contractual relationship). *See, e.g., UnitedHealthcare Servs., Inc. v. Asprinio*, 16 N.Y.S.3d 139, 142 (N.Y. Sup. Ct. 2015) (holding that "absent an applicable statute or a contractual agreement between the insurer and the health care provider, there is no legal basis upon which the Court may properly compel" the provider to accept payment from the health insurer).

Under New York common law, health care providers have no private right of action to recover directly from health plans. Shortly after the New York Emergency Medical Services and Surprise Bill Law was enacted, a group of physicians, dissatisfied with the compensation they received from the health plan through New York's IDR process, sued a health plan directly in New York State court. The court dismissed the action, "rejecting, among other things, plaintiffs' argument that the common-law claims that were asserted existed independent of" the New York surprise billing law. *Buffalo Emergency Assocs., LLP*, 195 A.D.3d at 1404-05. The First Department affirmed, similarly concluding that the New York law "does not provide for a private right of action to enforce its provisions, and" because no common law cause of action existed to sustain the lawsuit, "the court properly dismissed the [amended] complaint as an improper effort to 'circumvent the legislative preclusion of private lawsuits' for violation of the [New York law]." *Id*. (citation omitted). To the extent that Plaintiffs contend that New York common law provides a right to recover directly from health plans, their argument has been rejected by New York courts, which are the definitive source of authority on state law. "[T]he origins . . . of the right to be adjudicated" in the IDR process thus demonstrate that it is a congressionally created "public right." *Schor*, 478 U.S. at 851.

> ### iii.   The right of out-of-network health care providers to recover from health plans and insurers flows from the federal statutory scheme and is integral to the purposes of the No Surprises Act to rein in health care costs.

The right adjudicated by the IDR entity is a public right for a second reason: the statutory arbitration scheme serves Congress's purpose as an integral part of a program designed to reduce surprise medical bills and lower health care costs. "[T]he congressional purpose behind the

jurisdictional delegation, [and] the demonstrated need for the delegation" demonstrate why the right created by the Act is a "public right" that can be adjudicated by an administrative tribunal. *Schor*, 478 U.S. at 855. Congress created a process in which the payment that a plan or insurer owes to an out-of-network provider is determined on the papers, and on a compressed timeline, rather than through the lengthy and expensive procedures of discovery and trial under the federal rules. *See* 42 U.S.C. § 300gg-111(c)(5) (requiring arbitrator to select offer, on the basis of paper submissions from the parties, within 30 days). By definition, the amount of the payment owed to the provider is the amount determined by the arbitrator in this expedited process. *See id.* § 300gg-111(a)(3)(K). "[D]ue regard must be given in each case to the unique aspects of the congressional plan at issue and its practical consequences in light of the larger concerns that underlie Article III." *Schor*, 478 U.S. at 857. The IDR process is an essential part of a broad statutory program that requires providers and health plans to bypass patients and deal directly over health care costs in an efficient manner. *See* H.R. Rep. No. 116-615, at 48, 58 (IDR process is structured "to reduce costs for patients and prevent inflationary effects on health care costs").

As discussed above, protecting patients from surprise medical bills was a primary goal of the No Surprises Act, but Congress also sought to address the spiraling cost of health care coverage overall. Predictability and efficiency in the IDR process will have the effect of lowering the transaction costs of arbitrations that otherwise would be borne by patients in the form of higher premiums. *See* 86 Fed. Reg. at 55,996. Without an efficient and streamlined IDR process, Congress's desire to create a low-cost, efficient means of dispute resolution, and its goal of lowering health care costs overall, would be thwarted. *See* 42 U.S.C. § 300gg-111(c)(3)(A) (Congress sought to "encourag[e] the efficiency" and "minimiz[e the] costs" of the arbitration process).

Like the arbitration process that the Court approved in *Thomas*, the IDR process represents a pragmatic solution to the thorny problem of resolving payment disputes while keeping transaction costs low. *See* 473 U.S. at 590 (recognizing that the FIFRA binding arbitration provision represented a pragmatic solution to a complex problem of public safety, health, and

environmental impact). If plans or insurers and health care providers were forced to settle disputes in Article III courts, the costs associated with disputes between plans or insurers and health care providers would balloon, taking the cost of health care for millions of Americans with it. *See, e.g.*, Br. of America's Health Insurance Plans as Amicus Curiae at 14-16, *Am. Med. Ass'n v. U.S. Dep't of Health & Human Servs.*, No. 21-cv-03231 (D.D.C Jan. 31, 2022), ECF No. 62-2 (discussing rising costs associated with wide-ranging and subjective dispute resolution procedures). The No Surprises Act's use of a streamlined IDR process represents the situation "in which resolution of the claim by an expert Government agency is deemed essential to a limited regulatory objective within the agency's authority." *Stern*, 564 U.S. at 490. Without these simplified procedures, Congress's goal of lowering health care costs "would have been confounded." *Schor*, 478 U.S. at 856.

### iv. The arbitration process decides streamlined and specialized questions of fact that are suitable for resolution outside of Article III procedures.

Finally, the right at issue is a public right for the additional reason that the IDR entity, like the CFTC in *Schor* and the arbitrator in *Thomas*, deals only with a "particularized area of law," adjudicated by highly-qualified subject-matter experts, and does not exercise all of the powers of an Article III court. *Schor*, 478 U.S. at 852-53. "Given the nature of the right at issue and the concerns motivating the Legislature, . . . this system [does not] threaten the independent role of the Judiciary in our constitutional scheme." *Thomas,* 473 U.S. at 590 (approving of "[r]emoving the task of valuation from agency personnel to civilian arbitrators").

The nature of the right that Congress created is closely tied to the forum that Congress created to adjudicate that right. The disputes settled by the IDR entity are narrow, specialized, and highly fact-specific. *See* 42 U.S.C. § 300gg-111(c)(2)(A) (scope of IDR proceedings is limited to determining "the amount of payment under the plan or coverage for an item or service furnished by the provider or facility" and covered by the Act). For example, under the rule, within 30 days of being selected as the IDR entity, the IDR must select one offer based on the papers and information provided by the parties. *Id*. § 300gg-111(c)(5)(A). IDR entities are not authorized to

hear from witnesses or adjudicate any claims or rights other than the narrow category of payment disputes authorized by the Act. Additionally, the IDR entity must be certified by the Departments and possess "sufficient medical, legal, and other expertise" to make determinations under the statute. *See* 42 U.S.C. § 300gg-111(c)(4)(A)(i); *see also* 45 C.F.R. § 149.510(e)(2)(i)-(iii) (setting forth detailed IDR entity qualification requirements, including accreditations and areas of expertise). "[T]he extent to which the non-Article III forum exercises the range of jurisdiction and powers normally vested only in Article III courts" is negligible. *Schor*, 478 U.S. at 852-53.

There is no need for a full-blown trial to adjudicate the payment rights at issue created by the No Surprises Act. "To hold otherwise would be to defeat the obvious purpose of the legislation to furnish a prompt, continuous, expert and inexpensive method for dealing with a class of questions of fact which are peculiarly suited to examination and determination by an administrative agency specially assigned to that task." *Thomas,* 473 U.S. at 590 (quoting *Crowell*, 285 U.S. at 46).

In addition, like the statutory scheme at issue in *Thomas*, the No Surprises Act "limits but does not preclude review of the arbitration proceeding by an Article III court." 473 U.S. at 592. The Act's provision for judicial review under the terms of the Federal Arbitration Act "preserves the 'appropriate exercise of the judicial function.'" *Id.* (quoting *Crowell*, 285 U.S. at 54). This form of judicial review "protects against arbitrators who abuse or exceed their powers or willfully misconstrue their mandate under the governing law." *Id.*

### B.  The No Surprises Act does not offend the Seventh Amendment.

The IDR process likewise does not offend the Seventh Amendment. The Seventh Amendment provides: "In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved . . . ." U.S. Const. amend. VII. The Supreme Court has consistently interpreted the phrase "suits at common law" to refer to suits in which legal, as opposed to equitable, rights are to be determined. Plaintiffs assert that the Act deprives them of their Seventh Amendment right to recover the reasonable value of the medical

services they provide in *quantum meruit*. There are good reasons to doubt whether actions in *quantum meruit* are of a legal nature in the first place. *See Speedfit LLC v. Woodway USA, Inc.*, No. 13-cv-1276-KAM-AKT, 2020 WL 3051511, at *4-5 (E.D.N.Y. June 8, 2020) (holding that *quantum meruit* claim is equitable), *R.B. Ventures, Ltd. v. Shane*, 112 F.3d 54, 60 (2d Cir. 1997) (same); *But see GSGSB, Inc. v. New York Yankees*, No. 91-cv-1803-SWK, 1995 WL 507246, at *4 (S.D.N.Y. Aug. 28, 1995) (holding *quantum meruit* is legal). But this Court need not delve into the legal/equitable distinction here, because Plaintiffs' congressionally created public rights may be properly delegated to an administrative tribunal shorn of a jury right.

In *Atlas Roofing*, the Supreme Court held that "when Congress creates new statutory 'public rights' it may assign their adjudication to an administrative tribunal with which a jury trial would be incompatible, without violating the Seventh Amendment's injunction that jury trial is to be 'preserved' in 'suits at common law.'" *Atlas Roofing*, 430 U.S. at 455. Congress may effectively supplant a common-law cause of action carrying with it a right to a jury trial with a statutory cause of action shorn of a jury trial right. *See Granfinanciera*, 492 U.S. at 52. The bounds of Article III and the Seventh Amendment right to a jury trial are coterminous, and neither reach as far as congressionally created public rights. In other words, "if a statutory cause of action is legal in nature, the question whether the Seventh Amendment permits Congress to assign its adjudication to a tribunal that does not employ juries as factfinders requires the same answer as the question whether Article III allows Congress to assign adjudication of that cause of action to a non-Article III tribunal." *Id.* at 53; *see also Oil States Energy Servs. LLC v. Greene's Energy Grp. LLC*, 138 S. Ct. 1365, 1379 (2018). "The crucial question, in cases not involving the Federal Government, is whether 'Congress, acting for a valid legislative purpose pursuant to its constitutional powers under Article I, [has] create[d] a seemingly 'private' right that is so closely integrated into a public regulatory scheme as to be a matter appropriate for agency resolution with limited involvement by the Article III judiciary." *Granfinanciera*, 492 U.S. at 54 (quoting *Thomas*, 473 U.S. at 593-94).

That question has already been answered above. "[N]otwithstanding the Seventh Amendment, 'Congress may decline to provide jury trials' for cases 'involving statutory rights that

are integral parts of a public regulatory scheme and whose adjudication Congress has assigned to . . . a specialized court of equity,' because such rights are 'public.'" *Germain v. Conn. Nat. Bank*, 988 F.2d 1323, 1331 (2d Cir. 1993) (quoting *Granfinanciera*, 492 U.S. at 55 n. 10). Because the right at issue in the IDR process is a congressionally created public right that is appropriately adjudicated in an administrative tribunal, it is likewise appropriately adjudicated without a jury. Plaintiffs' Seventh Amendment claim thus fails for the same reason as their Article III claim.

**C.  The No Surprises Act preempts state common law claims for surprise bills.**

The preceding discussion shows that Congress acted within its Constitutional powers in creating a new arbitration process to adjudicate the newly-created public right of out-of-network health care providers to seek compensation directly from health plans or insurers. To be sure, to the extent that providers previously had a common law cause of action to sue their patients directly for thousands of dollars' worth of surprise medical bills, the Act extinguishes that right. *See* 42 U.S.C. §§ 300gg-131; 300gg-132. But that is no accident. That was the very harm that Congress sought to eradicate in passing the No Surprises Act. Sections 300gg-131 and 300gg-132 expressly prohibit providers from billing or holding liable patients for any amount in excess of the patient's in-network cost-sharing requirements under their health plans. If dissatisfied with the results of the IDR process, providers may not turn around and sue their patients to recover any additional amount for medical bills. *Id.*

Congress has the power to preempt state law. *Arizona v. United States*, 567 U.S. 387, 399 (2012). "Under the Supremacy Clause of the Constitution, state and local laws that conflict with federal law are without effect." *N.Y. SMSA Ltd. P'ship v. Town of Clarkstown*, 612 F.3d 97, 103-04 (2d Cir. 2010) (internal quotation marks omitted). Congress can "supplant a common law cause of action" with a statutory right adjudicated by an administrative tribunal. *Granfinanciera*, 492 U.S. at 53. Whether a state law cause of action has been preempted by a federal statute may be apparent on the face of the statute itself or by necessary implication based on the depth and breadth of the federal statutory scheme. *In re Series 7 Broker Qualification Exam Scoring Litig.*, 548 F.3d

110, 113 (D.C. Cir. 2008). In *Lanier v. BATS Exchange*, the Southern District of New York found that state common law claims for breach of contract were preempted by federal securities laws. *Lanier v. BATS Exch., Inc.*, 105 F. Supp. 3d 353, 363 (S.D.N.Y. 2015), *aff'd on other grounds*, 838 F.3d 139 (2d Cir. 2016). In so holding, the court found that, "[t]he determination as to whether a breach of contract claim has been preempted turns on both the nature of the violation and relief. . . . Even a 'genuine' breach of contract suit may be preempted if it 'stand[s] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Id*. (internal citations omitted).

"The purpose of Congress is the ultimate touchstone" in any preemption analysis. *In re Series 7*, 548 F.3d at 113 (citation omitted). Here, Congress has clearly expressed an intent to occupy the field exclusively when it comes to the practice of surprise medical billing of patients not otherwise protected by a specified state law. Allowing providers to continue to balance bill their patients and sue them in state or federal court to recover the value of the medical care provided would "stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id*.

Sections 300gg-131 and 300gg-132 are also completely severable from the other provisions of the Act that Plaintiffs challenge here. Courts apply a presumption in favor of severability, severing any problematic provisions while leaving the remainder of the statute intact. *See e.g.*, *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2350 (2020) (plurality op.) ("The Court presumes that an unconstitutional provision in a law is severable from the remainder of the law or statute."). Accordingly, should this Court find that any of the challenged provisions of the No Surprises Act relating to the IDR process are unconstitutional, the protections against balance billing patients and holding them liable for medical bills codified in Sections 300gg-131 and 300gg-132 should remain good law.

**D. The No Surprises Act does not offend due process or effect an unconstitutional taking.**

> **i. Plaintiffs' due process claim rests on a misunderstanding of the No**

Surprises Act's text and structure.

Plaintiffs allege in Count III that the IDR process violates principles of due process because it gives "one party . . . the health plan . . . the unilateral right to define the standard by which the outcome of that process will be determined." Compl. ¶ 71. But that statement rests on two flawed premises based on a misunderstanding of the Act itself, the IDR process, and the statutory definition of "qualifying payment amount."

When deciding between the two competing payment amounts, the Act requires that the IDR entity "tak[e] into account the considerations specified in subparagraph (C)." 42 U.S.C. § 300gg-111(c)(5)(A). Subparagraph (C) begins by instructing the IDR entity to consider "the qualifying payment amount." *Id*. § 300gg-111(c)(5)(C)(i)(I). As discussed above, the "qualifying payment amount" for a given item or service and for a given plan or insurer is generally based on "the median of the contracted rates recognized" by the plan or insurer, measured with respect to the payment rates for "the same or a similar item or service that is provided by a provider in the same or similar specialty and provided in the geographic region in which the item or service is furnished." *Id*. § 300gg-111(a)(3)(E)(i).

Plaintiffs' due process claim first fails to recognize that the "qualifying payment amount" is defined by reference to the "contracted rates" recognized by the plan or insurer and does not mean, as Plaintiffs assert, that the plan or insurer unilaterally sets the rates. Compl. ¶ 68. To the contrary, "contracted" rates are rates set by contract and contracts necessarily require (at least) two parties to be valid. A contracted rate is a rate negotiated at arms-length *between* the plan or insurer and another party—typically the health care provider. The Act thus treats the qualifying payment amount as a reasonable proxy for what the agreed-upon payment rate between a provider and a plan or insurer would have been for a given out-of-network service. It is hardly something that the plan or insurer can unilaterally set.

Plaintiffs' due process claim also rests on a second misunderstanding of the Act. Plaintiffs assert that, by giving the plans or insurers the unilateral right to determine the qualifying payment amount, the Act therefore gives them the "unilateral right to define the standard by which the

outcome of [the IDR] process will be determined." *Id.* ¶ 71. But the qualifying payment amount does not alone determine the outcome of the IDR process. To be sure, the IDR entity is required to *consider* the "qualifying payment amount," but the inquiry does not end there. 42 U.S.C. § 300gg-111(c)(5)(C)(i)(I). After instructing the IDR entity to consider the "qualifying payment amount," the Act goes on to list "additional information" and "additional circumstances" for the IDR entity to consider, which include: the provider's level of training, experience, and quality and outcomes measurements; the market share of the provider or of the plan or insurer; the acuity of the individual receiving the medical service, or the complexity of that service; the provider's teaching status, case mix, and scope of services; and a demonstration of the provider's or the plan's or insurer's good faith efforts to enter into network agreements for the service, or the lack of such efforts. *Id.* § 300gg-111(c)(5)(C)(i)(II), (C)(ii). The regulations implementing the Act similarly require the IDR entity to consider other relevant, credible information when determining whether a payment closest to the qualifying payment amount is appropriate. See 45 C.F.R. § 149.510(c)(4)(ii), (iii). The qualifying payment amount does not by itself determine the outcome of the IDR proceeding.

Plaintiffs' claim that the Act's IDR process violates due process because it gives the plan or insurer the unilateral right to set the standard by which the outcome of the IDR process will be determined fails because it rests on a fundamentally flawed understanding of the Act. The Act does no such thing—it neither allows the plan or insurer to unilaterally set the qualifying payment amount nor does it require the IDR entity to determine the outcome of the IDR process based on the qualifying payment amount alone. For these reasons, in addition to the others discussed below, Plaintiffs' due process claim fails.

### ii. Plaintiffs lack a legally cognizable property interest in future claims, causes of action, or future business expectations.

In any event, Plaintiffs' lack of a legally cognizable property interest dooms both their due process claim in Count III and their takings claim in Count IV. "In order to assert a violation of procedural due process rights, a plaintiff must 'first identify a property right, second show that the

[government] has deprived him of that right, and third show that the deprivation was effected without due process.'" *DeFabio v. E. Hampton Union Free Sch. Dist.*, 658 F. Supp. 2d 461, 487 (E.D.N.Y. 2009) (quoting *Local 342, Long Island Pub. Serv. Emps. v. Town Bd. of Huntington*, 31 F.3d 1191, 1194 (2d Cir. 1994)). Plaintiffs' due process and takings claims both turn on whether or not Plaintiffs possess a protected property interest, of which the Act deprives them. Both claims also fail because Plaintiffs have not yet been deprived of any property interest.

Precisely what kind of property interest Plaintiffs assert they are being deprived of remains unclear. Plaintiffs assert that they are deprived of "their property rights to the reasonable value of the services they [render]" Compl. ¶ 72. But "business in the sense of the activity of doing business, or the activity of making a profit is not property in the ordinary sense." *College Savings Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S 666, 675 (1999). To the extent that Plaintiffs complain of a lost opportunity to profit from future medical services performed for out-of-network patients, "the loss of future business opportunity is not a protect[a]ble property interest." *Chrebet v. Cnty. of Nassau*, 24 F. Supp. 3d 236, 245-46 (E.D.N.Y. 2014), *aff'd sub nom. Chrebet v. Nassau Cnty.*, 606 F. App'x 15 (2d Cir. 2015).

The Complaint does not allege that the Act's IDR process has prevented Plaintiffs from recovering fees for services that they have already provided (nor could it, as the Complaint was filed the day before the No Surprises Act went into effect). Instead, Plaintiffs claim a property right in, essentially, the future revenues generated by their business: "the reasonable value of their services." Compl. ¶ 75. Provider compensation for the treatment of future patients is not a legally recognized property interest either. The right of compensation for the services provided by providers participating in the Medicaid program has long been established not to constitute a property interest. "It is fundamental that a Medicaid provider has no property interest in or contract right to reimbursement at any specific rate or, for that matter, to continued participation in the Medicaid program at all." *Rye Psych. Hosp. Ctr., Inc. v. New York*, 576 N.Y.S.2d 449, 450 (3d Dep't 1991) (citing *Kaye v. Whalen*, 405 N.Y.S.2d 682 (1978)); *see also Senape v. Constantino*, 936 F.2d 687, 691 (2d Cir.1991). Nor do providers hold a property interest in any asserted common

law right to sue for the value of services rendered to patients; the case law has clearly established that "[a] person has no property, no vested interest, in any rule of the common law." *Mondou v. N.Y., New Haven, & Hartford R.R. Co.*, 223 U.S. 1, 50 (1912); *Duke Power Co. v. Carolina Envtl. Study Grp., Inc.*, 438 U.S. 59, 88 (1978).

To the extent that Plaintiffs assert that the property interest in question is the quasi-contract claim of *quantum meruit* for the care they have or will provide to their patients, that too is not a property interest. The Second Circuit has noted that, "although a public contract can confer a protectable benefit, not every contract does so." *Martz v. Inc. Village of Valley Stream*, 22 F.3d 26, 30 (2d Cir. 1994); *see also Walentas v. Lipper*, 862 F.2d 414, 418 (2d Cir.1988) ("[I]t is relatively clear that a contract dispute, in and of itself, is not sufficient to give rise to a [due process] cause of action . . . ." (citations omitted)); *Costello v. Town of Fairfield*, 811 F.2d 782,784 (2d Cir. 1987) ("A contract dispute, however, does not give rise to [a due process] cause of action . . . ."). Any potential future *quantum meruit* claims Plaintiffs may someday wish to assert against patients bear no resemblance to the property interest in the sole and exclusive possession of real property of the plaintiffs in *Cienaga Gardens*, upon which Plaintiffs principally rely. *Cienega Gardens v. United States*, 331 F.3d 1319, 1328 (Fed. Cir. 2003) (statutes "intentionally defeated the Owners' real property rights to sole and exclusive possession"). Because Plaintiffs' have not been deprived of a legally recognized property interest, their due process and takings claims must fail.

### iii.   At any rate, Plaintiffs' takings claim is not ripe.

Even if Plaintiffs could identify a legally cognizable property interest that the Act's IDR process would deprive them of, any claim for the deprivation of that property is at this juncture premature. In order to state a takings claim, a plaintiff must show that she has actually suffered a taking of property. *See Knick v. Twp. of Scott*, 139 S. Ct. 2162, 2170 (2019) (holding that "a property owner has a claim for a violation of the Takings Clause *as soon as* a government takes his property for public use without paying for it" but not before) (emphasis added).

It was this attempt to seek relief before a taking had actually occurred that doomed the

plaintiffs in *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1013 (1984).  In that case, plaintiffs attempted to challenge a provision of FIFRA that similarly created a system of private arbitration to resolve payment disputes about sharing of trade secret data. *Ruckelshaus*, 467 U.S. at 1020 (addressing the same arbitration system later at issue in *Thomas*). The plaintiff, Monsanto, brought suit before any arbitrations had taken place, challenging both the constitutionality of the arbitration system and alleging that the arbitration would result in an unconstitutional taking. *Id.* But, because no arbitrations had actually taken place, "Monsanto did not allege or establish that it had been injured by actual arbitration under the statute." *Id.* The Supreme Court found that, by failing to wait until it was actually impacted by the alleged infirmities in FIFRA, Monsanto's takings claims were not yet ripe. *Id.* The Court held that, "[i]f a negotiation or arbitration pursuant to [FIFRA] were to yield just compensation to Monsanto . . . then Monsanto would have no claim against the Government for a taking. Since no arbitration has yet occurred with respect to any use of Monsanto's data, any finding that there has been an actual taking would be premature." *Id.* at 1013. Like the Plaintiffs in *Monsanto*, Plaintiffs here only offered speculation that arbitrations will result in a taking of their property interests.

Plaintiffs may very well proceed to an arbitration and come away happily paid in full for the reasonable value of the services they provided. Because it is entirely premature to speculate whether an arbitration under the No Surprises Act will actually result in Plaintiffs obtaining anything less than the fair value of the services they provide, their takings claim must be dismissed as unripe.

### E.  There is no live dispute concerning the regulation.

Plaintiffs' challenge to the Departments' rule is no longer a live dispute that the Court need resolve, least of all on an expedited basis. Plaintiffs recognize that on February 23, 2022, a court in the Eastern District of Texas vacated the same portions of the rule that Plaintiffs challenge here. *See* ECF No. 23 at 22; *Tex. Med. Ass'n v. U.S. Dep't of Health & Human Servs.*, No. 6:21-cv-425-JDK, 2022 WL 542879 (E.D. Tex. Feb. 23, 2022), *appeal filed* No. 22-40264 (5th Cir. 2022). That

court's order was not limited to the particular plaintiffs in that case, but vacated the challenged provisions of the rule on a nationwide basis. The provisions of the rule that Plaintiffs challenge here are not in effect and can have no impact on Plaintiffs or any other health care providers. The Departments have taken comments from the public on the interim final rules that they have issued under the No Surprises Act. They have begun the preparation of a final rule that will address the procedures for arbitrations under the Act, and that will address the provisions of the interim final rules that were vacated by the Eastern District of Texas. The Departments anticipate that the final rule will be issued by early summer of 2022.

However, should the Court nevertheless find it necessary to reach the merits of Plaintiffs' challenge to the rule, it should uphold the rule as a valid interpretation of the Act. The Departments hewed to the Act's requirements in drafting the interim final rule that Plaintiffs challenge here. The rule directs the arbitrator to "tak[e] into account" each of the considerations that are listed in the statute itself. *See* 45 C.F.R. § 149.510(c)(4)(ii), (iii). The arbitrator is also instructed to consider any "[a]dditional information submitted by a party," so long as the information is credible, relates to either party's offer, and does not include information on the factors that the arbitrator is prohibited from considering under the statute. *Id*. § 149.510(c)(4)(iii)(D).

The rule further instructs the arbitrator, in choosing between the offer presented by the provider and the offer presented by the health plan or insurer, to "select the offer closest to the qualifying payment amount" unless the arbitrator "determines that credible information submitted by either party . . . clearly demonstrates that the qualifying payment amount is materially different from the appropriate out-of-network rate." *Id*. § 149.510(c)(4)(ii)(A). This is the portion of the rule that Plaintiffs object to, but the rule does not stop there. Critically, the rule defines several of the terms in this clause. Information is defined to be "credible" if "upon critical analysis [it] is worthy of belief and is trustworthy," *id*. § 149.510(a)(2)(v), and information is defined to show a "material difference" if there is "a substantial likelihood that a reasonable person with the training and qualifications of a certified IDR entity making a payment determination would consider the submitted information significant in determining the out-of-network rate and would view the

information as showing that the qualifying payment amount is not the appropriate out-of-network rate," *id*. § 149.510(a)(2)(viii).

The rule thus directs the arbitrator to: (1) begin with the qualifying payment amount; (2) consider all of the additional factors or "any additional information" that may be credible and relevant; (3) assess whether there is a "substantial likelihood" that the information is "significant" in showing that the qualifying payment amount is not the appropriate out-of-network rate; and, after completing that analysis, then (4) select one of the offers as the payment rate, with the offer that is closest to the qualifying payment amount being the offer selected, unless the arbitrator finds that the additional statutory factors point in favor of a different decision. The statute instructs the arbitrator to begin his or her analysis with one number—the qualifying payment amount, or the typical contracted rate for a given medical service—and further requires the arbitrator to conclude his or her analysis with a second number—the appropriate out-of-network payment amount. What comes in between is a series of "additional" circumstances or "additional" information for the arbitrator to consider. The Departments, accordingly, have reasonably read the statute to require the arbitrator to address whether any of this supplemental information reasonably bears on the question whether the second number should be different from the first number. *See In re Border Infrastructure Envtl. Litig.*, 915 F.3d 1213, 1223 (9th Cir. 2019) ("In simple terms, 'additional' means 'supplemental.'") (citation omitted).

This rule is therefore nothing like the Clean Air Act rule that was at issue in *American Corn Growers Association v. EPA*, 291 F.3d 1 (D.C. Cir. 2002). In that case, the court invalidated an EPA rule that "extract[ed] one of the five statutory factors listed in [the Clean Air Act] and treat[ed] it differently than the other four." *Id*. at 6. The statute at issue listed five statutory factors together in a single clause, without any indication that any one factor should be treated differently. *See* 42 U.S.C. § 7491(g)(2). The No Surprises Act is quite different. The Act directs the arbitrator first to the qualifying payment amount, and then separately instructs the arbitrator to consider "additional information" or "additional circumstances" that may warrant an award of a different amount. 42 U.S.C. § 300gg-111(c)(5)(C)(i)(II), (ii). At the very least, the Departments reasonably read the Act

in this way, and *Chevron* deference is owed to their reading.

## II.   Plaintiffs have not shown any risk of irreparable harm that would be remedied by the injunctive relief they seek.

"Irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction[.]" *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005). To satisfy the irreparable harm requirement, Plaintiffs "must demonstrate that absent a preliminary injunction they will suffer 'an injury that is neither remote nor speculative, but actual and imminent,' and one that cannot be remedied 'if [the Court] waits until the end of trial to resolve the harm.'" *Id.* (quoting *Rodriguez v. DeBuono*, 175 F.3d 227, 234-35 (2d Cir. 1999)). Because the Act is entirely constitutional, Plaintiffs will suffer no harm from any alleged constitutional violation. And the provisions of the rule that Plaintiffs challenge is no longer in effect, having been vacated by the Eastern District of Texas, so it cannot cause Plaintiffs any imminent irreparable harm. The need for urgent, speedy relief is further undermined both by that fact Plaintiffs fail to point to any imminent harm that will occur absent an injunction and by the fact that they delayed over a year before bringing this motion in the first place.

Plaintiffs argue that they will suffer irreparable harm by being compelled to arbitrate when they do not wish to do so. ECF No. 23 at 24 (citing *UBS Securities, LLC v. Voegeli*, 405 F. App'x 550, 552 (2d Cir. 2011)). Unlike the cases they rely on, Plaintiffs do not point to an actual dispute that is imminently headed to arbitration, but instead theorize about a general fear of unspecified, indeterminate future arbitrations. *See, e.g.*, *UBS Securities*, 405 F. App'x at 552 (granting preliminary injunction where there was a specific dispute set for imminent arbitration); *N. Y. Bay Cap., LLC v. Cobalt Holdings, Inc.*, 456 F. Supp. 3d 564 (S.D.N.Y. 2020) (same). Nor do Plaintiffs explain why any recordkeeping or administrative burdens that they would face in arbitrations would be greater than the burdens that they would face if they were to pursue their claim instead in full-blown litigation in an Article III court. As explained above, the very point of the arbitration process is to minimize the administrative costs of adjudicating claims for out-of-network payment amounts. Plaintiffs have thus failed to establish any imminent risk of irreparable harm.

Plaintiffs fail to carry their burden to demonstrate irreparable harm for the additional reason that they delayed over a year after the Act became law before bringing this motion. "[P]reliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiffs' rights. Delay in seeking enforcement of those rights, however, tends to indicate at least a reduced need for such drastic, speedy action." *Costello v. McEnery*, 767 F. Supp. 72, 78 (S.D.N.Y. 1991) (quoting *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985)). The Second Circuit has held that it is harder for a plaintiff to meet its burden to show irreparable harm "if the plaintiff has delayed either in bringing suit or in moving for preliminary injunctive relief." *Tough Traveler, Ltd. v. Outbound Prod.*, 60 F.3d 964, 968 (2d Cir. 1995); *see also Majorica, S.A. v. R.H. Macy & Co.*, 762 F.2d 7, 8 (2d Cir.1985) (per curiam) (delay in bringing both suit and motion); *Citibank*, 756 F.2d at 276-77 (delay of nine months in bringing suit negated irreparable harm). Delay in bringing a preliminary injunction motion "indicate[s] an absence of the kind of irreparable harm required to support a preliminary injunction." *Id*. at 276. "Though such delay may not by itself warrant the denial of ultimate relief, 'it may, standing alone, . . . preclude the granting of preliminary injunctive relief,'" *Tough Traveler*, 60 F.3d at 968, because the "failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury," *Citibank*, 756 F.2d at 277 (quotation marks omitted).

Plaintiffs waited unreasonably long in both bringing this lawsuit and filing this motion. The No Surprises Act was signed into law on December 27, 2020, over a year before Plaintiffs filed their lawsuit. After waiting over two months to serve Defendants, Plaintiffs finally filed their motion for a preliminary injunction in early April 2022, more than three months after filing their Complaint, six months after the second interim final rule was promulgated, and over fifteen months after the Act was signed into law. This lengthy delay far exceeds delays that courts in this Circuit have previously found negate a finding of irreparable harm. *See Tough Traveler*, 60 F.3d at 968 (finding delay negated irreparable harm where plaintiff waited at least nine months to commence the lawsuit); *Citibank*, 756 F.2d at 276-77 (delay of nine months in bringing suit negated

irreparable harm); *Broecker v. N. Y. City Dep't of Educ.*, No. 21-cv-6387 (KAM)(RLM), 2021 WL 5514656, at *9 (E.D.N.Y. Nov. 24, 2021) (finding delay of forty-four days "greatly undermines the strength of Plaintiffs' 'emergency' motion for preliminary injunction"); *Livery Round Table, Inc. v. New York City FHV & Limousine Comm'n*, No. 18-cv-2349 (JGK), 2018 WL 1890520, at *9 (S.D.N.Y. Apr. 18, 2018) (finding "delay of about three months undercuts a showing of immediate and irreparable injury").

Plaintiffs take issue primarily with the constitutional structure of the Act and its use of an IDR entity to resolve payment disputes between health care providers and plans or insurers. Any purported facial constitutional infirmities in the Act would have been apparent from the day it was signed into law in 2020, and Plaintiffs could have sought non-emergency relief at that time. Plaintiffs' memorandum of law and Plaintiff Haller's affidavit include no explanation for why Plaintiffs waited over a year to file this lawsuit or over three months to file this Motion, or why relief is needed so urgently. This inexcusable delay further confirms why this Court should deny Plaintiffs' motion for preliminary relief.

### III.   The equities and the public interest disfavor injunctive relief.

Plaintiffs' brief neglects to even mention these final two factors, and thus they have failed to carry their burden as to them. *See N.Y. Progress & Prot. PAC*, 733 F.3d at 486 (preliminary relief will not issue unless a plaintiff carries his burden on these factors); *Ohr Somayach/Joseph Tanenbaum Educ. Ctr. v. Farleigh Int'l Ltd.*, 483 F. Supp. 3d 195, 206 n.6 (S.D.N.Y. 2020) ("Arguments not raised in a party's brief are deemed waived."). In any event, the public interest and the balance of the equities also weigh strongly against granting Plaintiffs' motion. These factors merge when the government is a party. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

There is no question that a preliminary injunction would impose substantial harms on the execution of and compliance with the nation's health insurance laws. An order striking key provisions of the Act and preventing IDR proceedings from taking place would disrupt the health care and health insurance industries on a massive scale; and it would sow confusion in the face of

providers' and health plans' and insurers' efforts to adjust their billing practices to comply with the Act's new legal regime. Health plans and insurers in particular have relied on the No Surprises Act and have devoted significant resources to build data management systems, hire staff, and negotiate contracts with vendors, employers, and health care providers in order to be ready to process claims under the Act's new legal framework. Plaintiffs' proposed preliminary injunction would radically upend the status quo, not maintain it.

Congress had already balanced the relevant interests when it determined that protecting patients from surprise medical bills would greater serve the public interest than allowing providers to sue their patients directly for potentially ruinous medical bills. That balance counsels against granting Plaintiffs' motion. For over three months now, patients have been spared from surprise medical bills while insurers and health care providers have instead negotiated with each other for out-of-network payments. If this Court were to upend this entire carefully crafted statutory and regulatory system overnight, thousands of patients may suddenly receive medical bills for hundreds or even thousands of dollars that they had believed they were protected by law from paying. The balance of the equities and the public interest strongly counsel in favor of leaving in place the carefully crafted legal landscape that private parties and government agencies have worked hard to implement and have come to rely on.[5]

## CONCLUSION

For the foregoing reasons, this Court should deny Plaintiffs' Motion for a Preliminary Injunction and dismiss this case for failure to state a claim.

Dated: April 26, 2022                    Respectfully submitted,

                                        BRIAN M. BOYNTON
                                        Acting Assistant Attorney General

---

[5] Although relief is unwarranted in this case, any such relief, declaratory or otherwise, should be "tailored to redress the [Plaintiffs'] particular injur[ies]" consistent with the limitations of Article III and principles of equity. *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018); *see also Va. Soc'y for Human Life, Inc. v. FEC*, 263 F.3d 379, 393-94 (4th Cir. 2001) ("language of the APA" does not require courts to invalidate a rule "for the entire country").

BREON PEACE
United States Attorney

ERIC B. BECKENHAUER
Assistant Branch Director

JOEL McELVAIN
Senior Trial Counsel

*/s/ Anna Deffebach*
ANNA DEFFEBACH
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Phone: (202) 305-8356
Fax: (202) 616-8470
E-mail: Anna.L.Deffebach@usdoj.gov
D.C. Bar No. 241346

JOSEPH A. MARUTOLLO
Assistant U.S. Attorney
United States Attorney's Office
Eastern District of New York
271-A Cadman Plaza East, 7th Floor
Brooklyn, NY 11201
Tel: (718) 254-6288
Fax: (718) 254-7489
Email: joseph.marutollo@usdoj.gov

*Counsel for Defendants*