UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

DR. DANIEL HALLER and LONG ISLAND
SURGICAL PLLC,

Plaintiffs,

– against –

U.S. DEPARTMENT OF HEALTH AND
HUMAN SERVICES, 200 Independence
Avenue SW, Washington, DC 20201, et al.,

Defendants.

Case No. 21-cv-7208-AMD-AYS

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS AND IN FURTHER SUPPORT OF PLAINTIFFS' MOTION
FOR A PRELIMINARY INJUNCTION**

**ABRAMS FENSTERMAN, LLP**
*Attorneys for Plaintiffs*
One Metrotech Center, Suite 1701
Brooklyn, New York 11201
Telephone: 718-215-5300

**TABLE OF CONTENTS**

Table of Authorities ............................................................................................................ ii

Preliminary Statement ......................................................................................................... 1

Argument .............................................................................................................................. 2

   A. Standard on a Motion to Dismiss .............................................................................. 2

   B. The Act's arbitration requirement deprives Plaintiffs of their Seventh Amendment right to a jury trial. .......................................................................................................................... 3

      1. Plaintiffs' claims to be paid for their services are legal in nature and the Seventh Amendment right to a jury therefore attaches to those claims. ....................................... 3

      2. The Act does not fall within the "Public Rights" Exception to Article III. ................... 4

         a. The Act does not create a new "Public Right." ........................................................ 5

         b. The IDR process is not a part of a "public regulatory scheme" ............................... 7

         c. Article III requires that compulsory non-consensual arbitration be reviewable by a court of record ............................................................................................................. 9

   C. Arbitration requires consent. .................................................................................... 11

   D. The Act violates the Fifth Amendment by depriving Plaintiffs of property without just compensation. ........................................................................................................... 13

      1. Plaintiffs have cognizable property interests. ............................................................ 13

      2. The Act deprives Plaintiffs of procedural due process. .............................................. 17

      3. Plaintiffs' Fifth Amendment claim is ripe. ................................................................. 21

   E. The Act does not preempt Plaintiffs' state common law claims. ............................... 22

   F. Plaintiffs are entitled to a preliminary injunction. .................................................... 28

      1. Standard for a preliminary injunction. ....................................................................... 28

      2. Plaintiffs will be irreparably harmed. ........................................................................ 29

      3. Plaintiffs are likely to succeed on the merits. ............................................................ 32

      4. The balance of equities is in Plaintiffs' favor and an injunction is in the public interest. ................................................................................................................................. 32

Conclusion ......................................................................................................................... 35

**TABLE OF AUTHORITIES**

## Cases

*Airday v. City of New York*, 310 F. Supp. 3d 399, 420 (S.D.N.Y. 2018) ..................................... 15

*Al Otro Lado v. Wolf*, 497 F. Supp. 3d 914, 926 (S.D. Cal. 2020) ................................................ 29

*American Soc. of Composers, Authors, and Publishers v. Pataki*, 930 F. Supp. 873, 878 (S.D.N.Y. 1996) ............................................................................................................................ 28

*Armstrong v. Manzo*, 380 U.S. 545, 552 (1965) .......................................................................... 17

*Arthritis and Osteoporosis Clinic of East Texas, P.A. v. Azar*, 450 F. Supp. 3d 740, 749 (E.D. Tex. 2020) ............................................................................................................................. 14

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ................................................................................... 3

*Ass'n of Air Med. Services v. U.S. Dep't of Health and Human Servs.*, 21-cv-03031 (D.D.C.) .. 31

*AT & T Technologies, Inc. v. Communications Workers of Am.*, 475 U.S. 643, 648 (1986) ....... 11

*Athletes & Artists, Inc. v. Millen*, No. 96 CIV. 9996 (KTD), 1999 WL 587883, at *8 (S.D.N.Y. Aug. 4, 1999) .......................................................................................................................... 3

*Atlas Roofing Co. v. Occupational Safety and Health Review Comm'n*, 430 U.S. 442, 455 (1977) ...................................................................................................................................... 11

*Aureus Asset Managers, Ltd. v. United States*, 121 Fed.Cl. 206, 213 (Fed. Cl. 2015) ................ 15

*Averhart v. Annucci*, 2021 WL 2383556, *8 (S.D.N.Y. June 10, 2021) ..................................... 28

*Barber v. Charter Twp. of Springfield*, 31 F.4th 382, 388-89 (6th Cir. 2022) ........................... 22

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 583 (2007) .................................................................. 3

*Bowsher v. Synar*, 478 U.S. 714, 736 (1986) ................................................................................ 23

*Branum v. Clark*, 927 F.2d 698, 705 (2d Cir. 1991) .................................................................... 15

*Cedar Point Nursery v. Hassid*, 141 S.Ct. 2063, 2070, 2072-73 (2021) ..................................... 22

*Chabad of S. Ohio & Congregation Lubavitch v. City of Cincinnati*, 363 F.3d 427, 436 (6th Cir. 2004) ............................................................................................................................. 33

*Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833 (1986) ........................................... 9

*Costello v. Town of Fairfield*, 811 F.2d 782,784 (2d Cir. 1987) ................................................. 16

*Crowell v. Benson*, 285 U.S. 22, 51-52 (1932) .............................................................................. 6

*D'Angelo v. Winter*, 403 Fed.Appx. 181, 182 (9th Cir. 2010) .................................................... 20

*DeMartino v. New York State Department of Lab.*, 167 F. Supp. 3d 342, 358-59 (E.D.N.Y. 2016) ................................................................................................................................. 14, 15

*DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 113 (2d Cir.2010).................................................... 3

*Emergency Grp. of Ariz. Pro. Corp. v. United Healthcare, Inc.*, 838 F.App'x 299, 300 (9th Cir. 2021)..................................................................................................................................... 27

*Emergency Physician Servs. of New York v. UnitedHealth Grp., Inc.*, 2021 WL 4437166 (S.D.N.Y. Sept. 28, 2021) ............................................................................................................... 26, 27

*Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir.2005) .......................................... 28

*Fuentes v. Shevin*, 407 U.S. 67, 80-81 (1972) .............................................................................. 17

*Furlong v. Shalala*, 156 F.3d 384, 393 (2d Cir. 1998) .................................................................. 14

*Gebin v. Mineta*, 239 F. Supp. 2d 967, 968 (C.D. Cal. 2002) ...................................................... 34

*Gen. Elec. Co. v. New York State Dep't of Lab.*, 936 F.2d 1448, 1453) (2d Cir. 1991)......... 14, 16

*Germain v. Conn. Nat. Bank*, 988 F.2d 1323 (2d Cir. 1993)................................................... 10, 11

*Gerosa v. Savasta & Co.*, 329 F.3d 317, 327 n.8 (2d Cir. 2003)............................................. 26, 27

*Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) .......................................................... 32, 33

*Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 60-63 (1989)............................................... passim

*Greenholtz v. Inmates of Nebraska Penal and Correctional Complex*, 442 U.S. 1, 12–13, (1979) ................................................................................................................................................. 17

*GSGSB, Inc. v. New York Yankees*, No. 91 CIV. 1803 (SWK), 1995 WL 507246, at *5 (S.D.N.Y. Aug. 28, 1995)................................................................................................................... 3

*Gvozdenovic v. United Air Lines, Inc.*, 933 F.2d 1100, 1105 (2d Cir. 1991) ............................... 12

*Hillsborough County v. Automated Med. Lab. Inc.*, 471 U.S. 707, 719 (1985) .......................... 25

*Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 123 S. Ct. 588, 589, 154 L. Ed. 2d 491 (2002) ................................................................................................................................................. 11

*In re Series 7 Broker Qualification Exam Scoring Litig.*, 548 F.3d 110 (D.C. Cir. 2008)..... 23, 24

*Jarkesy v Sec. and Exch. Comm'n*, 2022 WL 1563613, at *4 (5th Cir. May 18, 2022)............. 5, 7

*John E. Andrus Memorial, Inc. v. Daines*, 600 F. Supp. 2d 563, 570 (S.D.N.Y. 2009)............... 28

*Johnson v. Miles*, 355 Fed.Appx. 444, 446 (2d Cir. 2009)......................................................... 29

*Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir.1996) ...................................................................... 29

*Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 375 (2004) ................................................... 6

*Kellman v. District Director, U.S. I.N.S.*, 750 F.Supp. 625, 628 n.4 (S.D.N.Y. 1990) ............... 20

*King v. New York City Employees Retirement System*, 212 F.Supp.3d 371, 396 (E.D.N.Y. 2016) 2

*Knick v. Township of Scott*, 139 S.Ct. 2162, 2172 (2019) ...................................................... 21, 22

*Koreska v. Perry-Sherwood Corp.*, 253 F. Supp. 830, 831 (S.D.N.Y. 1965), *aff'd sub nom. Matter of Koreska*, 360 F.2d 212 (2d Cir. 1966) ................................................................. 12

*Krimstock v. Kelly*, 306 F.3d 40, 52 (2d Cir. 2002) ........................................................... 17

*Lanier v. BATS Exch., Inc.*, 105 F. Supp. 3d 353 (S.D.N.Y. 2015) ................................ 23, 24

*LifeNet, Inc. v. U.S. Dep't of Health and Human Services*, 22- cv-00162-JDK (E.D. Tex.) ....... 31

*Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982) ............................................. 15

*Martz v. Inc. Vill. of Valley Stream*, 22 F.3d 26, 27 (2d Cir. 1994) .................................. 16

*Mastrovincenzo v. City of New York*, 435 F.3d 78, 89 (2d Cir. 2006) ............................... 28

*Med. Soc. of N.Y. v. Cuomo*, 976 F.2d 812, 816 (2d Cir.1992) .................................... 25, 26

*Montefiore Med. Ctr. v. Teamsters Loc. 272*, 642 F.3d 321, 332 (2d Cir. 2011) .................. 27

*Morgan Guar. Tr. Co. of New York v. Republic of Palau*, 680 F. Supp. 99, 105 (S.D.N.Y. 1988) ................................................................................................................. 15

*Munn v People of State of Illinois*, 94 U.S. 113, 122 (1876) .............................................. 6

*New York Bay Capital, LLC v. Cobalt Holdings, Inc.*, 456 F. Supp. 3d 564, 573 (S.D.N.Y. 2020) ................................................................................................................. 30

*New York City Health and Hospitals Corp. v. WellCare of New York, Inc.*, 801 F. Supp. 2d 126, 141 (S.D.N.Y. 2011) ................................................................................. 25

*New York SMSA Ltd. Partnership v. Town of Clarkstown*, 612 F.3d 97, 106 (2d Cir. 2010) ...... 26

*New York State Nat. Org. for Women v. Pataki*, 261 F.3d 156, 163 (2d Cir. 2001) .................... 15

*New York State Telecommunications Association, Inc. v. James*, 544 F. Supp. 3d 269, 288 (E.D.N.Y. 2022) ................................................................................................ 29

*New York v. United States Dep't of Homeland Sec.*, 969 F.3d 42, 86 n.38 (2d Cir. 2020) .......... 29

*Northern Pipeline Construction Co.*, 458 U.S. 50, 84 (1982) ............................................. 5

*Oil States Energy Services, LLC v Greene's Energy Grp., LLC*, 138 S. Ct. 1365, 1373 (2018).... 6

*Old Dutch Farms, Inc. v. Milk Drivers & Dairy Employees Union*, 359 F.2d 598, 603 (2d Cir. 1966) ................................................................................................................ 12

*Pakdel v. City and Cnty. of San Francisco*, 141 S.Ct. 2226, 2228 (2021) .......................... 21

*Pernell v. Southall Realty*, 416 U.S. 363, 375 (1974) ......................................................... 3

*Perry v. Sindermann*, 408 U.S. 593, 601–03 (1972) ......................................................... 15

*R.B. Ventures, Ltd. v. Shane*, 112 F.3d 54 (2d Cir. 1997) .................................................... 4

*Regeneron Pharmaceuticals, Inc. v. United States Dep't of Health and Hum. Servs.*, 510 F. Supp. 3d 29, 38 (S.D.N.Y. 2020) ................................................. 29

*Rock River Health Care, LLC v. Eagleson*, 14 F.4th 768, 774 (7th Cir. 2021) .......... 14, 17, 19, 20

*RxUSA Wholesale, Inc. v. Dep't of Health and Hum. Servs.*, 467 F. Supp. 2d 285, 300 (E.D.N.Y. 2006) ................................................................... 28

*Skepnek v. Roper & Twardowsky, LLC*, 2015 WL 5178054, *2-3 (D. Kan. Sept. 4, 2015) ........... 3

*Speedfit LLC v. Woodway USA, Inc.*, 2020 WL 3051511 (E.D.N.Y. June 8, 2020) .................... 4

*Steelworkers v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960) ........................................ 11

*Stern v. Marshall*, 564 U.S. 462, 490 (2011) ................................................................. 5

*Texas Medical Ass'n v. U.S. Dep't of Health and Human Servs.*, 2022 WL 542879, *9 (E.D. Tex. Feb. 23, 2022) ................................................. 19, 20, 30, 31

*Texas Oral and Facial Surgery, PA v. United Healthcare Dental, Inc.*, 2018 WL 3105114, *8 (S.D. Tex. June 25, 2018) ................................................. 27

*Thomas v. Union Carbide Agr. Products Co.*, 473 U.S. 568, 584 (1985) ....................... 5, 6, 8, 10

*Transit Mix Concrete Corp. v. Local Union No. 282*, 809 F.2d 963, 967 (2d Cir. 1987) ........... 11

*UBS Securities, LLC v. Voegeli*, 405 Fed.Appx. 550, 552 (2d Cir. 2011) ................................... 30

*United Food & Com. Workers Union, Local 1099 v. Southwest Ohio Reg'l Transit Auth.*, 163 F.3d 341, 364 n.11 (6th Cir. 1998) ................................................. 34

*Vera v. Saks & Co.*, 335 F.3d 109, 116 (2d Cir. 2003) ................................................. 11

*Walentas v. Lipper*, 862 F.2d 414, 418 (2d Cir. 1988) ................................................. 16

*Washington v. Kirksey*, 811 F.2d 561, 564 (11th Cir. 1987) ................................................. 20

*Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*, 933 F.2d 131, 135 (2d Cir. 1991) ................................................................. 3

## Statutes

42 U.S.C. § 300gg-111(a)(3)(E)(i) ................................................................. 18

42 U.S.C. § 300gg-111(c)(5)(C) ................................................................. 17

42 U.S.C. § 300gg-111(c)(5)(D) ................................................................. 18

42 U.S.C. § 300gg-131 ................................................................. 21

42 U.S.C. § 300gg-132 ................................................................. 21

Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. § 136 *et seq.* ............... 8

**Regulations**

45 CFR § 149.510(c)(4)(ii) .......................................................................................................... 20

86 Fed. Reg. 36,872 ...................................................................................................................... 25

86 Fed. Reg. at 36,946 .................................................................................................................. 26

**Constitutional Provisions**

U.S. Const. Amend. VII ................................................................................................................... 4

## PRELIMINARY STATEMENT

Plaintiffs, Dr. Daniel Haller and Long Island Surgical PLLC ("Plaintiffs"), respectfully submit this memorandum of law in opposition to the motion to dismiss filed by Defendants, the Department of Health and Human Services, the Department of Labor, the Department of the Treasury, the Office of Personnel Management, Xavier Becerra in his official capacity as the Secretary of Health and Human Services, Janet Yellen in her official capacity as the Secretary of the Treasury, Martin J. Walsh in his official capacity as the Secretary of Labor, and Kiran Ahuja in her official capacity as the Director of the Office of Personnel Management (collectively, "Defendants"), and in further support of Plaintiffs' motion for a preliminary injunction.

Dr. Haller is a critical care surgeon, certified by the American Board of Surgery. (*See* Haller Declaration, Dock. No. 22, ¶ 3). He is President of Long Island Surgical PLLC, a general and acute care surgical private practice in Rockville Centre, New York employing six physicians who have over forty combined years of clinical experience. (*Id.* at ¶¶ 1, 5). Dr. Haller and the other surgeons of Long Island Surgical perform approximately 2,700 emergency consultations and surgical procedures each year on patients admitted to hospitals through their emergency departments. (Dock. No. 1, Complaint at ¶ 12; Haller Decl. at ¶ 6). During the first wave of COVID-19 in March of 2020, Long Island Surgical managed two intensive care units in two different hospitals, treating over 40 patients a day. (Haller Decl. at ¶ 4). Approximately 78 percent of the patients that Dr. Haller and Long Island Surgical treat each year are covered by health plans with whom Dr. Haller and Long Island Surgical have no contractual relationship. (Complaint at ¶ 13; Haller Decl. at ¶ 7). With respect to those patients, Dr. Haller and Long Island Surgical are nonparticipating, or out-of-network, providers within the meaning of the No Surprises Act (the "Act").

Emergency physicians and surgeons such as Plaintiffs—at whose fees the Act was largely directed—work at all hours of the day and night to perform life-saving procedures on patients they

1

do not know and with whom they have no prior relationship. These physicians have a right to be paid a fair fee for the critical work they do. While they have a right under state common law to be paid by their patients, emergency physicians cannot depend on this right because they may not ask about the patient's financial circumstances before beginning treatment. What they depend on is that most of their patients will have some form of medical insurance and that the insurer will pay the physician because the patients have likely assigned their insurance claim to the physician. The Act seeks to reduce costs by protecting insurance companies through the imposition of the insurer's own price caps on out-of-network physicians with whom the insurer has no prior contractual relationship. This gift to the health insurance industry comes at the cost of the physician being compensated for the fair value of her services.

This action, however, is not about the wisdom of reducing health care costs at the expense of physicians. It is about the legality and constitutionality of doing so in the manner provided by the Act. Congress certainly has the right to legislate to reduce the cost of health care, but not by depriving physicians of their constitutional right to a jury trial, by requiring that their claims for payment be adjudicated in an arbitration to which they did not agree, by denying them due process of law in fixing the standards for the arbitration to favor insurers and, ultimately, by taking, without compensation, physicians' common law right to be paid by patients. For these reasons, the Act, however well intentioned, must be set aside.

## ARGUMENT

### A.    <u>Standard on a Motion to Dismiss</u>

On a motion to dismiss for failure to state a claim, a court must accept the plaintiff's "factual allegations as true, drawing all reasonable inferences in plaintiff's favor." *King v. New York City Employees Retirement System*, 212 F.Supp.3d 371, 396 (E.D.N.Y. 2016). "[A] complaint

must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 583 (2007) (citation omitted)). It is the "legal feasibility of the complaint," and not the weight of the evidence, that must be assessed. *Id.* (citing *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 113 (2d Cir.2010)).

For the reasons set forth below, Defendants' motion to dismiss should be denied.

**B.     The Act's arbitration requirement deprives Plaintiffs of their Seventh Amendment right to a jury trial.**

**1.   Plaintiffs' claims to be paid for their services are legal in nature and the Seventh Amendment right to a jury therefore attaches to those claims.**

Defendants do not dispute that the constitutional right to a trial by jury attaches to an action involving claims "traditionally enforced in an action at law." *Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*, 933 F.2d 131, 135 (2d Cir. 1991) (quoting *Pernell v. Southall Realty*, 416 U.S. 363, 375 (1974)). While Defendants contend they see "good reasons to doubt" that suits in *quantum meruit* for monetary relief (like the claims at issue) are actions at law (Def. Br. at 27), the weight of authority leaves little reason to doubt. *See* Pls. Opening Br. at 12 (citing cases); *Athletes & Artists, Inc. v. Millen*, 1999 WL 587883, at *8 (S.D.N.Y. Aug. 4, 1999) ("In the past, there had been confusion concerning the nature of quantum meruit proceedings—whether they are actions at equity (where a jury is not permitted) or at law (where a jury demand must be honored). It now seems settled that an action for quantum meruit must be deemed an action at law."); *GSGSB, Inc. v. New York Yankees*, 1995 WL 507246, at *5 (S.D.N.Y. Aug. 28, 1995) (holding that "since quantum meruit is an action at law, numerous federal courts have allowed actions for quantum meruit to be tried before a jury," and collecting cases). Other federal courts agree. *See Skepnek v. Roper & Twardowsky, LLC*, 2015 WL 5178054, *2-3 (D. Kan. Sept. 4, 2015)

(collecting cases, holding that "plaintiffs' *quantum meruit* claim is an action at law and seeks legal relief [and] is therefore triable to a jury," stating that "[q]uantum meruit is a form of quasi-contract that enables [a] performing party to recover the reasonable value of [their] services rendered," and "[i]n federal courts, actions in quasi-contract grew out of the common law writ of assumpsit and, therefore, are actions at law"). Cases cited by Defendants are not to the contrary.[1]

Since *quantum meruit* claims are suits at law, the Seventh Amendment's right to a jury trial attaches to those claims. U.S. Const. Amend. VII. Defendants' argument that "Plaintiffs' congressionally created public rights may be properly delegated to an administrative tribunal shorn of a jury right" (Def. Br. at 27) misses the point. Claims by out-of-network physicians for the fair value of their services are *not* created by Congress. They are preexisting state common law rights. Nor are they public rights. The Seventh Amendment, therefore, requires that those rights be adjudicated by a court. Congress cannot bypass the Seventh Amendment by relabeling an existing state law right, and then claiming that no jury trial is required because it has created a new right.

### 2.  The Act does not fall within the "Public Rights" Exception to Article III.

The compulsory arbitration process defined by the Act does not create a new "public right," nor is the statute a "public regulatory scheme" as that term has long been understood by the courts. Defendants' arguments to the contrary (Def. Br. 21 – 25) rest on a fundamental mischaracterization of both the "public rights" exception and the nature of Plaintiffs' claims.

Plaintiffs' common law claims are against the recipient of the medical treatment, not the insurer. The Act improperly seeks to contort these existing common-law contract claims against

---

[1] *See* Def. Br. at 27, citing *R.B. Ventures, Ltd. v. Shane*, 112 F.3d 54 (2d Cir. 1997), which did not examine whether a *quantum meruit* claim is entitled to a jury trial, and *Speedfit LLC v. Woodway USA, Inc.*, 2020 WL 3051511 (E.D.N.Y. June 8, 2020), where the plaintiffs argued that they had a right to a jury for their claim for unjust enrichment, because, they argued, it was synonymous with *quantum meruit,* warranting a jury trial, a position the court rejected.

the patient into an action against the insurer alone in order to force physicians into a truncated adjudication process before a private arbitrator, a scheme without precedent in our laws.

### a. The Act does not create a new "Public Right."

The public rights exception is limited to circumstances in which the "right to compensation [under a regulatory scheme] does not depend on or replace a right to such compensation under state law." *Thomas v. Union Carbide Agr. Products Co.*, 473 U.S. 568, 584 (1985) (citing *Northern Pipeline Construction Co.*, 458 U.S. 50, 84 (1982)) ("Rather, such inroads suggest unwarranted encroachments upon the judicial power of the United States, which our Constitution reserves for Art. III courts."). In determining whether an assignment of a claim to a non-Article III tribunal is permissible, the first question that must be addressed, therefore, is whether "Congress 'creat[ed] a new cause of action, and remedies therefor, unknown to the common law,' because traditional rights and remedies were inadequate to cope with a manifest public problem." *Jarkesy v Sec. and Exch. Comm'n*, 2022 WL 1563613, at *4 (5th Cir. May 18, 2022) (quoting *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 60-63 (1989)).

Formerly confined to "matter[s] of public rights [which] must at a minimum arise 'between the government and others,'" *Northern Pipeline,* 458 U.S. at 69, the definition of "public rights" has expanded to include cases where the federal government is not a party, but where "the claim at issue derives from a federal regulatory scheme, or in which resolution of the claim by an expert Government agency is deemed essential to a limited regulatory objective within the agency's authority." *Stern v. Marshall*, 564 U.S. 462, 490 (2011). That exception does not apply here.

The compulsory arbitration mandated by the Act clearly does not fall within the more limited definition of the "public rights" exception embraced prior to *Northern Pipeline*, as the federal government was never a party to the controversies the Act purports to resolve by arbitration. These are purely actions to determine "the liability of one individual to another under

5

the law as defined," *Northern Pipeline*, 458 U.S. at 69-70, *citing Crowell v. Benson*, 285 U.S. 22, 51-52 (1932), neither dependent upon nor arising from a federal statutory scheme. Rather than the claims "'arising between the government and others, which from their nature do not require judicial determination and yet are susceptible of it,'" *Oil States Energy Services, LLC v Greene's Energy Grp., LLC*, 138 S. Ct. 1365, 1373 (2018) (citations omitted), the claims at issue are purely private claims between individuals, and neither involve nor implicate the federal government, nor any new right, privilege, or franchise granted by the government. *Id.*

The Act is unprecedented precisely because it does not create a new right as an adjunct to a larger regulatory scheme. Instead, the primary object of the scheme is to "replace" an existing state law contract claim, *Thomas*, 473 U.S. at 584, with substantively the same claim, also sounding in contract, between the provider and the patient's insurer, a claim which the Act does not permit to be heard before or even reviewed by an Article III tribunal. This is a power that the states might exercise, *see, e.g.*, *Munn v People of State of Illinois*, 94 U.S. 113, 122 (1876), but that Congress may not exercise without encroaching upon the judiciary's powers under Article III.

Plaintiffs' common law claims at issue do not "arise" from the Act, because "a case arises under federal law for purposes of Article III jurisdiction whenever federal law 'forms an ingredient of the original cause.'" *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 375 (2004). The "original cause" in this case has no federal law "ingredient." Rather, Congress has merely assigned "traditional legal claims" to a non-Article III tribunal. *Granfinanciera*, 492 U.S. at 52. The fact that Congress has put a new label on a pre-existing common-law claim and diverted it into what amounts to a summary extra-agency arbitration does not change the nature of the analysis, for the "ingredients" are the same. "Congress cannot convert any sort of action into a 'public right' simply by finding a public purpose for it and codifying it in federal statutory law." *Jarkesy*, 2022 WL

1563613, at *6.

The Fifth Circuit's recent decision in *Jarkesy* is instructive. There, the plaintiff challenged the constitutionality of Congress's delegation of securities fraud claims to the SEC's in-house adjudication process, which deprived the plaintiff of the right to a jury trial. The SEC argued that the legal interests at issue vindicated "public rights," and that Congress therefore could properly delegate such actions to agency proceedings without juries. 2022 WL 1563613 at *2. The Fifth Circuit rejected this argument and held that "[t]he Seventh Amendment guarantees Petitioners a jury trial because the SEC's enforcement action is akin to traditional actions at law to which the jury-trial right attaches. And Congress, or an agency acting pursuant to congressional authorization, *cannot assign the adjudication of such claims to an agency because such claims do not concern public rights alone*." *Id.* (emphasis added).[2] Thus, the court ruled that the mandatory adjudication process was unconstitutional as violative of the Seventh Amendment. It is respectfully submitted that this case presents an even clearer constitutional violation, where Plaintiffs seek to preserve their right to a jury trial of state common law claims between physicians and patients, and where the federal government traditionally has had more limited involvement (*see* Section E, *infra*), unlike in the securities industry. Moreover, the claims here, like the claims in *Jarkesy*, are classic actions at law, to which the jury-trial right attaches.

### b. The IDR process is not a part of a "public regulatory scheme"

The operative inquiry for determining whether Congress acts within its power in assigning an adjudicative function to a non-Article III court is whether Congress "create[d] a seemingly

---

[2] In reaching this decision, the Fifth Circuit noted that "[s]urely Congress believes that the securities statutes it passes serve the public interest and the U.S. economy overall, not just individual parties." *Id.* at *6. But the court rejected this argument, holding that Congress cannot convert any action into a "public right" simply by finding a public purpose for it. *Id.* (citing *Granfinanciera*).

'private' right that is so closely integrated into a public regulatory scheme as to be a matter appropriate for agency resolution with limited involvement by the Article III judiciary." *Thomas*, 473 U.S. at 594. Here, Congress did not create a "public regulatory scheme."

The public regulatory scheme at issue in *Thomas* is illustrative: the Court addressed itself to the 1978 amendments to the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), 7 U.S.C. § 136 *et seq.*, which is a general act for the regulation of pesticides. The challenged statutory arbitration at issue in *Thomas* was not dissimilar to the one in the Act—in the event of a dispute over "follow-on registrations" concerning the safety of registered pesticide products which were FIFRA's primary object, the parties were first obliged to negotiate their relative liability for sharing of costs related to FIFRA's data collection requirements and, if such negotiations were fruitless, would then face binding arbitration to resolve the dispute.7 U.S.C. § 136a(c)(1)(F)(iii).]

Unlike the Act, however, the "public regulatory scheme" at issue in *Thomas* did not have as its sole, or even primary, object the resolution of these follow-on registration cost sharing disputes. FIFRA's object was the collection of data concerning pesticide products' health, safety, and environmental impact, of which the binding arbitration scheme was an essential part, but even so, only a part. *Thomas*, 473 U.S. at 573

The Act, however, has as its primary (and seemingly *sole*) objective an attempt to extinguish claims by providers against private individuals who use their services. In so doing, Congress did not "create" a private right. *Thomas*, 473 U.S. at 594. Indeed, no right was created at all. Instead, Congress barred state-based common law claims against the patient and substituted a right of action against the insurer alone, which is then shunted into a dead-end venue: mandatory binding arbitration before a private arbitrator to which the provider never consented, and over which no meaningful judicial review may be had. Rather than create a new right, "Congress simply

8

reclassified a pre-existing, common-law cause of action, […] a purely taxonomic change," *Granfinanciera*, 492 U.S. at 60-61, which cannot act to strip Article III courts of jurisdiction to hear the dispute. The Act, therefore, does not "create a private right" in any meaningful sense, nor is the attempt to extinguish these claims "closely integrated into a public regulatory scheme." Here, the Act's "independent dispute resolution" process ("IDR"), for all practical purposes, *is* the regulatory scheme. Defendants thus rely on circular logic, seeking to justify an otherwise impermissible Article III violation by reference to itself.

Even the authorities cited by Defendants make clear that such a law is without precedent. Non-Article III adjudicatory measures have passed constitutional muster when the regulatory scheme of which they are a part deal with, for example, comprehensive regulation of commodities brokers, *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833 (1986), comprehensive regulation of workplace safety, *Atlas Roofing Co. Inc. v. Occupational Safety and Health Review Comm'n*, 430 U.S. 422 (1977), and registration of hazardous products, *Thomas*. Here, however, Defendants have cited no examples where the sole object of the purported "regulatory scheme" is the adjudicatory component itself, presumably because no such examples exist. Despite the characterization of the Act as "highly technical" or "comprehensive" (Def. Br. at 22), the complexity of a "regulatory scheme" that nonetheless has as its primary objective an otherwise impermissible violation of Article III cannot be sufficient to bring the Act within the limited and narrow exception of the public rights doctrine. Otherwise, Article III would be rendered meaningless; Congress would be free to assign any claim to a private arbitrator provided that the statute doing so was sufficiently byzantine.

### c. Article III requires that compulsory non-consensual arbitration be reviewable by a court of record

Even if the Court were to hold that Plaintiffs' common law claims were closely integrated

into a public regulatory scheme, recourse to a court would still be required.

Indeed, in *Granfinanciera*, upon which Defendants rely, the Supreme Court recognized that *some* involvement by the Article III judiciary is necessary, even where the right at issue is closely integrated into a public regulatory scheme. Specifically, the Court held that "[t]he crucial question, in cases not involving the Federal Government, is whether 'Congress, acting for a valid legislative purpose pursuant to its constitutional powers under Article I, [has] create[d] a seemingly 'private' right that is so closely integrated into a public regulatory scheme as to be a matter appropriate for agency resolution with ***limited*** involvement by the Article III judiciary." *Granfinanciera*, 492 U.S. at 54 (quoting *Thomas*, 473 U.S. at 593-94) (emphasis added). The Court further noted that "district courts may presently set aside clearly erroneous factual findings by bankruptcy courts." *Id.* at 50. Thus, the non-Article III tribunal at issue in *Granfinanciera*, a bankruptcy court, was materially different from the arbitrations required by the Act, which does not provide for even "limited involvement by the Article III judiciary." Rather, the Act completely bars healthcare providers from ever seeking recourse to any court, at any stage. *Granfinanciera* thus does not shield the Act from the requirement that Plaintiffs be permitted some access to the judiciary.

Defendants' reliance on *Germain v. Conn. Nat. Bank*, 988 F.2d 1323 (2d Cir. 1993) is also misplaced. In *Germain*, the Second Circuit held that "Congress may decline to provide jury trials for cases 'involving statutory rights that are integral parts of a public regulatory scheme and whose adjudication Congress has assigned to . . . a specialized court of equity,' because such rights are 'public.'" 988 F.2d at 1331. This holding is inapposite for at least four reasons. First, the rights at issue are not "public rights," nor are they "integral parts of a public regulatory scheme" as discussed above in Sections (B)(2)(a) and (b). Second, Plaintiffs' claims for payment were not

newly created by Congress; they were preexisting claims that Congress simply sought to relabel and modify. Third, *Germain* did not permit the government to relegate claims to arbitration that is mandatory, binding, and final. Rather, in *Germain*, the Second Circuit was asked to decide whether the Seventh Amendment applied to a bankruptcy trustee's claims for tortious interference, breach of contract and other common law claims. The court held that the Seventh Amendment did apply, and that the right to a jury trial was not barred by the public rights doctrine. 988 F.2d at 1332. Finally, the arbitral panels required by the IDR process are not "specialized courts of equity."

*Atlas Roofing* also does not support Defendants' position. In that case, the Supreme Court held that Congress could create new statutory "public rights" and assign their adjudication to an administrative agency. *Atlas Roofing Co.*, 430 U.S. at 455. But even if Plaintiffs' rights to payment were public rights (which they are not), Congress has not assigned them to an administrative agency. Rather, it has assigned them to private arbitrators, without any of the rules or safeguards that apply to administrative agency adjudicatory proceedings.

Accordingly, Congress may not force Plaintiffs to forgo jury trials in favor of the Act's mandatory arbitration scheme without recourse to any court.

## C.     Arbitration requires consent.

The Supreme Court has emphasized that voluntariness is the "first principle" of arbitration. *AT & T Technologies, Inc. v. Communications Workers of Am.*, 475 U.S. 643, 648 (1986). The Supreme Court has thus recognized that "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 123 S. Ct. 588, 589 (2002) (citing *Steelworkers v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960)); *see also Vera v. Saks & Co.*, 335 F.3d 109, 116 (2d Cir. 2003) (affirming that "'arbitration is a matter of contract,' and therefore 'a party cannot be required to submit to arbitration any dispute which [it] has not so agreed to submit'") (quotation omitted).  It is therefore well-

established that without an explicit statement, or conduct implying an agreement to arbitrate, arbitration will not be compelled. *Old Dutch Farms, Inc. v. Milk Drivers & Dairy Employees Union*, 359 F.2d 598, 603 (2d Cir. 1966); *Gvozdenovic v. United Air Lines, Inc.*, 933 F.2d 1100, 1105 (2d Cir. 1991).

There are many good reasons for the policy against forcing parties to arbitrate absent any agreement to do so. Congress has therefore strongly cautioned *against* mandatory arbitration schemes on legal as well as public policy grounds:

> Congress found that '[m]andatory arbitration undermines the development of public law because there is inadequate transparency and inadequate judicial review of arbitrators' decisions' and noted '[a]rbitration can be an acceptable alternative when consent to the arbitration is truly voluntary, and occurs after the dispute arises." The mandatory arbitration clause in GEICO's policies, prescribed by Section 5106(b) of New York Insurance Law, does not result in arbitrations that are 'truly voluntary' because it is mandated by statute and not by voluntary agreement of the parties. Further, unlike a bargained-for arbitration clause, the parties here are not permitted to choose where the arbitrations take place, who will serve as the arbitrators, or any other procedural components of the arbitration.

*Gov't Emps. Ins. Co. v. Mayzenberg*, 2018 WL 6031156, *3 (E.D.N.Y. Nov. 16, 2018) (emphasis in original) (granting preliminary injunction staying all pending and future no-fault collections arbitrations).

Those same concerns are implicated here. Unlike a contractual arbitration agreement, the Act requires healthcare providers to go to mandatory, binding, and final arbitration against a party with whom they have no contractual relationship, and where they have no practical ability to choose the "procedural components of the arbitration." Moreover, Plaintiffs here are not "merely the instrumentality" of a party bound by an arbitration agreement. *Koreska v. Perry-Sherwood Corp.*, 253 F. Supp. 830, 831 (S.D.N.Y. 1965), *aff'd sub nom. Matter of Koreska*, 360 F.2d 212 (2d Cir. 1966). Instead, the Act creates a forced arbitration scheme unprecedented in its scope and constraint. It covers emergency physicians who, by the nature of their roles, must regularly treat

patients they do not know and did not choose, and who may be covered by insurers with which the physicians have no relationship, nor any desire for any relationship. The physicians are forced to give up any right to payment from the recipient of their treatment, and instead, are forced into an arbitration scheme with those insurers that lacks critical due process safeguards (*see infra* Section (D)(2)), and which is based on rates they never negotiated. And the arbitration is final, with no recourse to any court of law, except in the most egregious cases of fraud, bias or misconduct.

Therefore, the Act violates the most basic and well-settled principles of arbitration.[3]

**D.    The Act violates the Fifth Amendment by depriving Plaintiffs of property without just compensation.**

**1.   Plaintiffs have cognizable property interests.**

Defendants argue that "Plaintiffs' due process and takings claims both turn on whether or not Plaintiffs possess a protected property interest, of which the Act deprives them. Both claims also fail because Plaintiffs have not yet been deprived of any property interest." (Def. Br. at 32). Although Defendants contend that it is "unclear" what property interest of Plaintiffs' is being deprived, Plaintiffs clearly allege that the Act deprives physicians, including Plaintiffs, of their "property rights to the reasonable value of the services they have rendered without due process of law by allowing health plans to determine the standard by which the 'independent dispute resolution process' determines physicians' claims." (Complaint ¶¶ 71, 72). Plaintiffs also allege the Act amounts to a taking of their property without just compensation "by prohibiting physicians

---

[3] Defendants argue that any "problematic" provisions of the Act should be severed and the remainder left intact because courts "apply a presumption in favor of severability." (Def. Br. at 29). However, Defendants are incorrect in claiming that the offending portions of the Act can effectively be severed. As discussed above, the Act's entire purpose and focus is the transmutation of physicians' state common law claims for payment into claims relegated to binding arbitration against insurers. *See* Section (B)(2)(a). The unconstitutional arbitration process cannot be severed from the rest, as doing so would leave physicians without any avenue for payment whatsoever. This result would be unconstitutional, unworkable, and unsustainable, and it would have ruinous consequences for the emergency medical services industry as we know it.

from recovering the balance of the fair value of their services from their patients." (Complaint ¶¶ 3, 77, 78).

Defendants also argue that compensation for the treatment of future patients is not a recognized property right, "[n]or do providers hold a property interest in any asserted common law right to sue for the value of services rendered to patients." (Def. Br. At 32-33). Not so. "Property interests derive not from the Constitution, but from 'existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims.'" *DeMartino v. New York State Department of Lab.*, 167 F. Supp. 3d 342, 358-59 (E.D.N.Y. 2016) (quoting *Gen. Elec. Co. v. New York State Dep't of Lab.*, 936 F.2d 1448, 1453) (2d Cir. 1991)).

Here, physicians providing emergency care services, such as Plaintiffs, have a cognizable property interest in being fully and fairly compensated for services they render to their patients, both in state court under common law, and against third-party insurers within the confines of the federally compelled IDR process. For example, courts have consistently held that "professionals who provide services under a federal program such as Medicaid or Medicare have a property interest in reimbursement for their services at the 'duly promulgated reimbursement rate.'" *Furlong v. Shalala*, 156 F.3d 384, 393 (2d Cir. 1998); *accord Rock River Health Care, LLC v. Eagleson*, 14 F.4th 768, 774 (7th Cir. 2021) ("Providers possess a legitimate entitlement to be paid for services rendered"); *Arthritis and Osteoporosis Clinic of East Texas, P.A. v. Azar*, 450 F. Supp. 3d 740, 749 (E.D. Tex. 2020) (Medicare provider had "a valid property interest in receiving Medicare payments for services rendered."). So too, here, Plaintiffs have a cognizable right to compensation for services rendered by them in an emergency setting. Thus, to the extent that Defendants rely on cases dealing generally with the right of "doing business" or about a property

14

interest to reimbursement "at any specific [Medicaid] rate" or participation in the Medicaid program (Def. Br. at 32), they are irrelevant to the facts presented here.

Further contrary to Defendants' assertion, "[t]here is no dispute that a legal cause of action constitutes a 'species of property protected by the Fourteenth Amendment's Due Process Clause.'" *New York State Nat. Org. for Women v. Pataki*, 261 F.3d 156, 163 (2d Cir. 2001) (quoting *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982)). In that regard, "an implied contract, recognized under state law"—such as an implied agreement to pay for services *quantum meruit*— provides the basis for a property interest that would be given constitutional protection. *Branum v. Clark*, 927 F.2d 698, 705 (2d Cir. 1991) (citing *Perry v. Sindermann*, 408 U.S. 593, 601–03 (1972)); *Airday v. City of New York*, 310 F. Supp. 3d 399, 420 (S.D.N.Y. 2018) ("[t]he law of contracts, including the rules governing implied contract, can establish the required property interest"). Similarly, a party has a cognizable property interest in "getting paid for work properly performed." *DeMartino*, 167 F. Supp. 3d at 361.

If, as is the case here, a statute "flatly preclude[s]" a claimant from pursuing her claim, due process is "implicated" and "a deprivation would have occurred." *New York State Nat. Org. for Women*, 261 F.3d at 163. Thus, it is clear that:

> [E]xtinguishing [the plaintiff's] right to enforce its contract claim ... in the United States courts constitute[s] a taking. Valid contracts ... and the rights arising out of such contracts are property and protected by the Fifth Amendment.... When the right to enforce a contract in the United States courts is taken away or materially lessened, the contract and the rights thereunder are taken within the meaning of the Constitution.

*Morgan Guar. Tr. Co. of New York v. Republic of Palau*, 680 F. Supp. 99, 105 (S.D.N.Y. 1988) (citation omitted); *see also Aureus Asset Managers, Ltd. v. United States*, 121 Fed.Cl. 206, 213 (Fed. Cl. 2015) ("Plaintiffs have alleged sufficient facts to show a property interest in the insurance contracts they sought to protect with a legal claim against Libya, which the United States

15

subsequently extinguished."). Moreover, the Act, by purporting to create a new claim to be adjudicated in the IDR process, itself implicitly recognizes the existence of Plaintiffs' property interest in their common law claims even as it attempts to extinguish them. *See Gen. Elec. Co*, 936 F.2d at 1453 ("GE's property interest is implicit in § 220 itself, which both creates an entitlement to payment of the full contract price . . . and provides for a hearing to determine if cause exists to deprive a contractor of the full contract price.").

Plaintiffs hold a cognizable interest in their New York common law *quantum meruit* claims to be paid for services rendered to patients. Plaintiffs' right to their claims, and their right to a fair adjudication of those claims, are property interests protected by their right to due process under the Fifth and Fourteenth Amendments, and they have the right to be compensated under the Fifth Amendment for the government's taking of such claims.

The authority relied on by Defendants (Def. Br. at 33) is inapposite because those cases considered whether a contract *dispute* between a private party and a governmental body may give rise to a due process claim, rather than whether a party's right to the *existence* of his claim that has been extinguished by the government constitutes a protected property interest.[4] Plaintiffs allege no contractual dispute with Defendants, and do not seek to adjudicate any contractual term. Rather, Plaintiffs seek relief from Defendants' unconstitutional taking of their state law claims, done for Defendants' stated purpose of creating another claim altogether within the confines of an unconstitutional IDR process.

---

[4] *See Martz v. Inc. Vill. of Valley Stream*, 22 F.3d 26, 27 (2d Cir. 1994) ("Village's alleged breach of a contract with Martz in not paying her for professional services rendered did not constitute a deprivation of a property interest protected by the Fourteenth Amendment"); *Walentas v. Lipper*, 862 F.2d 414, 418 (2d Cir. 1988) ("There is a distinction between the breach of an ordinary contract right and the deprivation of a protectible property interest within the meaning of the due process clause."); *Costello v. Town of Fairfield*, 811 F.2d 782,784 (2d Cir. 1987) ("Clearly, it is the interpretation of a contract term that is at issue here and the appellants have pursued this contract dispute in the district court under the guise of a due process violation.").

### 2.  The Act deprives Plaintiffs of procedural due process.

"A fundamental requirement of procedural due process is 'the opportunity to be heard'" in a "meaningful time and in a meaningful manner." *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965). The purpose of procedural due process is "to minimize substantively unfair or mistaken deprivations of property." *Krimstock v. Kelly*, 306 F.3d 40, 52 (2d Cir. 2002) (quoting *Fuentes v. Shevin*, 407 U.S. 67, 80-81 (1972)). "The concept of due process is a flexible one which calls for such procedural protections as are necessary for a particular situation for the purpose of minimizing the risk of erroneous decisions." *Rock River Health Care, LLC*, 14 F.4th at 776 (citing *Greenholtz v. Inmates of Nebraska Penal and Correctional Complex*, 442 U.S. 1, 12–13, (1979)).

Defendants argue, first, that Plaintiffs fail to recognize that the qualified payment amount ("QPA") "is defined by reference to the 'contracted rates' recognized by the plan or insurer" and these "contracted" rates are "negotiated at arms-length *between* the plan or insurer and another party—typically the health care provider," and the Act thus treats the QPA as a "reasonable proxy for what the agreed-upon payment rate between a provider and a plan or insurer would have been for a given out-of-network service." (Def. Br. at 30). Defendants' description of the Act is, however, incomplete and does not respond to Plaintiffs' allegations.

The Act prohibits out-of-network physicians, such as Plaintiffs, from recovering anything for their services other than the amount determined by the IDR process—they are effectively captive to that process. The Act requires that the IDR determine the amount to which an out-of-network physician is entitled on the basis of the QPA "for the applicable year for comparable services," with the potential to also consider additional circumstances, such as the physician's level of training or experience; acuity of the individual receiving treatment; market share of the physician or health plan; and demonstrations of good faith efforts to enter into network agreements. 42 U.S.C. § 300gg-111(c)(5)(C). (Complaint at ¶ 68). The Act defines the QPA as the "median of

17

the contracted rates recognized by the" insurer as of January 31, 2019 in the same insurance market for "the same or similar item or service" provided by a provider "in the same or similar specialty and . . . geographic region," increased by inflation over the base year. 42 U.S.C. § 300gg-111(a)(3)(E)(i). (Complaint at ¶ 69). The Act, however, specifically excludes consideration of "usual and customary charges," which would be the amount the provider would have charged had the Act not applied, or the amounts payable under Medicare or Medicaid. 42 U.S.C. § 300gg-111(c)(5)(D). (Complaint at ¶ 68). The Act thus defines the amount to which every physician, including out-of-network physicians such as Plaintiffs, are entitled to be paid for their services by the amount the insurer has agreed to pay in-network physicians through negotiations with those physicians, subject to the potential consideration of a handful of additional circumstances. But the Act expressly *excludes* consideration of the amount an out-of-network physician would customarily charge in determining the QPA.

Therefore, even if the QPA is based upon fees agreed to between an insurer and its in-network physicians, the out-of-network physicians subject to the IDR process are not parties to those negotiations. The in-network physicians have no authority, interest, or incentive to act on behalf of out-of-network physicians during those negotiations, and whether such negotiations are "arms-length," as Defendants contend, is wholly irrelevant. In determining the QPA, the Act effectively compels out-of-network physicians to accept what an insurer has previously agreed to pay in-network physicians without *any* input of evidence or data by the out-of-network physicians. Specifically, in determining the QPA, out-of-network physicians are prohibited by the Act from submitting data on the amount an out-of-network physician would customarily charge. Indeed, as one court has already found, the Rule implementing the Act treats the QPA as "an insurer-determined number," and makes it the default payment amount under the IDR process. *Texas*

*Medical Ass'n v. U.S. Dep't of Health and Human Servs.*, 2022 WL 542879, \*9 (E.D. Tex. Feb. 23, 2022). The Act thus denies the out-of-network physician a meaningful opportunity to be heard during the IDR process, thereby depriving them of procedural due process.

A recent Seventh Circuit decision is instructive. In *Rock River Health Care, LLC v. Eagleson*, the Court of Appeals reversed a decision of the lower court dismissing a procedural due process claim brought by nursing care providers against the state department administering the state's Medicaid program. 14 F.4th at 770-71. The provider plaintiffs alleged that, in conducting audits of the providers and recalculating reimbursement rates, the defendant failed to provide the plaintiffs with preliminary results and did not identify missing or deficient documents to give the plaintiffs an opportunity to respond. *Id*. at 772. The plaintiff providers also alleged that the procedure was inadequate to provide due process because it "prohibits the submission of any evidence not provided to the auditors at the initial stage." *Id*. The Court of Appeals held that "[a]t this early stage in the litigation, the allegations are sufficient to allege a violation of procedural due process," noting that "[e]ven in cases involving relatively-minimal property interests, courts have recognized that due process at a minimum requires an opportunity to ascertain and confront the evidence in opposition." *Id*. at 778, 780. The court reasoned that:

> The Providers, then, are not made aware of the evidence against them before the decision is made to recalculate the reimbursement rates. And at that point, the Providers have no further opportunity to present documents or other evidence. That omission is consequential because, in the absence of an opportunity to respond to new evidence gathered by the auditors, the Providers would have no opportunity to address all of the facts upon which the recalculation is based. In that way, the procedures followed by the auditors gave the Providers an opportunity to present a legal challenge to the decision, but denied them any practical opportunity to mount a factual challenge to it. What is lacking in the procedures allegedly followed is a fundamental part of any due process inquiry, which is the opportunity to be presented with the evidence against the entity and an opportunity to respond.

*Id*. at 778 (emphasis in original).

Here, too, Plaintiffs are not aware of, and have no input in, the makeup of the QPA which

is largely based upon fees agreed to between an insurer and its in-network physicians. They are precluded by the Act from submitting any data or evidence, at any stage, regarding the amount an out-of-network physician would customarily charge, thus limiting their ability to submit realistic data to calculate their fees. As was the case with the providers in *Rock River Health Care*, *LLC,* here Plaintiffs have no opportunity to address all of the facts upon which the QPA calculation is based. In that way, the Act's procedures give Plaintiffs "an opportunity to present a legal challenge to the [arbitrator's] decision, but den[y] them any practical opportunity to mount a factual challenge." *Id.* at 778. *See also Kellman v. District Director, U.S. I.N.S.*, 750 F.Supp. 625, 628 n.4 (S.D.N.Y. 1990) ("procedural due process cannot be satisfied merely by the opportunity for a hearing where the result of that hearing is statutorily predetermined"); *accord D'Angelo v. Winter*, 403 Fed.Appx. 181, 182 (9th Cir. 2010) ("A hearing with a predetermined outcome does not satisfy due process."); *Washington v. Kirksey*, 811 F.2d 561, 564 (11th Cir. 1987) ("Due process of law does not allow the state to deprive an individual of property where the state has gone through the mechanics of providing a hearing, but the hearing is totally devoid of a meaningful opportunity to be heard."). Accordingly, the IDR scheme set forth in the Act as implemented by the Rule denies Plaintiffs their procedural due process and must be struck down as unconstitutional.

Defendants also argue that the QPA does not alone determine the outcome of the IDR process (Def. Br. at 31), but that position is belied by the Rule providing that the QPA is the *default rate* that must be considered by the arbitrator. *See* 45 CFR § 149.510(c)(4)(ii); *Texas Medical Ass'n*, 2022 WL 542879, *9. To the extent that part of the Rule has been vacated by the Eastern District of Texas court, as discussed below, Defendants have indicated an intent to appeal that ruling. In any event, by Defendants' own admission, a new governing rule has yet to be issued by Defendants, making this defense premature.

### 3.  Plaintiffs' Fifth Amendment claim is ripe.

Defendants argue that any claim by Plaintiffs for the deprivation of a property interest is "at this juncture premature" because "it is entirely premature to speculate whether an arbitration under the Act will actually result in Plaintiffs obtaining anything less than the fair value of the services they provide." (Def. Br. at 33-34).

Defendants, however, misunderstand Plaintiffs' position. Plaintiffs do not premise their takings claim on the outcome of future IDR proceedings. Rather, Count IV of the Complaint asserts a claim under the Fifth Amendment because the Act prohibits out-of-network physicians, who are primarily emergency care providers such as Plaintiffs, the right to bill and hold liable patients for the reasonable value of services rendered in excess of the amount determined by the IDR, without the physicians receiving just compensation. (Complaint ¶ 33, 78; 42 U.S.C. § 300gg-131 and 132). To the extent Defendants argue that Plaintiffs' takings claim, properly construed, is still unripe, the Court should reject that position.

A property owner acquires a right to compensation immediately upon an uncompensated taking, by regulation or otherwise, because the taking without compensation "violates the self-executing Fifth Amendment at the time of the taking, [and] the property owner can bring a federal suit at that time." *Knick v. Township of Scott*, 139 S.Ct. 2162, 2172 (2019). "When a plaintiff alleges a regulatory taking in violation of the Fifth Amendment, a federal court should not consider the claim before the government has reached a 'final' decision." *Pakdel v. City and Cnty. of San Francisco*, 141 S.Ct. 2226, 2228 (2021). The finality requirement is "relatively modest," requiring "nothing more than *de facto* finality," and "[a]ll a plaintiff must show is that 'there [is] no question ... about how the 'regulations at issue apply to the particular [property] in question.'" *Id.* at 2230. Once "the government is committed to a position," the dispute is "ripe for judicial resolution." *Id.* Thus, a claim for injunctive relief is ripe if the government has reached a final decision that will

enable a future taking. *See Barber v. Charter Twp. of Springfield*, 31 F.4th 382, 388-89 (6th Cir. 2022) (citing *Cedar Point Nursery v. Hassid*, 141 S.Ct. 2063, 2070, 2072-73 (2021)) ("As the Supreme Court made clear, plaintiffs may sue for injunctive relief even before a physical taking has happened.").

Here, Defendants concede that the federal government has made a final decision to preclude out-of-network physicians, such as Plaintiffs, from balance billing and seeking to hold liable patients receiving emergency care from those physicians. Accordingly, Plaintiffs' taking claim and request for injunctive relief precluding the Act's implementation is ripe for adjudication. A holding to the contrary would be senseless. If Plaintiffs' future *quantum meruit* claims have been extinguished by the Act *ab initio*, such claims would never "ripen." Undoubtedly, at some later date, Defendants would argue that a taking has not occurred because the Act extinguished Plaintiffs' claims in the first place. The law does not countenance such a result. For example, in *Knick*, the Supreme Court authorized property owners to seek damages for unconstitutional takings in federal court without first resorting to state law remedies. *Knick*, 139 S. Ct. at 2172–73. In so holding, the Chief Justice explained that, under prior precedent, plaintiffs had found themselves in a "Catch-22": they could not go to federal court without going to state court first, but if they went to state court and lost, their claims would be barred in federal court, such that the "federal claim dies aborning." *Id.* at 2167. Here, too, Plaintiffs need not wait until some point in the future to assert a taking claim when the Act *in fact* extinguishes Plaintiffs' property rights *now*, creating an actionable taking cause of action. Plaintiffs cannot be compelled to wait until a point in the future when Defendants will seek to trap Plaintiffs and others similarly situated in a "Catch-22."

**E.     The Act does not preempt Plaintiffs' state common law claims.**

Defendants rely on *Granfinanciera* for the proposition that "Congress can 'supplant a common law cause of action' with a statutory right adjudicated by an administrative tribunal."

(Def. Br. p. 28). Defendants' quotation of *Granfinanciera*, is, however, truncated. The Court's full statement is as follows:

> In *Atlas Roofing*, supra, 430 U.S., at 458, 97 S.Ct., at 1270, we noted that Congress may effectively supplant a common-law cause of action carrying with it a right to a jury trial with a statutory cause of action shorn of a jury trial right *if that statutory cause of action inheres in, or lies against, the Federal Government in its sovereign capacity*.

*Granfinanciera*, 492 U.S. at 53 (emphasis added). The Court continued that the class of "public rights" which Congress may assign to administrative agencies or courts of equity sitting without juries may be more "expansive," and the federal government need not be a party.

However, as discussed *supra*, Sections (B)(2)(b) and (C), the Act neither created a new "public right," nor was the "right" at issue a component of an otherwise permissible federal regulatory scheme. As the Court in *Granfinanciera* concluded, while providing jury trials in some actions may "impede swift resolution" and increase the expense of bankruptcy proceedings, "these considerations are insufficient to overcome the clear command of the Seventh Amendment." *Id.* at 63 (citing *Bowsher v. Synar*, 478 U.S. 714, 736 (1986) ("[T]he fact that a given law or procedure is efficient, convenient, and useful in facilitating functions of government, standing alone, will not save it if it is contrary to the Constitution.")).

Defendants' reliance on *In re Series 7 Broker Qualification Exam Scoring Litig.*, 548 F.3d 110 (D.C. Cir. 2008) and *Lanier v. BATS Exch., Inc.*, 105 F. Supp. 3d 353 (S.D.N.Y. 2015) is similarly misplaced. In *In re Series 7 Broker Qualification Exam Scoring*, the court held that the state law claims at issue based on breach of contract and negligence stemming from errors in the scoring of the plaintiffs' standardized tests administered by the National Association of Securities Dealers ("NASD") could only have arisen from the NASD's duties under the Securities and Exchange Act of 1934 ("Exchange Act"). 548 F.3d at 115. The court found that "[w]ere it not for the regulations that flow from the Exchange Act, NASD would not be administering the Series 7

examination," and thus "[t]hese duties arise only under the Exchange Act, and they are not open to suit under state common law theories." *Id.* The court therefore held that such common law claims were preempted, and Congress could adopt a specific process against SEC regulators and those operating in their stead which did not provide for monetary relief and could "displace[] claims for monetary relief based on state common law." *Id.* at 114-115. Here, to the contrary, the state common claims possessed by out-of-network physicians pre-date the Act, were not created by the Act, and are not dependent on any provision of the Act for their existence.

Likewise, in *Lanier*, where the plaintiff sued certain securities exchanges for breach of contract under state law in connection with the exchanges' provision of market data to the plaintiff under a subscriber agreement, the court ruled that awarding the plaintiff relief on his breach of contract claim would require the court to determine that the defendants were violating plans adopted by the exchanges for the processing and dissemination of market data that had been reviewed and approved by the SEC. 105 F. Supp. 3d at 366. Thus, "success for [plaintiff] on his breach of contract claims would create a conflict between federal law (as interpreted by the SEC) and state law (as interpreted by this Court)." *Id.* The court found that the plaintiff had effectively "convert[ed] claims that are ultimately based on a violation of federal regulations into state law breach of contract claims." *Id.* Thus, the court concluded, the plaintiff's claims were preempted. *Id.* Here, however, it cannot be argued that Plaintiffs' claims are in any way based on a violation of federal regulations. To the contrary, Plaintiffs' claims are preexisting, state common law claims, and it is not Plaintiffs who seek to convert those claims into federal ones, but, rather, it is the Act that purports to do precisely that.

Defendants further argue that "Congress has clearly expressed an intent to occupy the field exclusively when it comes to the practice of surprise medical billing of patients not otherwise

protected by a specified state law. Allowing providers to continue to balance bill their patients and sue them in state or federal court to recover the value of the medical care provided would 'stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" (Def. Br. at 29).

"Field preemption occurs 'where Congress has legislated so comprehensively that federal law occupies an entire field of regulation and leaves no room for state law.'" *New York City Health and Hospitals Corp. v. WellCare of New York, Inc.*, 801 F. Supp. 2d 126, 141 (S.D.N.Y. 2011). "The presumption against preemption applies in any field in which there is a history of state law regulation, even if there is also a history of federal regulation." *Id.* Significantly, "[t]he regulation of public health and the cost of medical care are virtual paradigms of matters traditionally within the police powers of the state." *Id.* (quoting *Med. Soc. of N.Y. v. Cuomo*, 976 F.2d 812, 816 (2d Cir.1992) (citing *Hillsborough County v. Automated Med. Lab. Inc.*, 471 U.S. 707, 719 (1985) ("the regulation of health and safety matters is primarily and historically a matter of local concern")). Thus, "[w]hile the battery of federal laws addressing healthcare is robust and growing, Congress has not demonstrated an intent to exclusively dominate the field." *Id.* Contrary to Defendants' contention, Plaintiffs' state common law *quantum meruit* claim arises independently of the Act or any other federal law, and is not preempted by the Act.

Indeed, on July 13, 2021, an interim final rule to implement certain of the Act's surprise medical billing requirements was published; this regulation became effective on September 13, 2021. 86 Fed. Reg. 36,872 (July 13, 2021). The interim rule makes clear that Congress did not intend to occupy the entire field concerning health care and medical billing:

> A number of states currently have laws related to surprise medical bills. The Departments are of the view that Congress did not intend to supplant state laws regarding balance billing, but rather to supplement such laws. The provisions in these interim final rules are consistent with the statute's general approach of

> supplementing state law. In addition, the No Surprises Act and these interim final
> rules recognize states' traditional role as the primary regulators of health insurance
> issuers, providers, and facilities.

86 Fed. Reg. at 36,946. This admission that Congress did not intend to "supplant state laws

regarding balance billing" precludes a finding that Congress intended to occupy that entire field.

*See Med. Soc. of N.Y.*, 976 F.2d at 819 (holding state statute not preempted where plaintiffs had

"failed to show that Congress has expressed a clear and manifest intent to occupy the field of

balance billing"). Authority cited by Defendants is not to the contrary. *See New York SMSA Ltd.*

*Partnership v. Town of Clarkstown*, 612 F.3d 97, 106 (2d Cir. 2010) (holding that federal statute

did preempt town law that implicated telecommunications technical and operational standards over

which the FCC had exclusive authority, rather than the authority of local governments over land

use and zoning decisions, which were preserved by the federal statute).

The recent decision in *Emergency Physician Servs. of New York v. UnitedHealth Grp., Inc.*,

2021 WL 4437166 (S.D.N.Y. Sept. 28, 2021) is instructive. There, the plaintiffs were physician

practice groups who staffed emergency rooms of hospitals in New York and who were out-of-

network providers with respect to the insurer defendants. 2021 WL 4437166, *1. The plaintiffs

alleged that the defendants failed to compensate them at a reasonable rate, enriching the

defendants, all while the insureds continued to use the plaintiffs' services, which the plaintiffs are

obligated to provide. *Id.* at *4. Among other claims, the plaintiffs asserted New York state claims

for breach of an implied-in-fact contract and for unjust enrichment. *Id.* The defendants argued that

the state law claims were completely preempted by the Employment Retirement Income Security

Act of 1974 ("ERISA"). *Id.* at *8. The court disagreed, first noting that "the Second Circuit has

warned against a 'very broad view of preemption.'" *Id.* (citing *Gerosa v. Savasta & Co.*, 329 F.3d

317, 327 n.8 (2d Cir. 2003)). And despite ERISA expressly preempting "any and all State laws"

that "relate to any employee benefit plan," the court stated that "'[c]ourts are reluctant to find that

Congress intended to preempt state laws that do not affect the relationships among' 'the core ERISA entities: beneficiaries, participants, administrators, employers, trustees and other fiduciaries, and the plan itself.'" *Id.* at *8 (citing *Gerosa*, 329 F.3d at 324).

The court first concluded that the plaintiffs' state-law claims were not expressly preempted because the defendants' alleged liability "does not 'derive' from 'the particular rights and obligations established by any benefit plan,'" nor did the plaintiffs allege a violation of any plan provision. *Id.* Rather, the court stressed, the defendant insurer's "obligation to compensate Plaintiffs comes from, among other authorities, New York state law." *Id.* The court held that the plaintiffs' state law claims were not subject to "complete preemption," because, among other things, the court found that the plaintiffs' claims against the insurer "arise 'not from an alleged violation of some right contained in the plan, but rather from a freestanding state-law duty,'" and the plaintiffs "had no preexisting relationship with" the insurer. *Id.* at *10 (quoting *Montefiore Med. Ctr. v. Teamsters Loc. 272*, 642 F.3d 321, 332 (2d Cir. 2011)). Thus, because "Plaintiffs 'assert legal duties arising under an implied-in-fact contract' and unjust enrichment, and would exist 'whether or not an ERISA plan existed, the claims are 'based on independent legal duties,' avoiding preemption." *Id.* (citing *Emergency Grp. of Ariz. Pro. Corp. v. United Healthcare, Inc.*, 838 F.App'x 299, 300 (9th Cir. 2021)).

Here, Plaintiffs are out-of-network providers and their claims do not arise from a preexisting contractual relationship with insurers. Rather, Plaintiffs' claims in *quantum meruit* against patients arise from a "freestanding state-law duty," under New York law. Thus, there can be no preemption since Plaintiffs' rights arise from an implied-in-fact contract and such rights exist independent of the Act or any other federal statute. *See also Texas Oral and Facial Surgery, PA v. United Healthcare Dental, Inc.*, 2018 WL 3105114, *8 (S.D. Tex. June 25, 2018) (holding

plaintiff's breach of contract claim against insurer was not subject to complete preemption because it was based on a representation independent of an insurance plan, and independent of ERISA).

**F.**   **Plaintiffs are entitled to a preliminary injunction.**

      **1.   Standard for a preliminary injunction.**

As Plaintiffs have established, when a party seeks to stay governmental action purportedly taken in the public interest under a statutory or regulatory scheme, the moving party must show (i) irreparable harm and (ii) a likelihood of success on the merits. (Pl. Opening Br. at 23, *RxUSA Wholesale, Inc. v. Dep't of Health and Hum. Servs.*, 467 F. Supp. 2d 285, 300 (E.D.N.Y. 2006)); *see also John E. Andrus Memorial, Inc. v. Daines*, 600 F. Supp. 2d 563, 570 (S.D.N.Y. 2009) (citing *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir.2005)). Furthermore, on a motion seeking a prohibitory (as opposed to a mandatory) preliminary injunction, such as enjoining enforcement of a government statute and regulation, the moving party must show a "likelihood of success" on the merits of the case, rather than the more rigorous "clear" or "substantial" likelihood of success on the merits. (Pl. Opening Br. at 23, *Averhart v. Annucci*, 2021 WL 2383556, *8 (S.D.N.Y. June 10, 2021), citing *Mastrovincenzo v. City of New York*, 435 F.3d 78, 89 (2d Cir. 2006)).

Defendants urge the Court to apply a higher standard of "clear" or "substantial" likelihood of success on the merits, because, they contend, Plaintiffs seek a mandatory injunction "that disrupts the status quo." (Def. Br. at 17). Although Plaintiffs have established a likelihood of success even under the more rigorous standard, that is not the standard to be applied here. Plaintiffs here request a prohibitory, rather than a mandatory, injunction, where they seek to "prevent defendants from enforcing the new [statutory] provisions, rather than mandate that defendants affirmatively take action." *American Soc. of Composers, Authors, and Publishers v. Pataki*, 930 F. Supp. 873, 878 (S.D.N.Y. 1996); *accord Al Otro Lado v. Wolf*, 497 F. Supp. 3d 914, 926 (S.D.

Cal. 2020) ("Preliminary injunctions 'that prohibit enforcement of a new law or policy ... [are] prohibitory,' not mandatory."). Moreover, contrary to Defendants' contention, a preliminary injunction here would maintain the status quo because it will preserve the law as it existed before the recent implementation of the Act. *See id.* at 926 ("Actions required to reinstate the status quo ante litem do not convert prohibitive orders into mandatory relief.").

Defendants further argue that Plaintiffs must also show that the balance of equities tips in Plaintiffs' favor and that an injunction is in the public interest. (Def. Br. p. 17). Whether or not Plaintiffs are required to make these two additional showings, a preliminary injunction may be "'warranted on the strength of the first two factors alone,' i.e., without considering the 'balance of the equities' and the 'public interest.'" *New York State Telecommunications Association, Inc. v. James*, 544 F. Supp. 3d 269, 288 (E.D.N.Y. 2022) (quoting *New York v. United States Dep't of Homeland Sec.*, 969 F.3d 42, 86 n.38 (2d Cir. 2020)); *Regeneron Pharmaceuticals, Inc. v. United States Dep't of Health and Hum. Servs.*, 510 F. Supp. 3d 29, 38 (S.D.N.Y. 2020) (same). Moreover, the third and fourth factors "merge when the Government is the opposing party." *Id.*

### 2.  Plaintiffs will be irreparably harmed.

First, Plaintiffs have established, and Defendants do not dispute, that the government's violation of a constitutional right "triggers a finding of irreparable harm," and "no separate showing of irreparable harm is necessary." (Def. Br. at 24, citing *Johnson v. Miles*, 355 Fed.Appx. 444, 446 (2d Cir. 2009) (quoting *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir.1996) ("The district court therefore properly relied on the presumption of irreparable injury that flows from a violation of constitutional rights.")). As set forth above, Plaintiffs' claims alleging violations under the Fifth, Seventh, and Fourteenth Amendments establish irreparable harm as a matter of law.

Second, "as a matter of law, there is irreparable harm when a party is compelled to arbitrate without having agreed to arbitration because that party is forced to expend time and resources

arbitrating an issue that is not arbitrable." (Pl. Opening Br. at 24, citing *New York Bay Capital, LLC v. Cobalt Holdings, Inc.*, 456 F. Supp. 3d 564, 573 (S.D.N.Y. 2020); *UBS Securities, LLC v. Voegeli*, 405 Fed.Appx. 550, 552 (2d Cir. 2011) ("Being forced to arbitrate a claim one did not agree to arbitrate constitutes an irreparable harm for which there is no adequate remedy at law.")).

Defendants argue that there is currently no "imminent" arbitration and that Plaintiffs "theorize about a general fear of unspecified, indeterminate future arbitrations." (Def. Br. at 27). However, it cannot be seriously disputed that out-of-network physicians such as Plaintiffs will be compelled to participate in the IDR process provided for in the Act, as that will be the only way those physicians will be able to be compensated for their services. Plaintiff Dr. Haller has submitted a Declaration attesting in detail to Plaintiffs' inevitable participation in the IDR process, and this point was also resolved by the District Court for the Eastern District of Texas. *See* Haller Declaration, Dock. No. 22, ¶¶ 9-10, 12-13; *see also Texas Medical Ass'n*, 2022 WL 542879 at *5 (rejecting Defendants' argument that plaintiffs had failed to establish injury-in-fact as a result of the Act and that the plaintiffs there were merely speculating, relying on plaintiffs' affidavits that their injuries would be inevitable as a result of their future participation in the IDR process).

Having argued—incorrectly—that Plaintiffs' allegation of irreparable harm is premature, Defendants next contradict themselves and assert that Plaintiffs waited *too long* to commence this action and bring their motion for a preliminary injunction and thus cannot establish imminent irreparable harm. (Def. Br. at 38). There can be no doubt, however, that if Plaintiffs had commenced this lawsuit and brought this motion in early 2021, as Defendants suggest, Defendants would have been arguing prematurity and lack of ripeness—as they do throughout their papers here. As discussed in Section (D)(3), *supra,* Defendants' effort to trap Plaintiffs in an unwinnable Catch-22 must be rejected.

In any event, Defendants are hard-pressed to complain about Plaintiffs' purported delay in commencing this action and filing this motion for preliminary relief when the Act only went into effect in January 2022, and arbitration of payment disputes under it was only supposed to have begun in April 2022, both *after* Plaintiffs commenced this action. (*See* Def. Br. at 2). Moreover, the parts of the Rule relating to the IDR process, which Plaintiffs seek to vacate, were recently vacated by the Texas federal court, with similar cases around the nation still pending. *See Texas Medical Ass'n*, 2022 WL 542879 at *15; *see also Ass'n of Air Med. Services v. U.S. Dep't of Health and Human Servs.*, 21-cv-03031 (D.D.C.); *LifeNet, Inc. v. U.S. Dep't of Health and Human Services*, 22- cv-00162-JDK (E.D. Tex.). Because of the vacatur of much of the Rule, Defendants concede that they have only *now* "begun the preparation of a final rule that will address the procedures for arbitrations under the Act, and that will address the provisions of the interim final rules that were vacated by the Eastern District of Texas. The Departments anticipate that the final rule will be issued by early summer of 2022." (Def. Br. at 35). Thus, the continued implementation of Act remains an unsettled question, underscoring as unsupportable Defendants' contention that Plaintiffs' request for injunctive relief is untimely.

Furthermore, while Defendants contend that, because of the *Texas Medical Ass'n* decision there is no live dispute over the relevant provisions of the Rule sought to be vacated by Plaintiffs (Def. Br. at 34), on April 22, 2022, three weeks *after* Plaintiffs moved for injunctive relief, and four days *before* Defendants moved to dismiss here, Defendants filed a Notice of Appeal in the Eastern District of Texas stating their intention to appeal that decision. *See Texas Medical Ass'n v. U.S. Dep't of Health and Human Servs.*, 21-cv-00425-JDK, Dock. No. 116. As a result of Defendants' own strategic choices, therefore, they have apparently committed to defending the

Rule as it currently exists, making the Act's future implementation even more uncertain.[5]

### 3. Plaintiffs are likely to succeed on the merits.

For the reasons discussed above in Sections (B), (C), and (D), Plaintiffs' claims under the Seventh, Fifth and Fourteenth Amendments to the United States Constitution are likely to succeed on the merits.

### 4. The balance of equities is in Plaintiffs' favor and an injunction is in the public interest.

Defendants argue that a preliminary injunction would "impose substantial harms on the execution of and compliance with the nation's health insurance laws" because an "order striking key provisions of the Act and preventing IDR proceedings from taking place would disrupt the health care and health insurance industries . . . and it would sow confusion in the face of providers' and health plans' and insurers' efforts to adjust their billing practices to comply with the Act's new legal regime." Defendants further urge that "[t]he balance of the equities and the public interest strongly counsel in favor of leaving in place the carefully crafted legal landscape that private parties and government agencies have worked hard to implement and have come to rely on." (Def. Br. at 39-40).

To the contrary, a preliminary injunction would "acknowledge the obvious: enforcement of an unconstitutional law is *always* contrary to the public interest." *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) (emphasis added) ("It may be assumed that the Constitution is the ultimate expression of the public interest.") (citations omitted); *see also Chabad of S. Ohio &*

---

[5] To the extent the Court finds, contrary to Defendants' contention, that Plaintiffs' request to vacate the specific provisions of the Rule, as set forth in the Complaint (at pp. 17-18), is still a live issue, Plaintiffs incorporate their arguments set forth in their opening memorandum concerning that issue. *See* Pl. Opening Mem., Dock. 23 at 4-8, 17-18, 21-22.

*Congregation Lubavitch v. City of Cincinnati*, 363 F.3d 427, 436 (6th Cir. 2004) ("No substantial harm can be shown in the enjoinment of an unconstitutional policy."). Indeed, Defendants' appeal to the purported policy implications of a preliminary injunction do not overcome enjoining the Act's constitutional violations while this case proceeds. *Gordon*, 721 F.3d at 653 ("The Constitution does not permit Congress to prioritize any policy goal over the Due Process Clause.").

On a practical level, as discussed above, Defendants' arguments regarding disruption and confusion in the healthcare industry and the Act's supposed "carefully crafted legal landscape" ring hollow when large portions of the Act's regulations implementing the IDR process have been vacated as conflicting with the terms of the Act. In truth, the only confusion now being sewn is by Defendants. On the one hand, they advise the Court that the dispute here with respect to the parts of the Rule implementing the Act sought to be vacated by Plaintiffs is no longer a live issue as a result of the Texas federal court's vacatur of those provisions. Instead, Defendants advise the Court that new regulations will be published at some point this summer. On the other hand, Defendants have sought to appeal the Texas ruling, seemingly indicating that the issues raised by Plaintiffs about the Rule are still live. This confusion exists not only this case, but also in a similar proceeding pending in the D.C. District Court.[6]

By the same token, Defendants' concern about the purported disruptive effects of a preliminary injunction on the healthcare industry and its various stakeholders is simply not credible. The IDR process was only set to become active in April of this year, *after* the main Rules governing that process were vacated. Indeed, Defendants concede that they are still formulating

---

[6] *See Ass'n of Air Med. Services v. U.S. Dep't of Health and Human Servs.*, 21-cv-03031 (D.D.C.), Dock No. 64, where the plaintiffs filed a Notice of the Departments' Decision to Appeal, advising the court that the Defendants' decision to appeal the Eastern District of Texas's decision "confirms that a live controversy remains in this case," and asking the court to enter an order holding that the presumption in favor of the QPA is unlawful, and vacating the entire Rule challenged by the plaintiffs there.

rules to replace those that have been vacated and cannot say exactly when new rules will be published. Meanwhile, the industry awaits Defendants' new regulations, with IDR arbitrations having barely begun, if at all. And, if Defendants proceed with their appeal of the Texas decision, they will continue to add confusion as the rules of the IDR process may change yet again. Thus, any disruption has been caused by the flawed structure of the Act's regulations as drafted, and a preliminary injunction temporarily enjoining the unconstitutional Act while this case is *sub judice* will simply maintain the *status quo* that existed a few short weeks ago when the IDR process was not in place at all. *See, e.g.*, *Gebin v. Mineta*, 239 F. Supp. 2d 967, 968 (C.D. Cal. 2002) ("Preliminarily enjoining the enforcement of the citizenship requirement will maintain the status quo pending a determination of its constitutionality and would merely delay the implementation of a new statute, while the denial of a preliminary injunction will result in the termination of plaintiffs' employment. As such, the balance of hardships tips decidedly in plaintiffs' favor. Moreover, because the termination of plaintiffs' employment could constitute a constitutional deprivation, the public interest will be advanced by granting the preliminary relief.").

Finally, although Defendants assert arguments about the harm that purportedly would be caused by "striking" provisions of the Act, a preliminary injunction would merely further delay its implementation—having already stalled before it began—and can, if Defendants ultimately prevail, be reversed. *See United Food & Com. Workers Union, Local 1099 v. Southwest Ohio Reg'l Transit Auth.*, 163 F.3d 341, 364 n.11 (6th Cir. 1998) (affirming preliminary injunction when the district court considered the merits of the plaintiff's claims solely to determine whether it demonstrated a likelihood of success on the merits of its First Amendment claims, noting that "[s]hould [plaintiff] fail to prevail after a full trial on the merits, the preliminary injunction will be vacated").

## CONCLUSION

For all of these reasons, Plaintiffs respectfully request that their motion for a preliminary

injunction be granted and that Defendants' motion to dismiss be denied, in their entireties.

Dated: White Plains, New York
May 24, 2022

**ABRAMS FENSTERMAN, LLP**
*Attorneys for Plaintiffs*

By: /s/ *Robert A. Spolzino*
Robert A. Spolzino
Edward A. Smith
Justin T. Kelton
Mordecai Geisler
Adam M. Birnbaum
One Metrotech Center, Suite 1700
Brooklyn, NY 11201
(718) 215-5300