IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| DR. DANIEL HALLER and LONG ISLAND SURGICAL PLLC, | ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Civil Action No. 2:21-cv-07208-AMD |
| U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*, | ) ) ) | |
| Defendants. | ) ) ) | |

**DEFENDANTS' REPLY IN SUPPORT
OF DEFENDANTS' MOTION TO DISMISS**

**TABLE OF CONTENTS**

INTRODUCTION ......................................................................................................... 1

ARGUMENT ............................................................................................................... 2

I.       The right adjudicated in the IDR process is a public right that can be adjudicated outside
         of Article III courts and without a jury. ................................................................2

         A.       The right adjudicated by the IDR process was created by Congress in the
                  Act. ................................................................................................... 2

         B.       The IDR process is an integral part of the public regulatory scheme
                  created by the Act. ........................................................................... 4

II.      The IDR process does not deprive providers of a property interest without due process
         or just compensation. ........................................................................................5

         A.       Plaintiffs do not assert a legally cognizable property interest. ............................... 5

         B.       The IDR process does not deprive Plaintiffs of procedural due process. ............... 7

III.     The No Surprises Act's ban on balance billing preempts state law....................................9

CONCLUSION............................................................................................................ 10

**TABLE OF AUTHORITIES**

**Cases**

*Arthritis & Osteoporosis Clinic of E. Tex., P.A. v. Azar,*
   450 F. Supp. 3d 740 (E.D. Tex. 2020)....................................................................... 6

*Atlas Roofing Co. v. Occupational Safety & Health Rev. Comm'n,*
   430 U.S. 442 (1977)........................................................................................... 2, 5

*Bates v. Dow Agrosciences L.L.C.,*
   544 U.S. 431 (2005)............................................................................................ 10

*Cipollone v. Liggett Grp.,*
   505 U.S. 504 (1992)............................................................................................ 10

*City of N.Y. v. Beretta U.S.A. Corp.,*
   401 F. Supp. 2d 244 (E.D.N.Y. 2005),
   *aff'd in part, rev'd in part*, 524 F.3d 384 (2d Cir. 2008) ............................................ 7

*Commodity Futures Trading Comm'n v. Schor,*
   478 U.S. 833 (1986)....................................................................................... 2, 4, 5

*Crowell v. Benson,*
   285 U.S. 22 (1932)............................................................................................... 2

*District of Columbia v. Beretta U.S.A. Corp.,*
   940 A.2d 163 (D.C. 2008) ..................................................................................... 7

*Duke Power Co. v. Carolina Env't Study Grp.,*
   438 U.S. 592 (1978).............................................................................................. 6

*Figueroa v. Foster,*
   864 F.3d 222 (2d Cir. 2017).................................................................................... 9

*French v. Centura Health Corp.,*
   -- P.3d --, 2022 WL 15317458 (Colo. May 16, 2022)................................................. 8

*Furlong v. Shalala,*
   156 F.3d 384 (2d Cir. 1998).................................................................................... 6

*Granfinanciera, SA v. Nordberg,*
   492 U.S. 33 (1989)............................................................................................... 2

*Ileto v. Glock, Inc.,*
   565 F.3d 1126 (9th Cir. 2009) ................................................................................ 7

*Jarkesy v. SEC,*
   -- F.4th --, 2022 WL 1563613, No. 20-61007 (5th Cir. May 18, 2022) ........................ 3

*Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.,*
    418 F.3d 168 (2d Cir. 2005)........................................................................................ 3

*Munn v. Illinois,*
    94 U.S. 113 (1876)..................................................................................................... 6

*Murphy v. NCAA,*
    138 S. Ct. 1461 (2018).............................................................................................. 9

*Riegel v. Medtronic, Inc.,*
    552 U.S. 312 (2008)................................................................................................. 10

*Rock River Health Care L.L.C. v. Eagleson,*
    14 F.4th 768 (7th Cir. 2021) .............................................................................. 6, 9

*Ruckelshaus v. Monsanto Co.,*
    467 U.S. 986 (1984)................................................................................................... 7

*Silver v. Silver,*
    280 U.S. 117 (1929)................................................................................................... 6

*Stern v. Marshall,*
    564 U.S. 462 (2011)............................................................................................ 2, 4, 5

*Thomas v. Union Carbide Agric. Prods. Co.,*
    473 U.S. 568 (1985)........................................................................................... 3, 4, 5

**Statutes**

N.Y. Fin. Serv. Law § 601 *et seq.*............................................................................... 6

15 U.S.C. § 7901 *et seq.*......................................................................................... 7, 10

42 U.S.C. § 300gg-111 ........................................................................................... 4, 8

42 U.S.C. § 300gg-112 ............................................................................................... 4

42 U.S.C. § 300gg-113 ............................................................................................... 4

42 U.S.C. § 300gg-114 ............................................................................................... 4

42 U.S.C. § 300gg-117 ............................................................................................... 4

42 U.S.C. § 300gg-131 ............................................................................................... 9

42 U.S.C. § 300gg-132 ............................................................................................... 4

42 U.S.C. § 300gg-133 ............................................................................................... 4

42 U.S.C. § 300gg-136 ................................................................................... 4

42 U.S.C. § 300gg-137 ................................................................................... 4

42 U.S.C. § 300gg-138 ................................................................................... 4

**The Constitution**

U.S. Const. art. VI cl. 2 ................................................................................. 9

**Regulations**

45 C.F.R. § 149.510 ...................................................................................... 3

**Other Authorities**

Christopher P. Tompkins et al., *The Precarious Pricing System for Hosptial Services,*
    25 HEALTH AFF. 45 (2006) ......................................................................... 8

George A. Nation III, *Hospital Chargemaster Insanity: Heeling the Healers,*
    43 PEPP. L. REV. 745 (2016) ..................................................................... 8

Press Release, AHIP, New Study: No Surprises Act Prevented Over Two Millsion Potential
    Surpise Bills for Insured Americans (May 24, 2022), https://perma.cc/BT7G-SHVM ........... 10

**INTRODUCTION**

Until recently, out-of-network health care providers were able to send staggeringly large, potentially ruinous medical bills directly to patients recovering from serious medical conditions, and sue them in court when they were unable to pay. These surprise medical bills have had devastating financial consequences on patients and have driven up the cost of health care for everyone. To address this crisis, Congress carefully crafted a statutory framework in the No Surprises Act ("Act") that holds insured patients harmless and instead creates a process for out-of-network health care providers to negotiate directly with group health plans and insurers over payment amounts. If negotiations fail, the Act creates an efficient and fair procedure (called an independent dispute resolution or "IDR" process) in which each party submits an offer of payment to an arbitrator, and the arbitrator selects the offer that best represents the appropriate payment amount.

Plaintiffs mount a constitutional challenge to the No Surprises Act itself, seeking to regain the right to subject patients to surprise medical bills. But the Act poses no constitutional problem. The Act's arbitration system involves a right created by Congress in the Act itself that is adjudicated by an expert independent arbitrator in an efficient and specialized process integral to the structure of the Act, and thus falls under the public rights doctrine, meaning that the payment dispute can be adjudicated outside of Article III courts and without a jury. It is within Congress's power to legislate to address economic problems by preempting the state law causes of action that providers previously had asserted against their patients. Doing so does not violate due process or constitute a taking. For the last five months, the No Surprises Act has been sparing patients from devastating surprise medical bills. Accordingly, for the reasons set forth in Defendants' motion papers and for the reasons discussed herein, this Court should decline Plaintiffs' invitation to radically upend this status quo and should dismiss this case.

**ARGUMENT**

I.      **The right adjudicated in the IDR process is a public right that can be adjudicated outside of Article III courts and without a jury.**

   **A.  The right adjudicated by the IDR process was created by Congress in the Act.**

   Before the No Surprises Act, out-of-network health care providers had no right under the common law of New York to seek payment directly from federally regulated health plans and health insurers for the medical services they provided to patients covered by those plans. Providers had rendered no medical services to the group health plans or insurers directly, hence no claim for *quantum meruit* could lie against them, nor did those out-of-network providers have a contract with the payor upon which they could sue. This forced out-of-network providers to bill and sue their patients for sometimes outrageous and ruinous medical bills, which patients were frequently unable to pay. Recognizing this problem, Congress created, for the first time, a statutory right for out-of-network providers to be compensated directly by health plans and insurers. *See Stern v. Marshall*, 564 U.S. 462, 489 (2011) ("Congress may set the terms of adjudicating a suit when the suit could not otherwise proceed at all.")

   The providers' right to compensation from group health plans and health insurers created by the Act is *similar* to the claims that they previously asserted against patients, in that in both instances providers seek payments for medical services provided. But that similarity does not prevent that right from being a "public right," properly adjudicated outside of Article III courts without a jury. As the Supreme Court has recognized, "Congress may fashion causes of action that are closely *analogous* to common-law claims and place them beyond the ambit of the Seventh Amendment by assigning their resolution to a forum in which jury trials are unavailable." *Granfinanciera, SA v. Nordberg*, 492 U.S. 33, 52 (1989) (collecting cases); s*ee also Atlas Roofing Co. v. Occupational Safety & Health Rev. Comm'n*, 430 U.S. 442, 461 (1977) (creating workplace safety cause of action); *Crowell v. Benson*, 285 U.S. 22, 54 (1932) (replacing a traditional

2

negligence action).[1] "Congress, acting for a valid legislative purpose pursuant to its constitutional powers under Article I, may create a seemingly 'private' right that is so closely integrated into a public regulatory scheme as to be a matter appropriate for agency resolution with limited involvement by the Article III judiciary." *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 593-94 (1985). That is exactly what Congress has done here.

There are other important differences between the common law claim sounding in *quantum meruit* that providers previously asserted against patients and the statutory claim that providers now assert against group health plans and insurers under the Act. For one thing, the claim is against the plan or insurer, not the patient. Additionally, the right to payment does not depend on the creation of an implied contract, and a provider need not prove the elements of a *quantum meruit* claim under New York law. *See Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 175 (2d Cir. 2005) (listing elements of *quantum meruit* claim). And plans and insurers, unlike many patients, have the resources to pay claims under the Act, and must do so within 30 days of the IDR entity's decision. *See* 45 C.F.R. § 149.510(c)(4)(ix).

Because the Act created a new statutory right for providers to seek compensation directly from health plans and insurers with whom they had no contractual relationship, the right at issue is a public right that can be appropriately adjudicated outside Article III courts and without a jury.[2]

---

[1] Even if the IDR process did adjudicate a common law claim, the Supreme Court has authorized the adjudication of common law claims outside of Article III courts where the adjudication involved only a "narrow class of common law claims" in a "particularized area of law" and the area of law in question was governed by "a specific and limited federal regulatory scheme" as to which the agency had "obvious expertise," all of which describe the IDR process at issue here. *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 853-56 (1986).

[2] This Court should not follow the recent out-of-circuit decision of the Fifth Circuit in *Jarkesy v. SEC*, -- F.4th --, 2022 WL 1563613, No. 20-61007, (5th Cir. May 18, 2022). That opinion, issued over a vigorous and well-reasoned dissent, contradicts Supreme Court and Second Circuit precedent. But, even under the narrow definition of the public rights doctrine articulated by the Fifth Circuit in that case, claims for payment under the No Surprises Act's IDR process involve a public right because "(1) . . . Congress created a new cause of action, and remedies therefor, unknown to the common law, because traditional rights and remedies were inadequate to cope with a manifest problem and (2) . . . jury trials would go far to dismantle the statutory scheme or impede swift resolution of the claims created by statute." *Id.* at *4.

**B. The IDR process is an integral part of the public regulatory scheme created by the Act.**

The IDR process is also an integral part of a statutory scheme that Congress designed to prevent surprise medical bills and lower health care costs. *See Stern*, 564 U.S. at 490-91. As Plaintiffs correctly note, "[t]he challenged statutory arbitration at issue in *Thomas* was not dissimilar to the one in the Act." ECF No. 31 at 8. *Thomas* is particularly instructive here for the Supreme Court's apt analysis of the public rights doctrine and its approval of the use of arbitration to resolve payment disputes between private parties pursuant to a statutory scheme.[3]

Despite Plaintiffs' claim to the contrary, *Thomas* did not turn in any way on how large or small a part of the overall statutory scheme the arbitration system may have been. Regardless, Plaintiffs mischaracterize what the No Surprises Act does, and what Congress intended to accomplish with the legislation. The Act does not, as Plaintiffs assert, have as its "seemingly *sole*" objective "an attempt to extinguish claims by providers against private individuals who use their services." ECF No. 31 at 8. The Act's balance billing provisions are part of a larger, comprehensive scheme covering, among other things, health care providers' billing and disclosure practices and patients' health care costs. The Act, for example, implements disclosure and transparency requirements on facilities, providers, and health plans and insurers regarding health care costs, 42 U.S.C. §§ 300gg-114, 300gg-133, 300gg-136; implements standards for adjudicating patient-provider disputes over costs for services, *id*. § 300gg-137; provides mechanisms for out-of-network providers to seek consent from patients regarding billing, *id*. § 300gg-132; provides for continuity of care and other patient protections, *id*. §§ 300gg-113, 300gg-117, 300gg-138; and addresses billing for emergency air ambulance services, *id*., § 300gg-112; among other things.

Congress's overarching goal in passing the Act was to lower the cost of health care for everyone—including, but not exclusively, by preventing surprise medical bills and creating a low-cost and efficient dispute resolution system for resolving payment disputes between out-of-

---

[3] Although Plaintiffs erroneously assert several times (ECF No. 31 at 6, 10) that the Act does not provide for *any* judicial review of the IDR entity's decisions, the Act, like the statute approved of in *Thomas*, "limits but does not preclude review of the arbitration proceeding by an Article III court." 473 U.S. at 592; *see* 42 U.S.C. § 300gg-111(c)(5)(E)(i)(II).

network providers and health plans and insurers. If providers and health plans and insurers were required instead to litigate all payment disputes to a jury trial in Article III courts, or even engage in a more protracted and costly administrative dispute resolution system with mandatory and expanded judicial review, Congress's goals would be "confounded." *Schor*, 478 U.S. at 856.[4]

Congress created a new right in the Act and provided for an efficient dispute resolution system whereby a highly qualified IDR entity, approved of by the Departments, adjudicates a narrow and technical class of disputes. Because the right was created by Congress, "flow[s] from a federal statutory scheme," and "is limited to a 'particularized area of the law,'" it is a public right which does not require adjudication in an Article III court or by a jury. *Stern*, 564 U.S. at 493. "To hold otherwise would be to erect a rigid and formalistic restraint on the ability of Congress to adopt innovative measures such as negotiation and arbitration with respect to rights created by a regulatory scheme." *Thomas*, 473 U.S. at 594.[5]

## II.   The IDR process does not deprive providers of a property interest without due process or just compensation.

### A.  Plaintiffs do not assert a legally cognizable property interest.

The due process clause and takings clause only protect against deprivations of legally cognizable property rights. Plaintiffs insist that their "right" to assert future *quantum meruit* claims

---

[4] Plaintiffs' argument that the IDR provisions in the Act cannot be severed from the rest of the Act, including the balance billing protections, is entirely unsupported by law and flatly illogical. If this Court were to find any infirmities with the IDR provisions in the Act, it should apply the presumption in favor of severability to strike those provisions alone. Doing so would not "leave physicians without any avenue for payment whatsoever" as Plaintiffs assert (ECF No. 31 at 13 n.3), but would instead permit provider claims for payment from health plans and insurers under the Act to be litigated in or reviewed by Article III courts. That doing so would "choke the already crowded federal courts with new types of litigation" is one more reason why Congress appropriately committed these claims to the IDR process. *See Atlas Roofing*, 430 U.S. at 455.

[5] Federal Arbitration Act and contract law principles of consent cited by Plaintiffs (ECF No. 31 at 11-13) are not applicable to this case, as parties do not have to provide consent to be subject to federal law. The No Surprises Act's system of arbitration in cases where providers and payors cannot agree to a payment amount tracks the arbitration system that the Supreme Court upheld in *Thomas*. When "Article III limitations are at issue, notions of consent and waiver cannot be dispositive." *Schor*, 478 U.S. at 851. Consent would not cure an Article III problem, nor would the absence of consent to Congress's choice of adjudication over a matter of public right create an Article III problem.

against patients who they will someday treat is a property right protected by the Constitution. ECF No. 31 at 16, 21, 22. But parties have no property interest in prospective common law causes of action, and Congress can extinguish common law causes of action through new federal legislation.

Even though Plaintiffs now explain that the property interest they claim they are being deprived of is the cause of action that they want to assert against future patients, they cite cases that stand for the proposition that physicians have a "property interest in money paid for services already performed." *Furlong v. Shalala*, 156 F.3d 384, 393 (2d Cir. 1998) (citation omitted); *see also Rock River Health Care L.L.C. v. Eagleson*, 14 F.4th 768, 774 (7th Cir. 2021); *Arthritis & Osteoporosis Clinic of E. Tex., P.A. v. Azar*, 450 F. Supp. 3d 740, 749 (E.D. Tex. 2020), ECF No. 31 at 14. The Act, enacted in December 2020, applied only prospectively, becoming effective with respect to plan or policy years beginning on or after January 1, 2022. It did not interfere with providers' payment for services already provided, but it does under certain circumstances prevent providers from balance billing insured patients for services performed after its effective date.

"The 'Constitution does not forbid the creation of new rights, or the abolition of old ones recognized by the common law, to attain a permissible legislative object,' despite the fact that 'otherwise settled expectations' may be upset thereby." *Duke Power Co. v. Carolina Env't Study Grp.*, 438 U.S. 59, 88 n.32 (1978) (quoting *Silver v. Silver*, 280 U.S. 117, 122 (1929)). As the Supreme Court has explained, "[a] person has no property, no vested interest, in any rule of the common law." *Munn v. Illinois*, 94 U.S. 113, 134 (1876). "Rights of property which have been created by the common law cannot be taken away without due process; but the law itself, as a rule of conduct, may be changed at the will, or even at the whim, of the legislature, unless prevented by constitutional limitations" *Id.* Congress, and state legislatures,[6] can legislatively abrogate a common law cause of action if doing so is within the power of the legislature—here, within

---

[6] The New York State Emergency Medical Services and Surprise Bill Law similarly abrogated physicians' rights to bill or hold patients liable for surprise medical bills where patients are covered by state-regulated insurance plans and required physicians to arbitrate payment disputes in an IDR process. *See* N.Y. Fin. Serv. Law § 601 *et seq*. Plaintiffs have presumably been complying with the New York law for the last seven years, and have offered no reason to doubt its constitutionality here.

Congress's ability to legislate in areas that affect interstate commerce.

Plaintiffs cite cases recognizing that a cause of action can be a species of property, but a cause of action is not a vested property right protected by the Constitution until it has been reduced to final judgment. Parties have no property interest in *unvested* causes of action. *Ileto v. Glock, Inc.*, 565 F.3d 1126, 1141 (9th Cir. 2009); *District of Columbia v. Beretta U.S.A. Corp.*, 940 A.2d 163, 180 (D.C. 2008). An analogous statute provides a helpful framework for analyzing Plaintiffs' claims. In 2005 Congress passed the Protection of Lawful Commerce in Arms Act ("PLCAA"), which requires dismissal of all actions against firearms manufacturers based on a third party's criminal use of a firearm, extinguishing preexisting causes of action under state or federal law. *See* 15 U.S.C. §§ 7901-03. Numerous parties brought lawsuits around the country arguing that the PLCAA violated due process and effected an uncompensated taking by extinguishing their causes of action against firearms manufacturers. Every court to consider that argument rejected it, holding that prospective causes of action are not vested property rights protected by the due process or takings clauses. *See Ileto v. Glock, Inc.*, 565 F.3d 1126, 1141 (9th Cir. 2009); *City of N.Y. v. Beretta U.S.A. Corp.*, 401 F. Supp. 2d 244, 294 (E.D.N.Y. 2005), *aff'd in part, rev'd in part*, 524 F.3d 384 (2d Cir. 2008); *Beretta U.S.A. Corp.*, 940 A.2d at 180. The No Surprises Act likewise does not deprive Plaintiffs of due process or effectuate a taking by preempting state law causes of action.

Even if Plaintiffs did assert a property interest in a claim for just compensation for future health care services, their takings claim would still be unripe. At this time, Plaintiffs can offer only speculation that the IDR process will not provide them with adequate compensation. Until Plaintiffs participate in an arbitration, they cannot allege that the arbitrator would award anything less than fair compensation. *See Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1013 (1984).

**B.  The IDR process does not deprive Plaintiffs of procedural due process.**

The IDR process created by Congress affords both sides to the dispute—the health care provider and the health plan or health insurer—an opportunity to persuade the IDR entity that their offer of the payment amount is the one the IDR entity should select. In addition to a statutory

requirement that the IDR entity consider the qualifying payment amount ("QPA") (a rough proxy for the fair market value of the medical services provided), the provider and plan or insurer may provide the IDR entity with additional information that may be relevant to the IDR entity's determination, including information relevant to the provider's level of training and experience, quality and outcomes measurements, the market share of the provider, the acuity of the individual receiving the service, the teaching status, case mix, and scope of services offered by the health care facility, and good faith efforts made by the out-of-network provider to join insurance networks. 42 U.S.C. § 300gg-111(c)(5)(c)(i)-(ii). Additionally, the parties may submit any information requested by the IDR entity relating to their respective offers and additional relevant information. *Id*. § 300gg-111(c)(5)(B)(i)(II), (c)(5)(B)(ii).[7]

There Act also prohibits the IDR entity from relying on certain forms of information, for good reason. Plaintiffs complain that the IDR entity is not permitted to consider a provider's usual and customary charges, but this represents Congress's deliberate judgment that these charges no longer reflect the actual value of providers' services. It is well established that prices charged by health care providers and facilities "have become increasingly arbitrary and, over time, have lost any direct connection to hospitals' actual costs, reflecting, instead, inflated rates set to produce a targeted amount of profit for the hospitals after factoring in discounts negotiated with private and governmental insurers." *French v. Centura Health Corp.*, -- P.3d --, 2022 WL 1531745, at *8 (Colo. May 16, 2022); *see also* George A. Nation III, *Hospital Chargemaster Insanity: Heeling the Healers*, 43 PEPP. L. REV. 745, 755 (2016) (prices "lost any direct connection to costs or to the amount the hospital actually expected to receive") (citing Christopher P. Tompkins et al., *The*

---

[7] Plaintiffs also purport to continue pursuing their challenge to portions of the October 2021 interim final rule that describe the role that the QPA plays in the IDR process. *See* ECF No. 31 at 31-32 & n.5. For the reasons the Departments have already explained, there is no live dispute about that issue. *See* ECF No. 30 at 34-35. Although the government has appealed from the Eastern District of Texas decision vacating the same portions of the rule that Plaintiffs challenge here, that appeal has been stayed in anticipation of the issuance of a final rule early this summer. *See* Order, *Tex. Med. Ass'n v. HHS*, No. 22-40264 (5th Cir. May 3, 2022). In any event, the Departments' prior brief also explains why the rule represented a valid interpretation of the Act, *see* ECF No. 30 at 35-37, and Plaintiffs have offered no further argument in response, *see* ECF No. 31 at 32 n.5.

*Precarious Pricing System for Hospital Services*, 25 HEALTH AFF. 45, 48 (2006)).

The IDR process bears no resemblance to the situation in *Rock River Health Care, L.L.C. v. Eagleson*, upon which Plaintiffs rely. That case involved physicians who were subject to an audit that resulted in the reduction of the amount they were paid for past services rendered where they had no opportunity to contest the findings of the audit. Even in the excerpt cited by Plaintiffs, it is obvious that the process described in *Rock River* bears no resemblance to the IDR process at issue here. ECF No. 31 at 19 (citing *Rock River*, 14 F.4th at 778 (providers were "not made aware of the evidence" and had "no opportunity to address all of the facts")). Here, by contrast, providers have an opportunity to present all relevant information to the IDR entity, within the statutory guidelines, to persuade the IDR entity that their offer represents the appropriate payment amount.

## III.     The No Surprises Act's ban on balance billing preempts state law.

Plaintiffs also argue that the Act does not preempt Plaintiffs' state common law claims. But this assertion belies not only the Supremacy Clause, U.S. Const. art. VI cl. 2, but also decades of Supreme Court precedent. Although there are three distinct forms of federal preemption—express, field, and conflict, *Figueroa v. Foster*, 864 F.3d 222, 227-28 (2d Cir. 2017)—all three work in essentially the same way: "Congress enacts a law that imposes restrictions or confers rights on private actors; a state law confers rights or imposes restrictions that conflict with the federal law; and therefore the federal law takes precedence and the state law is preempted." *Murphy v. NCAA*, 138 S. Ct. 1461, 1480 (2018).

Here, the Act expressly extinguishes out-of-network providers' state law causes of action against patients for surprise medical bills, leaves no room for state law to permit balance billing or holding patients liable in those situations, and thus places any preexisting state law cause of action for surprise medical bills in direct conflict with the Act. *See* 42 U.S.C. § 300gg-131(a)(2) ("the health care provider shall not bill, and shall not hold liable, such participant, beneficiary, or enrollee" for a payment amount greater than the cost-sharing requirement). Congress's policy choice to prohibit billing and holding patients liable for surprise medical bills preempts any

9

preexisting state policy permitting providers to bill and hold their patients liable for surprise medical bills.[8] The No Surprises Act is not unique in this respect. Congress has passed numerous federal laws that preempt preexisting state common law causes of action. *See Riegel v. Medtronic, Inc.*, 552 U.S. 312, 325 (2008) (holding federal medical device law preempted state tort claims); *Bates v. Dow Agrosciences L.L.C.*, 544 U.S. 431, 443 (2005) (holding common law actions preempted federal pesticide law); *Cipollone v. Liggett Grp.*, 505 U.S. 504, 523 (1992) (holding common law actions preempted by federal law); *see also* 15 U.S.C. §§ 7901-03 (Protection of Lawful Commerce in Arms Act) (preempting causes of action against firearms manufacturers).

## CONCLUSION

The No Surprises Act was signed into law over seventeen months ago, the balance billing protections took effect over five months ago and arbitrations have been underway since April. One recent study has found the Act has already prevented over two million surprise medical bills across commercially insured patients in the first few months of this year, and could be on track to prevent 12 million surprise medical bills in 2022. Press Release, AHIP, New Study: No Surprises Act Prevented Over Two Million Potential Surprise Bills for Insured Americans (May 24, 2022), https://perma.cc/BT7G-SHVM. The health care and health insurance industries have come to rely on the Act and have adjusted their practices to comply with it. Although there have been lawsuits challenging the intricacies of specific provisions of the regulations promulgated under the Act, only Plaintiffs here have sought to undermine the Act's continued validity. This Court should reject Plaintiffs' calls to radically upend the status quo and disrupt the statutory framework that Congress spent years carefully crafting. For the foregoing reasons, this Court should dismiss this case for failure to state a claim.

---

[8] Plaintiffs take out of context (ECF No. 31 at 25-26) the preamble to the rule, which recites that the No Surprises Act is intended to supplement, rather than supplant, preexisting state surprise billing laws. Before the No Surprises Act, many states (including New York) had implemented policies to address surprise billing in some respect, but those state laws are limited in application, as certain types of health insurance plans—such as self-funded plans offered by employers—are exempt from state insurance regulation. Although Congress did not intend to supplant state laws that already protected patients from surprise medical bills, Congress certainly did supplant state laws that allowed the predatory surprise billing practices it sought to prohibit.

Dated: May 31, 2022

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

BREON PEACE
United States Attorney

ERIC B. BECKENHAUER
Assistant Branch Director

*/s/ Anna Deffebach*
ANNA DEFFEBACH
Trial Attorney
D.C. Bar No. 241346
JOEL McELVAIN
Senior Trial Counsel
D.C. Bar No. 448431
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Phone: (202) 305-8356
Fax: (202) 616-8470
E-mail: Anna.L.Deffebach@usdoj.gov

JOSEPH A. MARUTOLLO
Assistant U.S. Attorney
United States Attorney's Office
Eastern District of New York
271-A Cadman Plaza East, 7th Floor
Brooklyn, NY 11201
Tel: (718) 254-6288
Fax: (718) 254-7489
Email: joseph.marutollo@usdoj.gov

*Counsel for Defendants*