UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------- X

                :

**DR. DANIEL HALLER** and **LONG ISLAND**
**SURGICAL PLLC,**

                :

             Plaintiffs,    :    **MEMORANDUM DECISION AND**
                              **ORDER**

                :

       – against –         :    21-CV-7208 (AMD) (AYS)

                :

**U.S. DEPARTMENT OF HEALTH AND**  :
**HUMAN SERVICES, XAVIER BECERRA,** *in*
*his official capacity as Secretary of Health and*  :
*Human Services***, U.S. OFFICE OF PERSONNEL**
**MANAGEMENT, KIRAN AHUJA,** *in her official*  :
*capacity as Director of the U.S. Office of Personnel*
*Management***, U.S. DEPARTMENT OF LABOR,**  :
**MARTIN J. WALSH,** *in his official capacity as*
*Secretary of Labor***, U.S. DEPARTMENT OF**  :
**THE TREASURY,** and **JANET YELLEN,** *in her*
*official capacity as Secretary of the Treasury***,**  :

                :

           Defendants.    :

-------------------------------------------------------------- X

**ANN M. DONNELLY**, United States District Judge:

      On December 31, 2021, the plaintiffs filed this action against the defendants, challenging

the constitutionality of the No Surprises Act, Pub. L. 116-260 (the "Act"), and seeking an

injunction against its enforcement.[1]  Before the Court are the plaintiffs' motion for a preliminary

---

[1] The plaintiffs also sought to set aside, under the Administrative Procedure Act, specific provisions of an interim final rule entitled "Requirements Related to Surprise Billing; Part II," 86 Fed. Reg. 55980 (Oct. 7, 2021) (the "Rule").  On February 23, 2022, the Honorable Jeremy D. Kernodle vacated the Rule in a separate case, *Texas Medical Association v. U.S. Department of Health and Human Services*.  No. 21-CV-425, 2022 WL 542879, at *14 (E.D. Tex. Feb. 23, 2022).  The defendants state that they are engaging in notice-and-comment rulemaking, "have begun the preparation of a final rule that will address the procedures for arbitrations under the Act, and that will address the provisions of the interim final rules that were vacated by the Eastern District of Texas," and "anticipate that the final rule will be issued by early summer of 2022."  (ECF No. 30 at 35.)  At oral argument, the parties agreed that in light of Judge Kernodle's decision and the forthcoming regulation, there is no live controversy with respect to the Rule.

injunction and the defendants' motion to dismiss.  For the reasons that follow, the motion for a preliminary injunction is denied, and the motion to dismiss is granted.

## BACKGROUND

The plaintiffs are Dr. Daniel Haller, a surgeon, and Long Island Surgical PLLC, Dr. Haller's private practice, which employs six physicians.  (ECF No. 23 at 3.)  Dr. Haller and the other surgeons do emergency consultations and perform surgical procedures on patients admitted to hospitals through their emergency departments.  (*Id.*)  The plaintiffs allege that approximately 78% of their patients are covered by health plans with which the plaintiffs have no contractual relationship.  (*Id.*)

On December 27, 2020, Congress enacted the No Surprises Act as part of the Consolidated Appropriations Act of 2021.  The law went into effect on January 1, 2021.  The defendants' July 13, 2021 interim final rule describes the background of the legislation.  "Most group health plans, and health insurance issuers offering group or individual health insurance coverage, have a network of providers and health care facilities (participating providers or preferred providers) who agree by contract to accept a specific amount for their services." Requirements Related to Surprise Billing; Part I, 86 Fed. Reg. 36872, 36874 (July 13, 2021). "By contrast, providers and facilities that are not part of a plan or issuer's network [('out-of-network providers')] usually charge higher amounts than the contracted rates that plans and issuers have negotiated with participating providers and facilities [('in-network providers')]."  *Id.* When an insured patient receives care from an out-of-network provider, "the individual's plan or issuer may decline to pay for the service or may pay an amount that is lower than the provider's billed charges, and may subject the individual to greater cost-sharing requirements than would have been charged had the services been furnished by [an in-network] provider."  *Id.*  "Prior to the No Surprises Act, the [out-of-network] provider could generally balance bill the individual

for the difference between the provider's billed charges and the sum of the amount paid by the

plan or issuer and the cost sharing paid by the individual, unless otherwise prohibited by state

law." *Id.*

A balance bill may be a "surprise bill" for a patient.  The July 13, 2021 rule summarizes

the issue of surprise billing, and when it generally occurs:

> Surprise billing occurs both for emergency and non-emergency care.  In an emergency, a person usually goes (or is taken by emergency transport) to a nearby emergency department.  Even if they go to a participating hospital or facility for emergency care, they may receive care from nonparticipating [out-of-network] providers working at that facility.  For non-emergency care, a person may choose a participating [in-network] facility (and possibly even a participating provider), but not know that at least one provider involved in their care (for example, an anesthesiologist or radiologist) is a nonparticipating provider.  In either circumstance, the person might not be in a position to choose the provider, or to ensure that the provider is a participating provider.  Therefore, in addition to a bill for their cost-sharing amount, which tends to be higher for out-of-network services, the person might receive a balance bill from the nonparticipating provider or facility.

*Id.*

The Act aims to prevent surprise bills in three ways relevant to this case.  First, for

patients who receive emergency services from out-of-network providers, or non-emergency

services from out-of-network providers in in-network facilities and for which patients do not

consent, the Act limits patients' cost sharing requirements to the "requirement that would apply

if such services were provided by a participating [in-network] provider or a participating

emergency facility."  42 U.S.C. § 300gg-111 ("Preventing surprise medical bills").  Second, the

Act prohibits out-of-network providers from balance billing patients for emergency services and

certain non-emergency services.  *See id.* § 300gg-131 ("[T]he health care provider shall not bill,

and shall not hold liable, such [patient] for a payment amount for an emergency service . . . that

is more than the cost-sharing requirement."); *id.* § 300gg-132.

Third, the Act establishes a procedure for resolving disputes between insurers and out-of-network providers over the payment amount for emergency and certain non-emergency services. If a state law sets the amount of payment for an out-of-network provider, the Act states that the insurer will make that payment. *Id.* § 300gg-111(a)(3)(K). Otherwise, the Act specifies that an insurer will issue a payment or deny payment to an out-of-network provider within 30 days after the provider submits its bill. *Id.* § 300gg-111(a)(1)(C)(iv), (b)(1)(C). If the out-of-network provider is not satisfied with the amount, it may initiate a 30-day period of negotiation with the insurer over the claim. *Id.* § 300gg-111(c)(1)(A). If those negotiations do not resolve the dispute, the parties may then proceed to an independent dispute resolution ("IDR") process. *Id.* § 300gg-111(c)(1)(B).

As part of the IDR process, the out-of-network provider and the insurer each submit a proposed payment amount with an explanation, and the IDR entity selects one offer as the amount for the relevant service. *Id.* §§ 300gg-111(c)(2), (5). The Act requires IDR entities to consider multiple factors. They must consider "the qualifying payment amount," which is the "median of the contracted rates recognized by the" insurer as of January 31, 2019 in the same insurance market for the "same or a similar item or service that is provided by a provider in the same or similar specialty and provided in the geographic region," increased by inflation over the base year. *See id.* §§ 300gg-111(a)(3)(E)(i), (c)(5)(C)(i)(I). In addition, the entities must consider the following:

(I) The level of training, experience, and quality and outcomes measurements of the provider or facility that furnished such item or service . . . .

(II) The market share held by the nonparticipating provider or facility or that of the plan or issuer in the geographic region in which the item or service was provided.

(III) The acuity of the individual receiving such item or service or the complexity of furnishing such item or service to such individual.

(IV) The teaching status, case mix, and scope of services of the nonparticipating facility that furnished such item or service.

(V) Demonstrations of good faith efforts (or lack of good faith efforts) made by the nonparticipating provider or nonparticipating facility or the plan or issuer to enter into network agreements and, if applicable, contracted rates between the provider or facility, as applicable, and the plan or issuer, as applicable, during the previous 4 plan years.

*Id.* § 300gg-111(c)(5)(C)(ii).  An IDR entity can request additional information from the parties, and each party can submit "any information relating to such offer submitted by either party, including information relating to any circumstance described" in the above five factors.  *Id.* § 300gg-111(c)(5)(B).  The Act, however, prohibits the IDR entity from considering the out-of-network provider's "usual and customary charges," the amount the provider would have billed in the absence of the Act, or the reimbursement rates for the service under public programs like Medicare, Medicaid or TRICARE.[2]  *Id.* § 300gg-111(c)(5)(D).  The IDR entity's decision is binding on the parties "in the absence of a fraudulent claim or evidence of misrepresentation of facts presented," and is subject to judicial review under the circumstances described in the Federal Arbitration Act.  *Id.* § 300gg-111(c)(5)(E).

States have enacted similar laws to prevent surprise billings.  For example, in 2014, New York enacted the New York State Emergency Medical Services and Surprise Bill Act (the "New York Surprise Bill Act").  Like the legislation at issue here, the New York law provides that patients pay only the usual cost-sharing amounts that they would have been charged had they seen an in-network provider, allows out-of-network providers to negotiate and recover their fees directly from insurers, and establishes an IDR process when those negotiations are unsuccessful.

---

[2] Congress considered and rejected other bills intended to address surprise medical billing, including the Protecting People from Surprise Medical Bills Act, which would have instructed IDR entities to consider "commercially reasonable rates for comparable services or items in the same geographic area" and the "usual and customary cost of the item or service involved."  Protecting People from Surprise Medical Bills Act, H.R. 3502, 116th Cong. § 2(c) (2019).

N.Y. Fin. Serv. L. §§ 601-08.  However, the New York statute applies only to plans regulated by the state and does not extend to self-funded health plans regulated under the Employee Retirement Income Security Act.  (ECF No. 1 ¶ 29; ECF No. 30 at 10-11.)  The plaintiffs have not challenged the constitutionality of the New York Surprise Bill Act, but explained at oral argument that under the New York law, out-of-network providers have no claim against beneficiaries of state-regulated plans, beyond their usual in-network cost-sharing amount.

The plaintiffs commenced this action on December 31, 2021.  (ECF No. 1.)  They moved for a preliminary injunction four months later on April 4, 2022.  (ECF No. 25.)  On April 26, 2022, the defendants filed their motion to dismiss the complaint for failure to state a claim, and opposed the plaintiffs' motion for preliminary injunction.  (ECF No. 29.)  On June 7, 2022, I heard oral argument on the parties' motions.

## LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy never awarded as of right," *Benisek v. Lamone*, 138 S. Ct. 1942, 1943 (2018) (per curiam) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)), and is intended to "preserve the relative positions of the parties until a trial on the merits can be held," *id.* (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)).  A decision to award preliminary injunctive relief is often based on "procedures that are less formal and evidence that is less complete than in a trial on the merits."  *Camenisch*, 451 U.S. at 395.  "To obtain a preliminary injunction, the moving party must demonstrate (1) irreparable harm absent injunctive relief; (2) either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in the plaintiff's favor; and (3) that the public's interest weighs in favor of

granting an injunction."[3]  *Red Earth LLC v. United States*, 657 F.3d 138, 143 (2d Cir. 2011) (internal quotation marks and citations omitted).

Where a party seeks injunctive relief that "will affect government action taken in the public interest pursuant to a statutory or regulatory scheme, the injunction should be granted only if the moving party meets the more rigorous likelihood-of-success standard."  *Sussman v. Crawford*, 488 F.3d 136, 140 (2d Cir. 2007) (quoting *Wright v. Giuliani*, 230 F.3d 543, 547 (2d Cir. 2000)); *cf. United States v. Siemens Corp.*, 621 F.2d 499, 505 (2d Cir. 1980) ("In litigation among private parties, the party seeking preliminary relief must show . . . either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation . . . .").  This heightened requirement "reflects the idea that governmental policies implemented through legislation or regulations developed through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly."  *Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs.*, 769 F.3d 105, 110 (2d Cir. 2014) (quoting *Able v. United States*, 44 F.3d 128, 131 (2d Cir. 1995)).

In order to survive a motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678

---

[3] According to the defendants, the plaintiffs must satisfy a more demanding standard—a "clear or substantial likelihood of success on the merits"—because they seek "a mandatory injunction—that is, an injunction that disrupts the status quo."  (ECF No. 30 at 17 (quoting *Am. Soccer League, LLC v. U.S. Soccer Fed'n*, 883 F.3d 32, 37 (2d Cir. 2018).)  But the plaintiffs do not seek to alter the status quo by compelling some positive government action; rather, they want to enjoin enforcement of the Act.  Accordingly, the likelihood-of-success standard applies.  *See Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*, 152 F. Supp. 3d 90, 101 (E.D.N.Y. 2015), *aff'd in part, vacated in part*, 841 F.3d 133 (2d Cir. 2016).

(2009)) (internal quotation marks omitted).  While "detailed factual allegations" are not required, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

## DISCUSSION

In their complaint and in their motion for injunctive relief, the plaintiffs challenge the constitutionality of the Act.  First, they say that the Act's IDR process "deprives physicians of the right to a jury trial guaranteed to them by the Seventh Amendment."  (ECF No. 1 ¶ 3.) Second, they claim that the Act "deprives those physicians of property without due process of law and is therefore unconstitutional under the Fifth and Fourteenth Amendments," because it "allow[s] insurers to define the standard by which the IDR will determine out-of-network physicians' claims for the reasonable value of their services, and by precluding the physicians from billing patients for the amounts insurers refuse to pay."  (ECF No. 23 at 2.)  The defendants oppose injunctive relief and move to dismiss the complaint.  (ECF No. 29.)

## I.     The Plaintiffs' Motion for a Preliminary Injunction

In seeking injunctive relief, the plaintiffs focus exclusively on two factors—likelihood of success on the merits and irreparable harm.  They say that if enforced, the Act will violate their rights under "the Fifth, Seventh and Fourteenth Amendments," causing them irreparable injury. (ECF No. 23 at 24-25); *see Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996) ("[I]t is the *alleged* violation of a constitutional right that triggers a finding of irreparable harm." (emphasis in original)).  As explained below, the plaintiffs have not demonstrated irreparable harm or a

likelihood of success on the merits of their claims.  Nor have they established that the public interest weighs in favor of injunctive relief.

      **a.**      **The Plaintiffs' Seventh Amendment Claim**

The Seventh Amendment provides that in "suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved . . . ."  U.S. Const. amend. VII.  The Supreme Court has "consistently interpreted the phrase 'Suits at common law' to refer to 'suits in which legal rights were to be ascertained and determined, in contradistinction to those where equitable rights alone were recognized, and equitable remedies were administered.'"  *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 41 (1989) (citation omitted).  "The Seventh Amendment protects a litigant's right to a jury trial only if a cause of action is legal in nature and it involves a matter of 'private right.'"  *Id.* at 42 n.4.

The same is not true when a cause of action involves "public rights."  "[W]hen Congress creates new statutory 'public rights,' it may assign their adjudication to an administrative agency with which a jury trial would be incompatible, without violating the Seventh Amendment's injunction that jury trial is to be 'preserved' in 'suits at common law.'"  *Atlas Roofing Co. v. Occupational Safety & Health Rev. Comm'n*, 430 U.S. 442, 455 (1977).  The Supreme Court has expanded the public rights exception beyond cases arising "between the Government and persons subject to its authority in connection with the performance of the constitutional functions of the executive or legislative departments."  *Stern v. Marshall*, 564 U.S. 462, 484 (2011) (quoting *Crowell v. Benson*, 285 U.S. 22, 50 (1932)); *see also id.* at 490; *Thomas v. Union Carbide Agr. Prod. Co.*, 473 U.S. 568, 586 (1985) ("Insofar as appellees interpret [*Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982)] and *Crowell* as establishing that the right to an Article III forum is absolute unless the Federal Government is a party of record, we cannot agree."); *Granfinanciera*, 492 U.S. at 54 ("[T]he Federal Government need not

9

be a party for a case to revolve around 'public rights.'" (citation omitted)).  Instead, the question is whether "Congress, acting for a valid legislative purpose pursuant to its constitutional powers under Article I, has created a seemingly 'private' right that is so closely integrated into a public regulatory scheme as to be a matter appropriate for agency resolution with limited involvement by the Article III judiciary."  *Thomas*, 473 U.S. at 593-94; *see also Stern*, 564 U.S. at 490-91 ("The Court has continued . . . to limit the exception to cases in which the claim at issue derives from a federal regulatory scheme, or in which resolution of the claim by an expert Government agency is deemed essential to a limited regulatory objective within the agency's authority.  In other words, it is still the case that what makes a right 'public' rather than private is that the right is integrally related to particular Federal Government action.").

The parties appear to agree that the question here is whether Congress created a new public right when it enacted the No Surprises Act.  The plaintiffs assert that Congress did not.  Rather, citing their private right under New York law to bring *quantum meruit* claims against patients for the value of out-of-network services (ECF No. 23 at 12), they maintain that "Congress has no authority to deny [] the physician the right to a jury trial *de novo* on state common law claims," and that "the Act requires the parties to a private billing dispute to submit themselves to final and binding arbitration [IDR], to which neither party agreed, and which would otherwise enjoy the right to a jury trial under the Seventh Amendment."  (*Id.* at 14.)  These arguments are unpersuasive.

The IDR entity does not adjudicate payment disputes between out-of-network doctors and their patients.  Rather, the IDR entity mediates between doctors and insurers, and determines what the out-of-network providers can get from insurers.  As the plaintiffs acknowledged at oral argument, out-of-network providers have no right of action under New York law to recover

directly from health insurers.  (*See* ECF No. 30 at 23); *see also Buffalo Emergency Assocs., LLP v. Aetna Health, Inc.*, 167 A.D.3d 461, 462 (1st Dep't 2018) (dismissing providers' suit against an insurer because "the New York Emergency Services and Surprise Bills Act . . . does not provide for a private right of action to enforce its provisions").  Thus, the Act does not compel providers to arbitrate state common law claims to which they had a right to a jury trial.  Instead, as the defendants point out, "[i]n cases where the federal law applies, it is the No Surprises Act itself that creates [an out-of-network] health care provider's right to recover payments directly from a health plan or insurer (and the corresponding legal obligation of the health plan or insurer to pay a provider with whom that plan had no contractual relationship)."[4]  (ECF No. 30 at 22-23.)

The plaintiffs also argue that the Act did not create a public right to recover from insurers because it "'replace[s]' an existing state law contract claim with substantively the same claim, also sounding in contract, between the provider and the patient's insurer."[5]  (ECF No. 31 at 6.)  Quoting the Supreme Court's decision in *Thomas*, the plaintiffs state that "[t]he public rights exception is limited to circumstances in which the 'right to compensation [under a regulatory scheme] does not depend on or replace a right to such compensation under state law.'"  (*Id.* (alteration in original) (quoting *Thomas*, 473 U.S. at 584).)

The plaintiffs cite no authority, and the Court is aware of none, to support the claim that a new federal cause of action—which creates a right to recover from an entity against which the

---

[4] The Act addresses surprise billing in two discrete situations: patients who because of their acute medical condition cannot consent to being treated by an out-of-network doctor, and patients who seek treatment from an in-network doctor, and unbeknownst to the patient, an out-of-network provider participates in the patients' care.  *See* 42 U.S.C. §§ 300gg-131, 300gg-132.  Presumably, the plaintiffs have recourse to state lawsuits against patients in cases not covered by the Act.

[5] "Under New York law, a quantum meruit claim is a claim in quasi-contract."  *Fieger v. Pitney Bowes Credit Corp.*, 251 F.3d 386, 394 (2d Cir. 2001).

plaintiff previously had no cause of action—replaces a similar but distinct state cause of action involving different parties.  As the Supreme Court held in *Granfinanciera*, "Congress may fashion causes of action that are closely analogous to common-law claims and place them beyond the ambit of the Seventh Amendment by assigning their resolution to a forum in which jury trials are unavailable."  492 U.S. 33 at 52; *see also Thomas*, 473 U.S. at 584 (holding that "[a]ny right to compensation from follow-on registrants under [the regulatory scheme] results from [the Federal Insecticide, Fungicide, and Rodenticide Act] and does not depend on or replace a right to such compensation under state law").

The plaintiffs conceded at oral argument that they have no state common law cause of action against insurers to recover payment for out-of-network services, but argued the Act replaces their state law cause of action because in practice, most of their *quantum meruit* cases were against insurers, since patients usually assigned their rights to benefits to the plaintiffs.  But that practice does not create a common law cause of action.  And Congress is not precluded from creating a distinct claim for out-of-network providers against insurers and assigning the adjudication to arbitration.  "To hold otherwise would be to erect a rigid and formalistic restraint on the ability of Congress to adopt innovative measures such as negotiation and arbitration with respect to rights created by a regulatory scheme."  *Thomas*, 473 U.S. at 594.

When Congress enacted the No Surprises Act, it permitted health care providers to recover payment directly from insurers for out-of-network services, which is a new public right.  Out-of-network providers' claims against insurers do not arise under state common law, but instead depend "upon the will of [C]ongress," *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. 272, 284 (1856), and flow from a federal statutory scheme, *see Thomas*, 473 U.S. at 584-85 ("For purposes of compensation under FIFRA's regulatory scheme, however, it is the

'mandatory licensing provision' that creates the relationship between the data submitter and the follow-on registrant, and federal law supplies the rule of decision.").  Indeed, a provider's right to recover payment directly from an insurer is "completely dependent upon" the adjudication of a claim created by the Act.  *See Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 856 (1986).  The IDR process is "limited to a 'particularized area of the law,' as in *Crowell, Thomas,* and *Schor*," and the IDR entity does not have "substantive jurisdiction reaching any area of the *corpus juris*."  *Stern*, 564 U.S. at 493 (citing *Northern Pipeline*, 458 U.S. at 85).

Finally, the Act provides for a certification process that ensures, among other things, that IDR entities have "sufficient medical, legal, and other expertise and sufficient staffing to make [payment] determinations . . . on a timely basis."  42 U.S.C. § 300gg-111(c)(4)(A)(i).  For this reason, the process more closely resembles a "situation in which Congress devised an 'expert and inexpensive method for dealing with a class of questions of fact which are particularly suited to examination and determination by an administrative agency specially assigned to that task.'"  *Stern*, 564 U.S. at 494 (quoting *Crowell*, 285 U.S. at 46).  In light of these considerations, Congress's assignment of the IDR process to non-Article III tribunals does not violate the Seventh Amendment.  *Cf. id.* at 493-94 (holding that the petitioner's claim did not fall within the public rights exception because it was a state common law claim between private parties, did not depend on the will of Congress, did not flow from a statutory scheme, was not limited to a particularized area of law, and dealt with a court with substantive jurisdiction).

Because the IDR process does not violate the plaintiffs' rights under the Seventh Amendment, they cannot show irreparable harm or a likelihood of success on the merits.  *See Weisshaus v. Cuomo*, 512 F. Supp. 3d 379, 393 (E.D.N.Y. 2021).  The plaintiffs' Seventh Amendment claim for injunctive relief is denied.

### b.       The Plaintiffs' Due Process Claim

The plaintiffs claim that the Act violates their right to due process.[6]  They argue that the

"Act deprives physicians, including Plaintiffs, of their property rights to the reasonable value of

the services they have rendered without due process of law by allowing health plans to determine

the standard by which the 'independent dispute resolution process' determines physicians'

claims."  (ECF No. 31 at 13.)[7]  "In order to assert a violation of procedural due process rights, a

plaintiff must 'first identify a property right, second show that the [government] has deprived

him of that right, and third show that the deprivation was effected without due process.'"

*DeFabio v. E. Hampton Union Free Sch. Dist.*, 658 F. Supp. 2d 461, 487 (E.D.N.Y. 2009)

(quoting *Local 342, Long Island Pub. Serv. Emps. v. Town Bd. of Huntington*, 31 F.3d 1191,

1194 (2d Cir. 1994)).

According to the plaintiffs, the property interest at issue is their "cognizable property

interest in being fully and fairly compensated for services they render to their patients, both in

state court under common law, and against third-party insurers within the confines of the

---

[6] The plaintiffs appear to make claims under both the Fifth and Fourteenth Amendments.  (*See* ECF No. 1 ¶ 3 (alleging that the Act "violates the Due Process Clause of the Fifth Amendment"); *id.* at 17 (alleging that it "deprives physicians, including Plaintiffs of property without due process of law in violation of the Fourteenth Amendment"); *see also* ECF No. 23 at 10 ("The Act also violates the out-of-network physicians' rights to due process of law under the Fifth and Fourteenth Amendments.").)  "The Due Process Clause of the Fifth Amendment prohibits the United States, as the Due Process Clause of the Fourteenth Amendment prohibits the States, from depriving any person of property without 'due process of law.'"  *Dusenbery v. United States*, 534 U.S. 161, 167 (2002).  The plaintiffs assert due process claims against only federal government defendants.  Therefore, to the extent that the plaintiffs seek injunctive relief under the Fourteenth Amendment, they cannot show a likelihood of success on the merits.  *Cf. Ambrose v. City of New York*, 623 F. Supp. 2d 454, 466 (S.D.N.Y. 2009) ("Because Plaintiff's lawsuit does not allege any deprivation of his rights by the federal government, any due process claim he has against the City is properly brought under the Due Process Clause of the Fourteenth Amendment, not under that of the Fifth Amendment.").

[7] The plaintiffs base their argument that the IDR process is "controlled by the insurers" (ECF No 23 at 1) on the Act's requirement that IDR entities consider the relevant qualifying payment amount.  But insurers do not unilaterally set these rates; they negotiate them with participating providers and facilities.  *See* Requirements Related to Surprise Billing; Part I, 86 Fed. Reg. 36872, 36874 (July 13, 2021).

federally compelled IDR process."  (ECF No. 31 at 14.)  They cite a 1913 case, *McGuire v. Hughes*, 207 N.Y. 516 (1913), and *Ruppert v. Bowen*, 871 F.2d 1172 (2d Cir. 1989) for the proposition that health care providers are entitled to recover from patients the reasonable value of emergency services provided.  (ECF No. 23 at 15-16); *see McGuire*, 207 N.Y. at 522 (holding that "that a physician, in the absence of a special contract, may recover upon an implied agreement to pay for his services *quantum meruit,* when they have been rendered at the request of the patient"); *Ruppert*, 871 F.2d at 1178 ("Under New York law, an incompetent is liable under an implied agreement for the reasonable value of necessities.").  These cases do not support the plaintiffs' position that the Act must be invalidated.  *McGuire* stands for the unremarkable proposition that a doctor can sue a patient for the costs of her services "when they have been rendered at the request of the patient."  207 N.Y. at 521.  *Ruppert* had to do with the methods by which the Social Security Administration calculates benefits under the Supplemental Security Income program, not whether a provider could sue a patient for the value of emergency services to which the patient did not or could not consent.  871 F.2d at 1178.

In an effort to contrast the Act with New York's Surprise Bill Act, the plaintiffs say that providers are entitled under the New York Surprise Bill Act "to recover the 'usual and customary cost of the service.'"  (ECF No. 23 at 9 (quoting N.Y. Fin. Servs. L. § 604(f)).)  But the New York Surprise Bill Act does not create an entitlement to "the usual and customary cost of the service;" rather, it instructs IDR entities to consider it among five other factors.  *See* N.Y. Fin. Servs. L. § 604.  The plaintiffs also cite *Furlong v. Shalala*, 156 F.3d 384 (2d Cir. 1998) for the proposition that "professionals who provide services under a federal program such as Medicaid or Medicare have a property interest in reimbursement for their services at the 'duly promulgated reimbursement rate.'"  (ECF No. 31 at 14 (quoting *Furlong*, 156 F.3d at 393).)  However, in

*Furlong*, the Second Circuit focused on the providers' "property interest in being reimbursed at [Medicare's] fee schedule rate." 156 F.3d at 393.  There is no similar fee schedule in this case.

Under the New York Surprise Bill Act, it is insurers, not patients, who must pay a "reasonable amount for the services of out-of-network emergency medical providers." *Emergency Physician Servs. of N.Y. v. UnitedHealth Grp., Inc.*, No. 20-CV-9183, 2021 WL 4437166, at *2 (S.D.N.Y. Sept. 28, 2021) (citing N.Y. Fin. Servs. L. § 605(a)).  Finally, the plaintiffs cite no authority, and the Court is not aware of any, for the proposition that a health care provider's entitlement to "reasonable payment" is a cognizable property interest for the purposes of a due process claim.[8]

To the extent there is a cognizable property interest in the reasonable value of out-of-network services for the purposes of a due process claim—and that is far from clear—the plaintiffs' claim for injunctive relief is not ripe.  "As the Second Circuit has recognized, '[r]ipeness is a doctrine rooted in both Article III's case or controversy requirement and prudential limitations on the exercise of judicial authority.'" *E. End Eruv Ass'n, Inc. v. Vill. of Westhampton Beach*, 828 F. Supp. 2d 526, 536 (E.D.N.Y. 2011) (quoting *Murphy v. New Milford Zoning Comm'n*, 402 F.3d 342, 347 (2d Cir. 2005)).  "The 'basic rationale' of the ripeness doctrine 'is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements.'" *Id.* (quoting *Murphy*, 402 F.3d at 347). "Determining whether a case is ripe generally requires [the court] to 'evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'" *Id.* (quoting *Murphy*, 402 F.3d at 347 and *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967)).  "The 'fitness of issues for judicial review' requires 'a weighing of the

---

[8] The plaintiffs appear to claim that the standard for "reasonable payment" is what they customarily charge.

sensitivity of the issues presented and whether there exists a need for further factual development,' whereas the 'hardship to the parties' requires the court to 'gauge the risk and severity of injury to a party that will result if the exercise of jurisdiction is declined.'"  *E. End Eruv Ass'n*, 828 F. Supp. 2d at 536 (quoting *Murphy*, 402 F.3d at 347).

As the plaintiffs acknowledge, there is currently no live dispute about the regulations that require arbitrators to give dispositive weight to the qualifying payment amount ("QPA").  That provision of the governing regulations was vacated in *Texas Medical Association v. U.S. Department of Health and Human Services*.  No. 21-CV-425, 2022 WL 542879 (E.D. Tex. Feb. 23, 2022).  As noted above, *see supra* note 1, the defendants are in the process of publishing a new rule that will address the *Texas Medical Association* decision, and the parties agree that there is no live dispute with respect to the Rule.

Because there is no live dispute about the regulation, the plaintiffs' claim that the Act is unconstitutional because it treats the QPA as the "general standard for determining the payment to physicians" is also not ripe.[9, 10]  The plaintiffs speculate that they may suffer harm under the yet-to-be-determined regulation, claiming that Dr. Haller "expect[s] that the rates [he] and [his] Long Island Surgical colleagues submit to out-of-network health plans will generally not be the amount closest to the [QPA] under the Act."  (ECF No. 22 ¶ 10.)  They also predict that their payments under the IDR process will be less than the reasonable value of the services they provide.  But speculation about what might happen does not establish irreparable harm.  *See Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) ("To satisfy the

---

[9] As explained above, the QPA is just one of the factors that an IDR entity must consider.

[10] The plaintiffs also argue that the Act violates their due process rights because it "specifically excludes consideration of [out-of-network providers'] 'usual and customary charges.'"  (ECF No. 31 at 25 (citing 42 U.S.C. § 300gg-111(c)(5)(D)).)  As discussed above, the plaintiffs have not established that for the purposes of a due process claim, they have a cognizable property interest in recovering the usual and customary cost of their services.  Accordingly, they cannot assert a due process violation on this basis.

irreparable harm requirement, Plaintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent . . . ." (quotation marks and citation omitted)).  Because the challenged provision of the Rule has been vacated and the relevant portion of the Act cannot be enforced until the new rule's publication, it poses no hardship to the plaintiffs, and the plaintiffs face no risk of injury if the Court declines to exercise jurisdiction at this point.  Moreover, the existing record does not permit a court to determine whether the IDR process deprives the plaintiffs of due process.  At this stage, there is no evidence of IDR decisions about payment amounts, how those amounts compare to the parties' submitted offers, or the extent to which the IDR entities consider additional evidence submitted by the parties.  Accordingly, the plaintiffs' claim for injunctive relief on the basis of an alleged due process claim is not ripe.

      **c.**    **The Plaintiffs' Takings Claim**

      The Takings Clause of the Fifth Amendment provides that no private property "shall . . . be taken for public use, without just compensation."  U.S. Const. amend. V.  In the federal takings context, "to succeed in establishing a constitutional violation claimants must demonstrate: (1) that they have a property interest protected by the Fifth Amendment, (2) that they were deprived of that interest by the government for public use, and (3) that they were not afforded just compensation."  *Ganci v. N.Y.C. Transit Auth.*, 420 F. Supp. 2d 190, 195 (S.D.N.Y.), *aff'd*, 163 F. App'x 7 (2d Cir. 2005).

      "[A] party challenging governmental action as an unconstitutional taking bears a substantial burden," *Eastern Enters. v. Apfel,* 524 U.S. 498, 523 (1998) (plurality opinion), a burden made even more demanding here because the plaintiffs have not sufficiently alleged that the Act will violate their right to due process.  *See Concrete Pipe & Prods. of Calif. Inc. v. Constr. Laborers Pension Tr. for S. Calif.*, 508 U.S. 602, 641 (1993) ("Given that [the

petitioner's] due process arguments are unavailing, it would be surprising indeed to discover [that] the challenged statute nonetheless violated the Takings Clause." (citation and quotation marks omitted)); *see also In re Chateaugay Corp.*, 53 F.3d 478, 494 (2d Cir. 1995) ("Where legislation adjusting the benefits and burdens of economic life withstands due process review, 'it would be surprising indeed to discover' that Congress had thereby committed an unconstitutional taking." (quoting *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 223 (1986))).  "It is well settled that a taking may more readily be found when the interference with property can be characterized as a physical invasion by government, than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." *Chateaugay Corp.*, 53 F.3d at 496 (quoting *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 490 n.18 (1987) (internal quotation marks omitted)).  In this case, the "[No Surprises] Act entails no physical invasion of property, nor any permanent confiscation of [the plaintiffs'] assets for governmental use.  On the contrary, the [] Act squarely falls within the category of legislation that serves to adjust the benefits and burdens of economic life on behalf of the common good." *Id.* (holding that the Coal Industry Retiree Health Benefit Act of 1992 did not violate the Takings Clause).

"Before the Supreme Court's [] decision in *Knick v. Township of Scott*, 139 S. Ct. 2162 (2019), the law in the Second Circuit provided that a takings claim was not ripe unless the property owner could show 'that (1) the state regulatory entity has rendered a "final decision" on the matter, and (2) the plaintiff has sought just compensation by means of an available state procedure.'" *Sagaponack Realty, LLC v. Vill. of Sagaponack*, 778 F. App'x 63, 64 (2d Cir. 2019) (quoting *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 88 (2d Cir. 2002)).  "*Knick* eliminated the state-exhaustion requirement as 'an unjustifiable burden on

takings plaintiffs . . . .'" *Id.* (quoting *Knick*, 139 S. Ct. at 2167).  "But *Knick* leaves undisturbed the first prong, that a state regulatory agency must render a final decision on a matter before a taking claim can proceed."  *Id.* (quoting *Knick*, 139 S. Ct. at 2169).  Moreover, the Court held that "[a]s long as an adequate provision for obtaining just compensation exists, there is no basis to enjoin the government's action effecting a taking."  *Knick*, 139 S. Ct. at 2176.

The plaintiffs argue that the Act "prohibits physicians from billing their patients for the reasonable value of their services that it is not paid by the patients' insurer," and "compels physicians to bear the societal burden of the increasing cost of health care, without imposing any corresponding burden on insurers or patients or the general public;" therefore, they say, the Act "violates the Fifth Amendment's proscription against taking private property without just compensation, and it must be struck down on that basis."  (ECF No. 23 at 20-21.)

While the Act prohibits out-of-network providers from balance billing patients covered by the Act, it also gives providers a right to recover the value of the services provided directly from insurers and creates a process to adjudicate that right.  Thus, it is not evident that the prohibition against balance billing constitutes a taking under the Fifth Amendment.  "'There is no set formula to determine where [government] regulation'—as distinct from the 'paradigmatic taking' of 'direct government appropriation or physical invasion of private property,'—'ends and taking begins.'"  *District of Columbia v. Beretta U.S.A. Corp.*, 940 A.2d 163, 180 (D.C. 2008) (quoting *Goldblatt v. Hempstead*, 369 U.S. 590, 594 (1962) and *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 537 (2005)).

The Court of Appeals for the District of Columbia addressed a similar issue in *District of Columbia v. Beretta U.S.A. Corporation*, in which the plaintiffs challenged the Protection of Lawful Commerce in Arms Act ("PLCAA"), which extinguished preexisting causes of action

under state or federal law by requiring dismissal of all actions against firearms manufacturers based on a third party's criminal use of a firearm. *See* 15 U.S.C. §§ 7901-03. The plaintiffs contended that the PLCAA effected an uncompensated taking by extinguishing their causes of action against firearms manufacturers. They argued that "just compensation" would be either the damages they could prove in a hypothetical suit against the defendants or an order enjoining application of the PLCAA to their action. *Beretta U.S.A. Corp.*, 940 A.2d at 180. The court rejected this argument, ruling that even though a plaintiff could have a protectible property interest in a cause of action, that interest does not vest until the cause of action is reduced to a final judgment. *Id.* ("The 'Takings Clause prevents the Legislature from depriving private persons of *vested* property rights' without just compensation." (emphasis in original) (quoting *Landgraf v. USI Film Prod.*, 511 U.S. 244, 266 (1994))); *see also id.* (collecting cases in which courts found no takings "in Congress's abrogation of pending—but not final—causes of action"). The court explained that "'causes of action' are inchoate and 'not fully vested interests until reduced to final judgments,' and thus 'the projected economic impact on [plaintiff] is not sufficiently concrete to establish a taking." *Id.* at 181 (quoting *In re Jones Truck Lines, Inc.*, 57 F.3d 642, 651 (8th Cir. 1995)); *see also Ileto v. Glock, Inc.*, 565 F.3d 1126, 1141 (9th Cir. 2009) (holding that the PLCAA did not constitute an unconstitutional taking because the plaintiffs' "property right in any cause of action does not vest until a final unreviewable judgment is obtained" (citation omitted)).

The court also observed that "Congress left intact means by which persons injured by firearms may yet pursue civil liability against sellers or manufacturers—recourse significant to measuring 'the severity of the economic impact of the [PLCAA],'" and explained that "while Congress unmistakably took away the specific cause of action the plaintiffs have alleged, that

interference cannot be viewed 'in a vacuum,' but must be considered in the context of what Congress both did and did not do." *Id.* (quoting *Connolly*, 475 U.S. at 225); *see also id.* at 181 n.11 ("Congress, that is to say, has not worked the equivalent of a 'total deprivation of beneficial use,' in regard to redress that persons injured by firearms may have against manufacturers or sellers." (quoting *Lucas v. S. Carolina Coastal Council*, 505 U.S. 1003, 1017 (1992))).  The fact that there were alternative causes of action weighed against a finding that the PLCAA violated the plaintiffs' Fifth Amendment rights:

> The preservation of these causes of action marks an important limitation on Congress's interference with the interests of the plaintiffs (and others similarly situated) seeking redress from manufacturers or sellers for injuries from the discharge of firearms.  That limitation reinforces our conclusion that regulation did not "end" and taking "begin," when Congress abolished qualified civil liability actions, including the plaintiffs'.

*Id.* at 182 (quoting *Goldblatt*, 369 U.S. at 594); *see also Ileto*, 565 F.3d at 1141 (holding that the PLCAA did not violate the Takings Clause and other constitutional rights); *City of New York v. Beretta U.S.A. Corp.*, 524 F.3d 384, 390 (2d Cir. 2008) (affirming the PLCAA's constitutionality on other grounds); *Est. of Charlot v. Bushmaster Firearms, Inc.*, 628 F. Supp. 2d 174, 184 (D.D.C. 2009) (same).

For similar reasons, the Act's elimination of the plaintiffs' state common law cause of action against patients in the surprise billing context does not constitute an uncompensated taking.  The plaintiffs do not point to any *quantum meruit* claims against patients that have been dismissed because of the Act's prohibition against balance billing, and thus reduced to a final judgment.  And, they do not have a vested property interest in a future cause of action that might serve as the basis for a takings claim.  Even if there were a vested interest, Congress limited the economic impact on providers by giving them the right to recover the value of their services directly from insurers, and established the negotiation and IDR process to adjudicate that right.

Because the plaintiffs have an avenue to obtain payment for their services, "regulation did not

end and taking begin" when Congress eliminated the plaintiffs' state common law cause of

action against patients.[11]

In short, the Act does not constitute a taking under the Fifth Amendment, so the plaintiffs

cannot show irreparable harm or a likelihood of success on the merits.  The plaintiffs' takings

claim for injunctive relief is denied.

### d.    Balance of Hardships and the Public Interest

The plaintiffs addressed the public interest factor in their reply brief.[12]  They maintain

that enforcement of an unconstitutional law is inherently contrary to the public interest.  (ECF

No. 31 at 32-33.)  "The Second Circuit has concluded that, where a plaintiff alleges

constitutional violations, the balance of hardships tips decidedly in the plaintiff's favor despite

arguments that granting a preliminary injunction would cause financial or administrative burdens

on the Government."  *Sajous v. Decker*, No. 18-CV-2447, 2018 WL 2357266, at *13 (S.D.N.Y.

May 23, 2018) (citing *Mitchell v. Cuomo*, 748 F.2d 804, 808 (2d Cir. 1984)); *see also Averhart v.*

*Annucci*, No. 21-CV-383, 2021 WL 2383556, at *16 (S.D.N.Y. June 10, 2021).  However, as

discussed above, the plaintiffs have not sufficiently alleged that the Act violates their

constitutional rights.

As the defendants point out, by enacting the No Surprises Act, Congress balanced the

relevant interests; it "determined that protecting patients from surprise medical bills would

greater serve the public interest than allowing [out-of-network] providers to sue their patients

---

[11] Indeed, the Act has formalized a practice that was already in existence.  As noted above and as the plaintiffs explained at oral argument, it is routine for patients to assign their rights to benefits to providers, which negotiate payment amounts with the patients' insurers.

[12] The public interest and the balance of hardships factors "merge when the Government is the opposing party."  *Nken v. Holder*, 556 U.S. 418, 435 (2009).

directly for potentially ruinous medical bills," and created a method for out-of-network providers to recover directly from insurers.  (ECF No. 30 at 40.)  Accordingly, the plaintiffs have not shown that a preliminary injunction would be in the public's interest, and this factor weighs against injunctive relief.

## II.    The Defendants' Motion to Dismiss

The Court denies the plaintiffs' motion for a preliminary injunction in part because the Act does not violate their constitutional rights.  For the same reasons, the defendants' motion to dismiss the plaintiffs' Seventh Amendment and takings claims is granted.  *See Evans v. Port Auth. of N.Y. & N.J.*, No. 15-CV-3942, 2017 WL 3396444, at *7 (E.D.N.Y. Aug. 8, 2017) ("den[ying] Plaintiffs' motion for a preliminary injunction for the same reason that it grant[ed] the [defendant's] motion to dismiss").

As explained above, *supra see* Section I.b, the plaintiffs' due process claim is not ripe. "To be justiciable, a cause of action must be ripe—it must present a real, substantial controversy, not a mere hypothetical question."  *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 687 (2d Cir. 2013) (citation and quotation marks omitted).  "A claim is not ripe if it depends upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'"  *Id.* (quoting *Thomas*, 473 U.S. at 580).  "[R]ipeness overlaps with standing: the former is essentially 'a specific application of the actual injury aspect of Article III standing.'"  *SC Note Acquisitions, LLC v. Wells Fargo Bank, N.A.*, 548 F. App'x 741, 742 (2d Cir. 2014) (quoting *Nat'l Org. for Marriage, Inc.*, 714 F.3d at 688).  Because the Rule was vacated in *Texas Medical Association*

and the new rule is forthcoming, there is no way to determine whether an IDR process deprives the plaintiffs' of the reasonable value of services provided.[13]

The plaintiffs do not allege that they have participated in an arbitration, much less that the IDR process resulted in a payment amount below the reasonable value.  At the time of oral argument—almost six months after the Act went into effect—the plaintiffs could not say whether they had participated in the IDR process.  They do not allege that the IDR process has caused any concrete harm, so their claims of constitutional injury are speculative.  Accordingly, they have no standing to assert the claim.  It must be dismissed for lack of subject matter jurisdiction.[14]

---

[13] As noted above, it is not clear that the plaintiffs have such a cognizable property interest.  However, because their due process claim is not ripe for judicial review, I do not decide this issue.

[14] At oral argument, the plaintiffs requested leave to file an amended complaint because they have provided out-of-network services since December 31, 2021.  The plaintiffs could not confirm, however, that they had participated in the IDR process.  Amending the complaint would be futile, in any case, because the defendants have not yet published the new rule governing the IDR process.  *See Bild v. Konig*, No. 09-CV-5576, 2014 WL 3015236, at *6 (E.D.N.Y. July 3, 2014) ("One appropriate basis for denying leave to amend is that the proposed amendment is futile.").

**CONCLUSION**

The plaintiffs' motion for preliminary injunction is denied.  The plaintiffs' Seventh

Amendment and takings claims are dismissed with prejudice.  Their due process claim is unripe

and is dismissed for lack of subject matter jurisdiction without prejudice.


**SO ORDERED.**

s/Ann M. Donnelly

_____

ANN M. DONNELLY
United States District Judge


Dated: Brooklyn, New York
August 10, 2022